**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE AKORN, INC. SECURITIES LITIGATION | Case No. 15-CV-01944 |
| | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | Judge Gary Feinerman |
| | CLASS ACTION |
| | **JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

I.  NATURE AND OVERVIEW OF THE ACTION ............................................................... 1

II.  JURISDICTION AND VENUE ...................................................................................... 5

III.  PARTIES ......................................................................................................................... 5

    A.  Plaintiff (Akorn Investor Group) ......................................................................... 5

    B.  Defendants ............................................................................................................ 6

IV.  BACKGROUND .............................................................................................................. 7

    A.  Akorn's Business ................................................................................................. 7

    B.  Akorn's Acquisitions of Hi-Tech and VersaPharm ............................................ 9

    C.  Akorn's Relevant Accounting Policies .............................................................. 10

    D.  Relevant Accounting Standards ........................................................................ 12

    E.  Relevant Internal Control Standards ................................................................. 15

V.  SUBSTANTIVE ALLEGATIONS ................................................................................. 18

    A.  Overview of Akorn's Accounting Fraud ........................................................... 18

    B.  Akorn's Internal Control Suffered from Material Weaknesses in 2012, 2013, 2014, and 2015 ................................................................................................... 23

    C.  Akorn's Failure to Timely Integrate Its Acquisitions' Accounting Systems ........ 32

    D.  Akorn's  Process for Calculating for Chargebacks and Net Revenue ................. 34

    E.  Akorn's Grossly Inadequate Internal Controls ................................................. 39

    F.  The Revelation of Akorn's Accounting Fraud and Its Aftermath ........................ 42

VI.  MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ............................................................................................................ 46

    A.  Akorn Announces 2014 First Quarter Financial Results ...................................... 46

    B.  Akorn Announces the Acquisition of VersaPharm ............................................... 49

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

C. Akorn Announces 2014 Second Quarter Financial Results.................................. 50

D. Akorn Announces the Completion of the VersaPharm Acquisition.................... 54

E. Akorn Announces 2014 Third Quarter Financial Results..................................... 54

F. Akorn Participates in the J.P. Morgan Healthcare Conference ........................... 59

G. Akorn Announces 2014 Fourth Quarter and Full Year 2014 Financial Results... 60

VII. THE REVELATION OF THE TRUTH ABOUT AKORN'S INACCURATE FINANCIAL RESULTS.................................................................................................. 65

A. The Truth Begins to Emerge................................................................................. 65

B. The Full Truth Emerges: Disclosures at the End of the Class Period.................. 71

C. Post Class Period Disclosures: Akorn Issues Its Restatement ............................. 73

VIII. AKORN'S VIOLATIONS OF GAAP RULES IN ITS FINANCIAL STATEMENTS FILED WITH THE SEC.................................................................................................. 76

IX. CLASS ACTION ALLEGATIONS ................................................................................. 78

X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)..................................................................................................................... 80

XI. LOSS CAUSATION........................................................................................................ 82

XII. ADDITIONAL SCIENTER ALLEGATIONS................................................................ 84

XIII. NO SAFE HARBOR ...................................................................................................... 88

XIV. CLAIMS FOR RELIEF .................................................................................................. 88

XV. PRAYER FOR RELIEF .................................................................................................. 93

XVI. JURY TRIAL DEMAND ............................................................................................... 93

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1.     Lead Plaintiff Akorn Investor Group (consisting of Lead Plaintiff members Mikolaj Sarzynski, Jonathan A. Golani, Kenny Kinsey, J. Michael Cuniff Jr., and Elizabeth Cuniff) ("Plaintiff"), by and through its attorneys, brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all other similarly situated purchasers of the securities of Akorn, Inc. ("Akorn" or the "Company") from May 6, 2014, through April 24, 2015, inclusive (the "Class Period").

2.     Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, the independent investigation of court-appointed Lead Counsel Glancy Prongay & Murray LLP and Pomerantz LLP.  This included, without limitation, a review and analysis of: (a) Akorn's public filings with the SEC; (b) press releases and media reports issued and disseminated by Akorn; (c) public statements, documents, conference calls and announcements issued and disseminated by the Company, Rajat Rai, and Timothy A. Dick (collectively, "Defendants"); (d) securities analysts' reports and advisories about the Company; (e) interviews with certain former Akorn employees, as well as former employees of related relevant entities; and (f) review of other publicly available information concerning Akorn, including information readily obtainable on the Internet.

I.     **NATURE AND OVERVIEW OF THE ACTION**

3.     Akorn is a specialty pharmaceutical company that develops, manufactures, and markets generic and branded prescription pharmaceuticals, branded and private-label over-the-counter consumer health products, and animal health pharmaceuticals.  Akorn is also the parent corporation of two wholly-owned subsidiaries: Hi-Tech Pharmacal Co., Inc. ("Hi-Tech"), and

VPI Holdings Corp. ("VPI"), which is the parent company of VersaPharm Incorporated ("VersaPharm"). Akorn completed the acquisition of Hi-Tech on April 17, 2014 for $640 million, and completed the acquisition of VPI/VersaPharm on August 12, 2014 for $440 million.

4.      During the Class Period, Defendants materially misstated the financial results that Akorn issued for each quarter in fiscal year 2014. The Company's financial results were materially misstated due to accounting violations that primarily related to understatements of rebates, chargebacks, and other contractual allowances that must be estimated and reserved. These reserves are then deducted from gross revenue to calculate net revenue.

5.      Specifically, Defendants: (1) overstated Hi-Tech's chargeback reserve by $8.9 million and improperly shifted that overstatement from the balance sheet to the income statement, thereby artificially inflating its net revenue by $8.9 million for the 2014 second quarter; (2) understated the pipeline reserve in 2014 by failing to accurately take into account all potential downstream rebate obligations, resulting in an overstatement of net revenue of $10.5 million in 2014; (3) understated gross to net revenue reserves in 2014 by failing to estimate certain revenue deductions – namely rebates, bill-backs, failure to supply, price protection penalties, and other contractual adjustments – resulting in an overstatement of net revenue of $21.0 million in 2014; and (4) improperly recognized $2.9 million of revenue for a portion of a transaction with a certain customer in the fourth quarter of 2014, despite the absence of sufficient evidence to substantiate it.

6.      Additionally, throughout the Class Period, Defendants failed to implement and enforce adequate internal controls. From 2012 through 2015, three independent audit firms audited Akorn's internal control over financial reporting. Each time, with management's concurrence, the independent auditor determined that the Company's internal controls were

ineffective and suffered from material weaknesses; and each time, Akorn's senior management represented that it was committed to closely monitoring remediation efforts, which were set forth in detailed Remediation Plans in 2013, 2014, and 2015.

7.     Nevertheless, by the end of 2015, Akorn had failed to remediate the critical material weaknesses that were identified during the 2013 year-end audit—the absence of controls designed to validate the completeness and accuracy of data, leading to errors in the data used to calculate gross to net revenue adjustments. The Company had also failed to remediate a critical material weakness identified during the 2014 year-end audit—the absence of an adequate process or appropriate controls to prevent or detect material errors in the financial statements of its acquired subsidiaries, which also led to errors in the calculation of gross to net revenue adjustments.

8.     This failure to remediate the material weaknesses in its internal controls was all the more egregious given that the Company closed two significant acquisitions in 2014, Hi-Tech and VersaPharm, which made remediating the deficiencies even more important.  Yet, the acquisitions of Hi-Tech and VersaPharm compounded Akorn's existing accounting violations and weak internal controls.  In fact, Akorn was unable to timely integrate its accounting system with those of its new acquisitions, which resulted in inaccuracies in the reserve accounts at Hi-Tech and VersaPharm.

9.     Numerous former employees of Akorn, as well as former employees of Hi-Tech and VersaPharm, detail: (i) Akorn's failure to timely integrate its accounting system with those of its new acquisitions; (ii) Akorn's grossly inadequate internal control over financial reporting and Defendants' knowledge thereof; and (iii) Akorn's flawed process for calculating

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

chargebacks and net revenue, leading to incomplete and incorrect data underlying the Company's gross to net revenue calculations.

10.     The truth about Akorn's misstated financial results and weak internal controls emerged through a series of partial corrective disclosures.  First, on March 2, 2015, the Company notified the SEC that the filing of its 2014 annual report would be delayed.  Second, on March 17, 2015, the Company announced that it would restate its financial results for the 2014 second and third quarters due to an error in Hi-Tech's opening balance sheet, which overstated its chargeback reserve by $8.9 million as of April 17, 2014.  Finally, after the market close on April 24, 2015, the Company announced that its financial results for the second, third, and fourth quarters, as well as the 2014 annual year, should no longer be relied upon due to errors related to the understatement of rebates and other sales allowances that resulted in an overstatement of net revenue.  The Company also announced that it would be restating the affected periods, and that based upon an initial assessment, it believed its net revenue and pretax income from continuing operations was overstated by $20 million to $35 million for the year ending December 31, 2014.

11.     In reaction to Defendants' disclosures after the market close on March 2, 2015, shares of Akorn decline $4.38 per share, or more than 8%, to close on March 3, 2015 at $49.33.  In reaction to Defendants' disclosures after the market close on April 24, 2015, on the next trading day, shares of Akorn plummeted $12.14 per share – approximately 22% – on heavy trading volume, to close at $43.10 per share on April 27, 2015.

12.     After the Class Period ended, on May 10, 2016, Akorn restated its consolidated financial statements a second time for each quarter during the 2014 fiscal year.  In total, the Company disclosed that it artificially inflated its revenue 8.4% and its net income a staggering *194.7%*.  As a result if the Restatement (which is defined as the combined first restatement on

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

March 17, 2015 and second restatement on May 10, 2016), $46.9 million of revenue and $27.0 million of net income evaporated. Indeed, the Restatement wiped out the vast majority of the Company's net income originally reported during the year, reducing it from $40.9 million to just $13.9 million. Akorn also admitted to continuing material weaknesses in its internal controls, which the Company hoped to remediate by early 2017.

## II.    JURISDICTION AND VENUE

13.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

15.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, Akorn's principal executive offices are located within this Judicial District.

16.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Plaintiff (Akorn Investor Group)

17.     Lead Plaintiff Member Mikolaj Sarzynski, as set forth in his previously-filed certification (Dkt. No 21-3), which is incorporated by reference herein, purchased Akorn common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.     Lead Plaintiff Member Jonathan A. Golani, as set forth in his previously-filed certification (Dkt. No 29-2), which is incorporated by reference herein, purchased Akorn common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19.     Lead Plaintiff Member Kenny Kinsey, as set forth in his previously-filed certification (Dkt. No 21-3), which is incorporated by reference herein, purchased Akorn common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20.     Lead Plaintiff Member J. Michael Cuniff Jr, as set forth in his previously-filed certification (Dkt. No 21-3), which is incorporated by reference herein, purchased Akorn common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

21.     Lead Plaintiff Member Elizabeth Cuniff, as set forth in her previously-filed certification (Dkt. No 21-3), which is incorporated by reference herein, purchased Akorn common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**B.      Defendants**

22.     Defendant Akorn is a Louisiana corporation with its principal executive offices located at 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.  Throughout the Class

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Period, Akorn common stock was actively traded on the NASDAQ Global Select Market ("NASDAQ") under the symbol AKRX.

23.     Defendant Rajat Rai ("Rai") was, at all relevant times, Chief Executive Officer ("CEO") and a director of Akorn. He became Interim CEO on March 2, 2009, was appointed permanent CEO on May 21, 2010, and he remains in that position at present.

24.     Defendant Timothy A. Dick ("Dick") was Chief Financial Officer ("CFO"), Principal Financial Officer, and Principal Accounting Officer of Akorn from June 15, 2009 through August 3, 2015, when he tendered his resignation, effective immediately.

25.     Defendants Rai and Dick are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Akorn's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

IV.     **BACKGROUND**

      **A.     Akorn's Business**

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

26.     Akorn is a specialty pharmaceutical company that develops, manufactures, and markets generic and branded prescription pharmaceuticals, branded and private-label over-the-counter consumer health products, and animal health pharmaceuticals.  In April 2015, JP Morgan reported that the prescription pharmaceuticals segment of Akorn's business accounted for approximately 92% of the Company's sales, while over-the-counter consumer health care products and animal health pharmaceuticals accounted for approximately 8%.  Akorn specializes in difficult-to-manufacture dosage forms, such as ophthalmics, injectables, oral liquids, otics, topicals, inhalants, and nasal sprays.  Historically, injectables, ophthalmology, and dermatology have been considered very attractive markets due to significant regulatory and manufacturing hurdles, which limit competitors.

27.     Akorn's customers include ophthalmologists, optometrists, physicians, veterinarians, hospitals, clinics, wholesalers, distributors, retail pharmacy chains, group purchasing organizations, and other pharmaceutical companies.

28.     Although Akorn sells some products *directly* to retinal surgeons, ophthalmologists, and hospitals through its field sales team(s), most parties elect to have their contracts with Akorn managed through wholesalers that buy the product from Akorn and subsequently sell it to the third party (also referred to as the "end user").  End users are typically retailers, pharmacies, and hospitals.  This distribution channel is referred to as the "wholesale channel."

29.     Overall, a significant portion of Akorn's gross and net sales, as well as its accounts receivable for the 2014 fiscal year, occurred in the Company's wholesale channel, with three large wholesale drug distributors – AmerisourceBergen Corporation, Cardinal Health, Inc., and McKesson Corporation – accounting for approximately 76.9% of gross sales, 61.9% of net

revenue, and 85.0% of gross accounts receivable in the 2014 fiscal year.

30.     To maintain standard pricing between wholesalers, Akorn enters into contractual agreements to sell wholesalers certain products at predetermined prices, which is referred to as the Wholesaler Acquisition Price ("WAP").  Accordingly, while wholesalers are responsible for managing third parties' contracts with Akorn to receive products at predetermined prices, the wholesalers themselves are also subject to contractual agreements to purchase these products from Akorn at the agreed upon WAP.  If the wholesaler sells a product to a third party for a predetermined price that is less than the WAP, then Akorn pays the wholesaler the difference. This payment from Akorn to the wholesaler is referred to as a "chargeback" or "billback."

B.     **Akorn's Acquisitions of Hi-Tech and VersaPharm**

31.     On August 27, 2013, Akorn announced that it had entered into a definitive agreement to acquire Hi-Tech for $640 million cash. Hi-Tech is a specialty pharmaceutical company that develops, manufactures, and markets generic and branded prescription and over-the-counter products. Hi-Tech specializes in difficult to manufacture liquid and semi-solid dosage forms and produces and markets a range of oral solutions and suspensions, as well as topical ointments and creams, nasal sprays, otics, sterile ophthalmics, and sterile ointments and gel products.

32.     On April 17, 2014, Akorn announced that it had completed the acquisition of Hi-Tech, and that its "priority now turn[ed] to executing on [its] integration plan."  Under the terms of the merger agreement, Hi-Tech continued as a surviving corporation and became a wholly owned subsidiary of Akorn.

33.     On May 9, 2014, Akorn also announced that it had entered into a definitive agreement with VPI Holdings Corp. ("VPI") to acquire VPI, together with its wholly owned

subsidiary VersaPharm, for $440 million in cash. VersaPharm develops and markets multi-source prescription pharmaceuticals, and has a focus in the niche therapeutic categories of dermatology, tuberculosis, and hemophilia.

34.     On August 12, 2014, Akorn announced that it had completed its acquisition of VPI/VersaPharm, and highlighted the "straightforward integration process" of VPI/VersaPharm. Under the terms of the merger agreement, VPI continued as a surviving corporation and became a wholly owned subsidiary of Akorn.

### C.     Akorn's Relevant Accounting Policies

35.     In its 2014 Form 10-K filed on March 17, 2015, Akorn disclosed its accounting policies regarding revenue recognition, chargeback and rebates as follows:

> *Revenue Recognition:* Revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the sales price is fixed or determinable, and collectability is reasonably assured. Revenues from product sales are recognized when title and risk of loss have passed to the customer.

> Provision for estimated chargebacks, rebates, discounts, managed care rebates, product returns and doubtful accounts is made at the time of sale and is ***analyzed and adjusted, if necessary, at each balance sheet date***.

> *Allowance for Chargebacks and Rebates:* The Company enters into contractual agreements with certain third parties such as hospitals, group-purchasing and managed care organizations to sell certain products at predetermined prices. The parties have elected to have these contracts administered through wholesalers that buy the product from the Company and subsequently sell it to these third parties. ***When a wholesaler sells products to one of these third parties that are subject to a contractual price agreement, the difference between the price paid to the Company by the wholesaler and the price under the specific contract is charged back to the Company by the wholesaler. The Company tracks sales and submitted chargebacks by product number and contract for each wholesaler. Utilizing this information, the Company estimates a chargeback percentage for each product and records an allowance as a reduction to gross sales when the Company records its sale of the products.*** The Company reduces the chargeback allowance when a chargeback request from a wholesaler is processed. Actual chargebacks processed by the Company can vary materially from period to period based upon actual sales volume through the wholesalers. However, the

Company's provision for chargebacks is fully reserved for at the time when sales revenues are recognized.

*Management obtains certain wholesaler inventory reports to aid in analyzing the reasonableness of the chargeback allowance. The Company assesses the reasonableness of its chargeback allowance by applying the product chargeback percentage based on historical activity to the quantities of inventory on hand at the wholesaler per the wholesaler inventory reports. In accordance with its accounting policy, the Company estimates the percentage amount of wholesaler inventory that will ultimately be sold to third parties that are subject to contractual price agreements based on a trend of such sales through wholesalers. The Company uses this percentage estimate until historical trends indicate that a revision should be made.* On an ongoing basis, the Company evaluates its actual chargeback rate experience, and new trends are factored into its estimates each quarter as market conditions change.

Similarly, the Company maintains an allowance for rebates related to contract and other programs with certain customers. Rebate percentages vary by product and by volume purchased by each eligible customer. The Company tracks sales by product number for each eligible customer and then applies the applicable rebate percentage, using both historical trends and actual experience to estimate its rebate allowance. *The Company reduces gross sales and increases the rebate allowance by the estimated rebate amount when the Company sells its products to its rebate-eligible customers.* The Company reduces the rebate allowance when it processes a customer request for a rebate. *At each balance sheet date, the Company analyzes the allowance for rebates against actual rebates processed and makes necessary adjustments as appropriate.* Actual rebates processed can vary materially from period to period.

*     *     *

*Advertising and Promotional Allowances to Customers:* The Company routinely sells its consumer health products to major retail drug chains. From time to time, the Company may arrange for these retailers to run in-store promotional sales of the Company's products. *The Company reserves an estimate of the dollar amount owed back to the retailer, recording this amount as a reduction to revenue at the later of the date on which the revenue is recognized or the date the sales incentive is offered.* When the actual invoice for the sales promotion is received from the retailer, the Company adjusts its estimate accordingly. *Advertising and promotional expenses paid to customers are expensed as incurred in accordance with Accounting Standards Codification ("ASC") 605-50, Customer Payments and Incentives.*

(Emphasis added.)

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

### C.    Relevant Accounting Standards

36.    Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures in accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

37.    According to GAAP and SEC regulations, revenue generally is realized or realizable and earned when all of the following criteria are met:

- persuasive evidence of an arrangement exists;

- delivery has occurred or services have been rendered;

- the seller's price to the buyer is fixed or determinable; and

- dollectability is reasonably assured.

Accounting Standards Codification ("ASC") 605-10-S99.

38.    Consideration provided by a vendor to a customer is generally presumed to be a reduction of the selling prices and is reported as a reduction of revenue:

> Consideration [i]ncludes items that the customer can apply against trade amounts owed to the vendor. Consideration may take a variety of different forms including cash payments by a vendor to a customer, credits that the customer can apply, equity instruments of the vendor (regardless of whether a measurement date has been reached), and free products or services given to the customer by the vendor. Consideration may be referred to by terms such as sales incentives, discounts, coupons, rebates, price reductions, and so forth.

ASC 605-50-20.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Cash consideration[1] (including a sales incentive) given by a vendor to a customer is presumed to be a reduction of the selling prices of the vendor's products or services and, therefore, shall be characterized as a reduction of revenue when recognized in the vendor's income statement. That presumption is overcome and the consideration should be characterized as a cost incurred if, and to the extent that, both of the following conditions are met:

    a.  The vendor receives, or will receive, an identifiable benefit (goods or services) in exchange for the consideration. In order to meet this condition, the identified benefit must be sufficiently separable from the recipient's purchase of the vendor's products such that the vendor could have entered into an exchange transaction with a party other than a purchaser of its products or services in order to receive that benefit.

    b.  The vendor can reasonably estimate the fair value of the benefit identified under the preceding condition. If the amount of consideration paid by the vendor exceeds the estimated fair value of the benefit received, that excess amount shall be characterized as a reduction of revenue when recognized in the vendor's income statement.

ASC 650-50-45-2. The separability aspect generally will require slotting fees and similar product development or placement fees to be characterized as a reduction of revenue. Buydowns could never meet the separability aspect of the condition and, therefore, should always be characterized as a reduction of revenue. ASC 650-50-45-4.[2]

       39.    A company is required to follow accounting guidance for loss contingencies in determining the amount of consideration to be reported. GAAP defines a loss contingency to be

---

[1] GAAP defines cash consideration primarily as "cash payments and credits that the customer can apply against trade amounts owed to the vendor." ASC 650-50-20.

[2] Buydowns are defined as "vendor reimbursements to a reseller or retailer up to a specified amount for shortfalls in the sales price received by the retailer for the vendor's products over a specified period of time. Buydown programs generally involve a vendor agreeing to reimburse, compensate, or issue credit memos to a reseller or retailer for the retailer's decreased revenue per unit for specific products during a specified promotion period. In contrast to cooperative advertising, buydown programs generally require no expenditures by the retailer for advertising or promotion. Other related forms of vendor consideration to a retailer include, but are not limited to, shortfalls, factory incentives, dealer holdbacks, price protection, and factory-to-dealer incentives." ASC 650-50-20.

"an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur. The term loss is used for convenience to include many charges against income that are commonly referred to as expenses and others that are commonly referred to as losses." ASC 450-10-20. A loss contingency is accrued in the company's books and records if both of the following conditions are met:

- the information is available before the financial statements are issued or are available to be issued indicates that is its **probable** that an asset had been impaired or a liability had been incurred at the date of the financial statements, and

- the amount of loss can be reasonably estimated.

ASC 450-20-25-2.

40.    GAAP states that "when . . . information available indicates that the estimated amount of loss is within a range of amounts, it follows that some amount of loss has occurred and can be reasonably estimated." ASC 450-20-25-5. "If some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued." ASC 450-20-30-1.

41.    SEC Regulation G applies to any entity required to file reports pursuant to Sections 13(a) or 15(d) of the Exchange Act (other than a registered investment company) that discloses a "non-GAAP financial measure," whether the disclosure is made in a press release, analyst call, SEC filing or other communication. A company making such disclosure must:

- present as part of the disclosure or release the most directly comparable financial measure calculated and presented in accordance with GAAP; and

-  reconcile the differences between the non-GAAP financial measure and the "most directly" comparable GAAP measure.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Regulation G expressly prohibits adjusting a non-GAAP performance measure to eliminate or smooth items identified as non-recurring, infrequent or unusual, when the nature of the charge or gain is such that it is reasonably likely to recur within two years or there was a similar charge or gain within the prior two years.

      **D.**      **Relevant Internal Control Standards**

      42.     Management plays a critical role in the operation and growth of a company, such as establishing the internal control environment within which employees function. The Committee of Sponsoring Organizations ("COSO") of the Treadway Commission Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. COSO Report, Executive Summary.

      43.     To prepare financial statements in conformity with GAAP, management's responsibility is acknowledged in a set of standards known as generally accepted auditing standards ("GAAS"). COSO Report, Executive Summary. GAAS outlines the responsibilities of an auditor, but also explains that management is responsible for its own financial reporting:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. ***Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control*** that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, ***the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***.

AU §110.03 (emphasis added).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

44.     It is also management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records.  Companies are required by the SEC to maintain books and records in sufficient detail to reflect the transactions of the Company and prepare financial statements in accordance with GAAP.  Section 13(b) 2 of the Exchange Act, entitled *Periodical and Other Reports*, states the following with respect to books and records and internal controls:

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:
>
> A.     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> B.     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that–
>
> > i.     transactions are executed in accordance with management's general or specific authorization;
> >
> > ii.     transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
> >
> > iii.     access to assets is permitted only in accordance with management's general or specific authorization; and
> >
> > iv.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

45.     Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

46.     The term "reliable" as used in the COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAS and regulatory requirements. Reliability of financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

47.     Internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, is a process designed by, or under the supervision of, the CEO and CFO and is effected by the Board of Directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. GAAP.  Internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with US GAAP, and that the receipts and expenditures of the Company are being made only in accordance with appropriate authorization of management and the board of directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

48.     Everyone in an organization has responsibility for internal controls.  However, the chief executive officer sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment.  "In any organization, 'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system. . . .  The influence of the CEO on an entire organization cannot be overstated."  COSO Report, Chapter 8,

p. 84. The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Overview of Akorn's Accounting Fraud

49.     Akorn materially misstated the financial results that it originally issued for each quarter in fiscal year 2014. In total, the Company has disclosed that it artificially inflated its revenue 8.4% and its net income a staggering ***194.7%***. As a result of the Restatement, $46.9 million of revenue and $27.0 million of net income evaporated. Indeed, the Restatement wiped out the vast majority of the Company's net income originally reported during the year, reducing it from $40.9 million to just $13.9 million. The table below summarizes the massive impact of the Restatement (in millions of dollars):

|  | Originally Reported (a) | After First Restatement | After Second Restatement (b) | Total Adjustment (c = a - b) | Percentage Overstated (c / b) |
|---|---|---|---|---|---|
| Revenue | | | | | |
| -- 1Q | 90.622 | n/a | 90.622 | -0.000 | n/a |
| -- 2Q | 150.749 | 141.896 | 133.872 | -16.877 | 12.6% |
| -- 3Q | 132.732 | n/a | 127.698 | -5.034 | 3.9% |
| -- 4Q | 227.828 | n/a | 202.856 | -24.972 | 12.3% |
| -- Total | 601.931 | n/a | 555.048 | -46.883 | 8.4% |
| Net Income | | | | | |
| -- 1Q | 9.828 | n/a | 9.494 | -0.334 | 3.5% |
| -- 2Q | 8.506 | 2.935 | -1.256 | -9.762 | 777.2% |
| -- 3Q | -11.650 | n/a | -12.333 | +0.683 | -5.5% |
| -- 4Q | 34.232 | n/a | 17.979 | -16.253 | 90.4% |
| -- Total | 40.916 | n/a | 13.884 | -27.032 | 194.7% |

50.     Akorn's accounting violations allowed the Company to beat Wall Street

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

consensus revenue estimates for the second quarter of 2014 ($150.7 million as originally reported > $145.2 million consensus > $133.9 million as restated) and the fourth quarter of 2014 ($227.8 million as originally reported > $218.9 million consensus > $202.9 million as restated).[3]

51.    Moreover, the accounting violations allowed the Company to meet the annual revenue guidance it issued on August 5, 2014 of $580 million to $600 million, compared to $601 million as originally reported and $555.0 million as restated.[4]

52.    Generally, a restatement is "the process of revising previously issued financial statements to reflect the correction of an *error* in those financial statements." ASC 250-10-20 (emphasis added). An "error" is defined as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or *oversight or misuse of facts that existed at the time the financial statements were prepared*. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error." ASC-10-20 (emphasis added). In contrast to a restatement, a change in estimate "result[s] from *new information*." ASC-10-20 (emphasis added).

53.    Akorn's Restatement is an admission that the Company's originally-issued financial statements for the first, second, and third quarters of 2014 and fiscal year 2014 contained material errors at the time they were issued. Further, by definition the Restatement did not occur due to new information coming to light, but instead resulted from errors relating to facts existing at the time.

54.    In short, while making its gross to net revenue calculations, Akorn failed to make

---

[3] Consensus Wall Street estimates were obtained from Bloomberg.

[4] According to Akorn's press release dated August 5, 2014, its annual guidance incorporated projected revenue resulting from the VersaPharm acquisition. The guidance assumed a mid-August close for the acquisition; the close occurred by August 12, 2014.

the necessary revenue deductions in accordance with GAAP and its own accounting policies. The Company's accounting violations primarily related to understatements of rebates, chargebacks, and other contractual allowances that must be estimated and reserved. An increase in the reserve for rebates and chargebacks (an asset on the balance sheet) decreases net revenue by the same amount. Consistent with the Restatement, Akorn's accounting violations fall into four categories.

55.     *Category A: Overstatement of Revenue Due to Hi-Tech Reserve.* In the first restatement issued on March 17, 2015, Akorn disclosed that it had overstated revenue in the second quarter due to miscalculations relating to Hi-Tech's chargeback reserve. In the fair value allocation of assets acquired in connection with the acquisition of Hi-Tech, Akorn overstated Hi-Tech's chargeback reserve by $8.9 million as of April 17, 2014, the date that the acquisition closed. According to Akorn, it subsequently calculated Hi-Tech's chargeback reserve correctly as of June 30, 2014, the end of the second quarter, resulting in the earlier overstated reserve amount being included in the reported revenue for that quarter. In other words, after overstating Hi-Tech's chargeback reserve by $8.9 million, Akorn improperly shifted that overstatement from the balance sheet to the income statement, thereby artificially inflating its net revenue by $8.9 million in the second quarter.

56.     *Category B: Understatement of Pipeline Reserve.* In the second restatement issued on May 10, 2016, Akorn disclosed that it understated the pipeline reserve in 2014. The "pipeline reserve" is the rebate reserve for products in the wholesale channel, and "downstream rebate obligations" are rebate obligations that Akorn assumes after the product leaves the Company and is transmitted through the wholesale channel to the end user. All downstream rebate obligations must be estimated and included in the pipeline reserve. Akorn has

acknowledged that it failed to accurately take into account all potential downstream rebate obligations, resulting in an understated pipeline reserve and an overstatement of net revenue of $10.5 million in 2014.

57.     ***Category C: Understatement of Gross to Net Revenue Reserves.*** In the second restatement issued on May 10, 2016, Akorn also disclosed that it understated gross to net revenue reserves in 2014. To calculate gross to net revenue, Akorn must estimate various reserves that are deducted from revenue. But the Company failed to reserve certain revenue deductions, namely rebates, billbacks, failure to supply, price protection penalties, and other contractual adjustments, even though they were probable and estimable based on information that was generally known or knowable as of the financial statement dates. By understating these reserves, Akorn overstated net revenue by $21.0 million in 2014. In addition, Akorn disclosed that for a portion of a transaction with a single customer, the Company improperly recognized $2.9 million of revenue in the fourth quarter of 2014 despite the absence of sufficient evidence to substantiate it. Thus, for this category of accounting violations, the total overstatement is $23.9 million.

58.     ***Category D: Other Accounting Violations.*** The remaining accounting violations artificially inflated Akorn's net revenue by $3.5 million in 2014 and increased Akorn's revenue and/or net income in the first, second, and fourth quarters. Except for one, Akorn states that it knew of these errors when it filed its original 2014 Form 10-K on March 17, 2015 but considered them immaterial at the time. Subsequently, the Company determined that these errors warranted restatement and therefore corrected them in its second restatement on May 10, 2016. The one exception is Akorn's inaccurate amortization of commitment fees incurred to consummate term loan debt across the life of the term loans, which the Company states it identified as a material

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

error on May 7, 2016. This error amounted to $1.9 million in the first quarter of 2014, and while it did not affect revenue, it artificially inflated net income by $0.3 million.

59.     The table below summarizes the impact of each category of Restatement adjustment on Akorn's net revenue (in millions of dollars):

|            | 1Q 2014 | 2Q 2014 | 3Q 2014 | 4Q 2014 | FY 2014 |
|------------|---------|---------|---------|---------|---------|
| Original   | 90.622  | 150.749 | 132.732 | 227.828 | 601.931 |
| Category A | n/a     | -8.853  | n/a     | n/a     | -8.853  |
| Category B | n/a     | -1.400  | -8.100  | -1.000  | -10.500 |
| Category C | n/a     | -1.700  | -2.900  | -19.400 | -24.000 |
| Category D | n/a     | -4.924  | +5.966  | -4.572  | -3.530  |
| Restated   | 90.662  | 133.872 | 127.698 | 202.856 | 555.048 |

60.     While Category A related to the Hi-Tech acquisition, Categories B, C, and D mostly impacted Akorn's organic revenue—*i.e.*, revenue not generated from simply adding Hi-Tech's and VersaPharm's businesses. Accordingly, Akorn's accounting violations allowed Defendants to exaggerate its organic growth during the Class Period.

61.     In the "Management's Discussion and Analysis" section of its Form 10-Q for the second quarter of 2014, dated August 11, 2014, Akorn reported "organic growth" of $9.9 million, representing a strong organic growth rate of 12.9% compared to the second quarter of the prior year. After the Restatement, however, the Company's organic growth in the second quarter was reduced to $2.9 million, an anemic growth rate of just 3.6%.

62.     In the "Management's Discussion and Analysis" section of its Form 10-Q for the third quarter of 2014, dated November 10, 2014, Akorn reported "organic growth" of $10.8 million, representing a similarly strong organic growth rate of 13.2% compared to the third quarter of the prior year. After the Restatement, however, the Company's organic growth in the third quarter was reduced to $6.8 million, an organic growth rate of just 8.3%.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

63.     While there is no such discussion of organic growth in Akorn's original 2014 Form 10-K dated March 17, 2015, during a conference call on February 26, 2015, Defendant Rai touted the Company's double-digit organic growth in the fourth quarter. As the Restatement would later reveal, however, organic growth in the fourth quarter actually *fell* $9.0 million.

**B.     Akorn's Internal Control Suffered from Material Weaknesses in 2012, 2013, 2014, and 2015**

64.     Over a four year period, from 2012 through 2015, three independent audit firms audited Akorn's internal control over financial reporting. Each time, with management's concurrence, the independent auditor determined that the Company's internal controls were ineffective and suffered from material weaknesses. Many of the identified material weaknesses directly relate to the accounting violations acknowledged by the Restatement—for example, the absence of controls designed to validate the completeness and accuracy of data, leading to errors in the data used to calculate gross to net revenue adjustments.

65.     In Akorn's 2012 Form 10-K, filed on March 1, 2013, the "Management's Report on Internal Control Over Financial Reporting" stated:

> [O]ur management concluded that, as of December 31, 2012, our internal control over financial reporting was not effective due to the identification of a material weakness related to our controls over our financial statement close process. More specifically, we did not maintain financial close process and procedures that were adequately designed, documented and executed to support the accurate and timely reporting of our financial results, and we did not maintain effective controls to provide reasonable assurance that accounts were complete and accurate and agreed to detailed support, and that account reconciliations were properly performed, reviewed and approved.

66.     Akorn's independent auditor at 2012 year-end, Ernst & Young LLP ("E&Y"), audited the Company's internal control over financial reporting as of December 31, 2012. In the independent auditor's report included in Akorn's 2012 Form 10-K, E&Y concluded: "In our opinion, because of the effect of the material weakness . . . on the achievement of the objectives

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

of the control criteria, Akorn, Inc. has not maintained effective internal control over financial reporting as of December 31, 2012."

67.     In Akorn's 2013 Form 10-K, filed on March 14, 2014, the "Management's Report on Internal Control Over Financial Reporting" stated:

[O]ur management concluded that, as of December 31, 2013, our internal control over financial reporting was not effective because of the identification of material weaknesses described as follows:

- *We did not have controls designed to validate the completeness and accuracy of underlying data* used in the determination of significant estimates and accounting transactions. As a result, *errors were identified in the underlying data used to support significant estimates and accounting transactions, primarily relating to gross to net revenue adjustments*, inventory reserves and the determination of useful lives of acquired intangible assets. . . .

- *We did not have an adequate process in place to support the accurate and timely reporting of our financial results and disclosures in our Form 10-K. As a result, errors were identified primarily related to accounts payable and inventory balances at year end. Additionally, we did not have an adequate process in place to complete our testing and assessment of the design and effectiveness of internal controls over financial reporting in a timely manner. . . .*

- *We did not have sufficient segregation of duties over information system access such that employees had the ability to inappropriately initiate and record transactions, and there were no compensating, preventative or detective controls. . . .*

(Emphasis added.)

68.     In its 2013 "Remediation Plan," Akorn represented that, "[w]ith the oversight of senior management and our audit committee, we have begun taking steps and plan to take additional measures to remediate the underlying causes of the material weaknesses." Specifically, "[w]ith respect to completeness and accuracy concerns, *management intends to add additional accounting and internal audit personnel and design, document, and test controls that are intended to validate the completeness and accuracy of the data* used in our

significant estimates and accounting transactions." Akorn further assured that **"senior management and our audit committee are closely monitoring the implementation of these remediation plans[.]"** Indeed, the Company represented that it had already made improvements to its internal controls, including the "implementation of new systems and software applications related to the gross to net revenue process."

69.     Akorn's independent auditor at 2013 year-end, KPMG LLP ("KPMG"), audited the Company's internal control over financial reporting as of December 31, 2013. In the independent auditor's report included in Akorn's 2013 Form 10-K, KPMG concluded: "[I]n our opinion, because of the effect of the aforementioned material weaknesses on the achievement of the objectives of the control criteria, Akorn, Inc. has not maintained effective internal control over financial reporting as of December 31, 2013[.]"

70.     Despite having clear notice of the material weaknesses in the internal control relating to the calculation of gross to net revenue in 2013, and senior management's commitment to closely monitoring remediation efforts, Akorn failed to resolve the deficiencies in 2014. This failure was all the more egregious given that the Company was closing two significant acquisitions in 2014, Hi-Tech and VersaPharm, that would make remediating the deficiencies even more important.

71.     In Akorn's 2014 Form 10-K, filed on March 17, 2015, the "Management's Report on Internal Control Over Financial Reporting" first noted that the Company "excluded from our assessment of the effectiveness of our internal control over financial reporting as of December 31, 2014, Hi-Tech's and VersaPharm's internal control over financial reporting." The report then stated:

> [O]ur management concluded that, as of December 31, 2014, our internal control over financial reporting was not effective because of the identification of material

weaknesses described as follows:

- *We did not have controls designed to validate the completeness and accuracy of underlying data* used in the determination of significant estimates and accounting transactions. As a result, *errors were identified in the underlying data used to support significant estimates and accounting transactions, primarily relating to gross to net revenue adjustments* and income taxes. . . .

- *We did not have an adequate process or appropriate controls in place to support the accurate and timely reporting of our financial results* and disclosures in our Form 10-K. As a result, *errors were identified primarily related to gross to net revenue adjustments* and income tax balances at year end. . . .

- *We did not have an adequate process or appropriate controls in place to prevent or detect material errors in the financial statements of acquired subsidiaries. As a result, errors were identified primarily related to gross to net revenue adjustments, expenses, inventory and accrued liabilities in the financial statements at the acquisition date and at year-end.* One of the aforementioned errors related to the chargeback reserve of Hi-Tech recognized at the acquisition date and required the restatement of our condensed consolidated financial statements for the quarter and six-months ended June 30, 2014 and the nine months ended September 30, 2014, as disclosed in our Form 8-K dated March 17, 2015.

(Emphasis added.)

72.     Thus, the very material weakness that was identified during the 2013 year-end audit—the absence of controls designed to validate the completeness and accuracy of data, leading to errors in the data used to calculate gross to net revenue adjustments—had not been remediated and was again identified as a material weakness during the 2014 year-end audit.  On top of that, Akorn lacked an adequate process or appropriate controls to prevent or detect material errors in the financial statements of its acquired subsidiaries, which also led to errors in the calculation of gross to net revenue adjustments.

73.     In its 2014 "Remediation Plan," Akorn again represented that, "[w]ith the oversight of senior management and our audit committee, the Company has begun taking steps and plans to take additional measures to remediate the underlying causes of the material

weaknesses." Specifically, "[w]ith respect to validation of the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions," management planned to make the following changes:

- ***Conduct manual data validation procedures on certain reports related to gross to net adjustments and inventory.***

- Enhance the design of management review controls to increase the level of precision.

- ***Establish a dedicated revenue accounting team focused primarily on significant gross to net revenue adjustments.***

- Ensure all systems relied upon in the financial reporting process are subject to ***Information Technology General Controls (ITGCs) which are intended to prevent system changes that could affect the completeness and accuracy of the data used***.

(Emphasis added.)

74.     And "[w]ith respect to the financial statements of acquired subsidiaries," management planned to make the following changes:

- ***Evaluate the control environment of target acquisitions and acquired entities in a timely fashion to facilitate improvements in the subsidiary's control environment within the year of acquisition.***

- ***Develop controls specifically designed to identify material errors within subsidiary financial statements.***

- Drive consistency in internal controls across all Akorn entities.

- Deploy appropriate personnel with public company accounting experience at the subsidiary level, as needed.

(Emphasis added.)

75.     Akorn's independent auditor at 2014 year-end, again KPMG, audited the Company's internal control over financial reporting as of December 31, 2014. As with Akorn's assessment, KPMG's internal control evaluation excluded Hi-Tech and VersaPharm. In the independent auditor's report included in Akorn's 2014 Form 10-K, KPMG concluded: "[I]n our

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

opinion, because of the effect of the aforementioned material weaknesses on the achievement of the objectives of the control criteria, Akorn, Inc. has not maintained effective internal control over financial reporting as of December 31, 2014[.]"

76.    Finally, in Akorn's amended Form 10-K, filed on May 10, 2016, the "Management's Report on Internal Control Over Financial Reporting" stated: "[O]ur management concluded that, as of December 31, 2015, our internal control over financial reporting was not effective because of the identification of [the following] material weaknesses":

**Control Environment**

*The control environment, which is the responsibility of senior management*, helps set the tone of the organization, influences the control consciousness of its officers and employees, and is an important component affecting how the organization performs financial analysis, accounting and financial reporting. A proper organizational tone can be promoted through a variety of means, such as well documented and communicated policies, a commitment to hiring competent employees, the manner and content of oral and written communications, strong internal controls and effective governance.

At December 31, 2015, we did not maintain an effective control environment to allow for the accurate and timely filing of our financial statements primarily attributable to the following factors:

- *We did not appropriately remediate existing material weaknesses on a timely basis.*

- *We did not have a sufficient complement of accounting and financial reporting personnel with an appropriate level of knowledge, US GAAP proficiency, experience and training commensurate with our financial reporting requirements.*

- *We did not have systems, processes or policies in place to enable timely financial analysis and accounting review.*

These deficiencies in the control environment resulted in certain instances of incorrect accounting decisions and contributed to the following material weaknesses:

- *We did not have controls designed to validate the completeness and accuracy of underlying data* used in account reconciliations and in the determination of significant estimates and accounting transactions and, as a

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

result, ***errors were later identified in the underlying data used to support significant estimates and accounting transactions, particularly with respect to gross to net revenue adjustments***.

- We did not have an adequate process or appropriate controls in place to support the accurate and timely reporting of our financial results and disclosures on our Form 10-K.

**Risk Assessment**

We did not effectively design controls in response to the risks of material misstatement. This control deficiency contributed to the following additional material weakness:

- ***We did not have an adequate process or appropriate controls in place to prevent or detect material errors in the financial statements of acquired subsidiaries.*** As a result, ***errors were identified primarily related to gross to net revenue adjustments***, expenses, inventory and accrued liabilities in the financial statements at the acquisition dates, the interim periods as of and for the periods ended June 30, 2014 and September 30, 2014, and as of and for the year ended December 31, 2014. One of the aforementioned errors related to the chargeback reserve of Hi-Tech, recognized at the acquisition date and required the restatement of our condensed consolidated financial statements for the three and six month periods ended June 30, 2014 and the nine month period ended September 30, 2014, as disclosed in our Form 8-K dated March 17, 2015.

**Information and Communication**

We did not maintain effective controls over information and communications. Specifically, ***we did not have an adequate process for internally communicating information between the accounting department and other operating departments necessary to support the proper function of internal controls***. This control deficiency led to the aforementioned material weaknesses related to the determination of significant estimates and detection of material errors in the financial statements of acquired subsidiaries.

(Emphasis added.)

77.    Even by the end of 2015, Akorn had failed to remediate the critical material

weakness that was identified during the ***2013*** year-end audit—the absence of controls designed

to validate the completeness and accuracy of data, leading to errors in the data used to calculate

gross to net revenue adjustments. The Company had also failed to remediate a critical material

weakness identified during the 2014 year-end audit—the absence of an adequate process or appropriate controls to prevent or detect material errors in the financial statements of its acquired subsidiaries, which also led to errors in the calculation of gross to net revenue adjustments. Hence, Akorn expanded its material weaknesses to include senior management's failure to timely remediate existing material weaknesses and its failure to commit personnel adequate to the task.

78.    In its 2015 "Remediation Plan," this time Akorn emphasized new senior management, noting that a new CFO, who was hired in October 2015 to replace Defendant Dick, and a new Corporate Controller, who was hired in April 2015 to replace Dave Hebeda, would be leading the remediation process. The Company also stated that: "During 2015 and 2016, we hired personnel with the appropriate experience, certification, education, and training for all key positions in the financial reporting and accounting functions, in many cases creating new positions. Consequently, *the key employees involved in the accounting and financial reporting functions in which misstatements were identified [i.e., Dick and Hebeda] are no longer involved in the accounting or financial reporting functions*." (Emphasis added.)

79.    Among other specific remediation actions, such as implement the automation of significant gross to net revenue accruals, Akorn represented that it would:

- *Conduct data validation procedures on certain reports related to gross to net revenue adjustments* and inventory.

- *Establish a dedicated revenue accounting team focused primarily on significant gross to net revenue adjustments*. We have also taken steps to increase the communication between the accounting and contracts departments.

- Ensure all systems relied upon in the financial reporting process are subject to *Information Technology General Controls (ITGCs) which are intended to prevent system changes that could affect the completeness and accuracy of the data used*.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

(Emphasis added.) Each of these three remediation actions, however, had been set forth in the Company's *2014* Remediation Plan but had not been completed.

80.     Akorn's new independent auditor at 2015 year-end, BDO USA, LLP ("BDO"), audited the Company's internal control over financial reporting as of December 31, 2015. As did E&Y and KPMG, BDO concluded in the independent auditor's report included in Akorn's 2015 Form 10-K, that: "In our opinion, Akorn, Inc. did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2015[.]"

81.     Akorn failed to remediate known material weakness in its internal controls in a timely manner, which ultimately led to a material misstatement of the Company' financial statements in 2014. The CEO and CFO had direct responsibility for the design, maintenance, and effectiveness of Akorn's internal control system. They each had a responsibility to oversee the implementation of proper internal controls over the Company's accounting and financial reporting functions. They were responsible for detecting breakdowns in the operation of controls within individual business units at Akorn. Defendants Rai and Dick knowingly or recklessly disregarded these responsibilities.

82.     Akorn operated in an environment in which there were significant weaknesses in the accounting governance function. Defendants Rai and Dick knowingly or recklessly failed to establish an effective control environment. In addition, they failed to maintain a sufficient complement of personnel with an appropriate level of accounting knowledge, experience, and training in the application of GAAP commensurate with their financial reporting requirements. Given that they were under clear notice of Akorn's internal control deficiencies, if Defendants Rai and Dick had exercised appropriate leadership by properly monitoring and evaluating the accounting and financial reporting functions, and by ensuring that an adequate review of the

particular revenue arrangements was performed, the public disclosure of materially misstated financial results could have been prevented.

### C.  Akorn's Failure to Timely Integrate Its Acquisitions' Accounting Systems

83.    Akorn's accounting violations stem in part from the Company's failure to timely integrate its accounting system with those of its new acquisitions in 2014, Hi-Tech and VersaPharm without having a system in place to prevent or detect material errors in the financial statements of acquired subsidiaries—particularly with respect to gross to net revenue adjustments.

84.    Confidential Witness ("CW")1 was an Accounts Receivable Analyst at Akorn from June 2011 through April 2015, who reported directly to Janice Yarkony, the Accounts Receivable Supervisor. According to CW1, the integration of Akorn's accounting system (JD Edwards) and Hi-Tech's accounting system (SAP) was repeatedly delayed. The integration did not occur until sometime after CW1 left the Company in 2015.

85.    CW2 was an Accounts Payable Staff Accountant at Akorn from August 2014 through October 2014, during which time CW2 worked at the Hi-Tech facility, reporting to Christine Sterling, Accounts Payable Supervisor, and then to Nicholas Bogdanski, Accounts Payable Supervisor.  CW2 stated that Akorn initially told Hi-Tech staff that integration of Hi-Tech's accounting system (SAP) would be completed by October 2014, but it kept being pushed back.  The integration deadline was pushed back at least once, while CW2 was at Akorn, and the integration had not even started by the time CW2 left the Company in October 2014.

86.    CW3 was a Sales Operation Coordinator at Hi-Tech starting in September 2009 and remained in the same position at Akorn until July 2015, reporting to Stephanie Jomisko, Director of Sales Operations. CW3 stated that the big problem was the database.  Hi-Tech was

using SAP and Akorn had a different database system, JD Edwards. According to CW3, Akorn management thought that the systems could be integrated within six months, which was not possible to do.

87. CW4 was the Chief Information Officer at Hi-Tech from 2004 through May 2014. Prior to Akorn's acquisition of Hi-Tech, CW4 reported to David Seltzer, President and CEO of Hi-Tech. After the acquisition, CW4 reported to Bill Bradford, the Chief Information Officer ("CIO") of Akorn. According to CW4, in the Spring of 2014, Akorn told Hi-Tech staff that it planned to merge the two companies' accounting systems by October 2014, specifically switching Hi-Tech from SAP to JD Edwards, Akorn's current accounting system. CW4 was given a date in October when Akorn would make the switch. CW4 responded by telling CIO Bradford that it was not possible to do so. Specifically, CW4 told Bradford that the enormity of the task would require about a year to make the full transition.

88. CW5 was a Sales Operations Coordinator at Hi-Tech from January 2013 through July 2014, reporting to Stephanie Jomisko, Director of Sales Operations, and Edwin Berrios, Vice President of Sales and Marketing. CW5 was told that the deadline for integrating Hi-Tech's and Akorn's accounting systems was in the Fall of 2014. CW5 thought the deadline was unrealistic and would be impossible to meet, and CW5 could not foresee how the Company could get to that end date. According to CW5, Hi-Tech's direct customer contracts were on a different SAP system from its indirect customer contracts, and internally, Hi-Tech had been unable to merge the two SAP systems. Yet Akorn was claiming it would merge both of Hi-Tech's SAP systems with Akorn's JD Edwards system, plus integrate all of Hi-Tech's business and sales operations into Akorn's workflow by the Fall of 2014. CW5 stated that there was no way Akorn was going to absorb all of this additional work by the specified deadline.

89.     CW6 was a Senior Analyst in Revenue Accounting at Akorn from August 2015 through February 2016, reporting to Manager of Revenue Accounting Purvi Soni and Director of Revenue Accounting Matthew Tsang. CW6 was hired to help Akorn complete its Restatement. According to CW6, Hi-Tech did not complete its switch to Akorn's accounting system, JD Edwards, until early 2016.  Before then, CW6 stated that Akorn's accounting data was stored in JD Edwards while Hi-Tech's was stored on SAP. For this reason, analysts had to pull Hi-Tech accounting data into Excel to make calculations, and the resulting amounts were then recorded into JD Edwards. This substantially complicated the calculation of the chargeback reserve for Hi-Tech and could lead to error, particularly if data were missing or incorrectly inputted.

**D.     Akorn's  Process for Calculating for Chargebacks and Net Revenue**

90.     CW13 was Vice President of Sales and Marketing at Hi-Tech from 1997 through October 2014, reporting to Hi-Tech's CEO, David Seltzer. CW13 explained that pharmaceutical manufactures (such as Hi-Tech and Akorn) negotiate prices with end users (generally, hospitals and pharmacies). Pharmaceutical companies do not distribute drugs to end users directly but instead use wholesalers. To maintain standard pricing, the pharmaceutical companies charge wholesalers a set price for each drug (the WAP). The wholesaler then sells the drugs to the end users at the price that the pharmaceutical company and end user negotiated.  If this price puts the wholesaler at a loss, then the wholesaler collects the difference from the pharmaceutical company, which is called the chargeback or billback.

91.     As shown in Akorn's own accounting policy on chargebacks and rebates, the Company must track the chargebacks and rebates for each product number and contract, and doing so is essential to accurately calculating gross to net revenue reserves. However, due to its inadequately  designed,  staffed,  and  integrated  accounting  system,  Akorn  was  unable  to

adequately track and process its chargebacks and rebates. Consequently, its chargeback and rebate reserves were calculated using hopelessly flawed and incomplete data.

92.     CW4 was dismayed to learn that Hi-Tech would be transitioning from its SAP system to JD Edwards. When Hi-Tech was selecting its accounting system, it had considered JD Edwards but decided that SAP was a far better program.  At the time, CW4 noted that the top pharmaceutical companies, all use SAP, making the decision easy for Hi-Tech.  Essentially, CW4 could not understand why Akorn management would replace a first tier system with a second tier system. According to CW4, JD Edwards does not have the functionality from a management standpoint that SAP does.

93.     Specifically, CW4 stated that, unlike JD Edwards, SAP has a chargeback and rebate software component. SAP developed the chargeback processing system that is fully integrated into the core SAP software system, automatically adjusting other aspects of the ledger that are dependent on chargeback amounts.  As CW4 further explained, SAP used X12 formatting via Electronic Data Interchange ("EDI"), which allowed Hi-Tech to communicate all transactions with customers and vendors via computer. No manual entry on the part of Hi-Tech was required for customer orders. SAP used X12/EDI for the chargeback processing system, and during the several years the SAP system was in place at Hi-Tech, CW4 could not recall any substantial errors in gross to net revenue reserves or the duplication of inventory in any way.

94.     CW7 was an Accounting Manager at Akorn from May 2014 through November 2014, reporting to Lynn Wassermann, who was the Assistant Corporate Controller at the time. CW7 also had serious concerns about Akorn's accounting system, which was causing problems at the Company. CW7 stated that the JD Edwards system was not efficient and required a lot of manual work that was unrealistic given the volume of work. As CW7 explained, employees

could not rely on the system to automatically calculate correct financial information from the different transactions taking place across Akorn. Often, employees had to manually check the accuracy of financial data by calling employees in different departments that handled the transaction; and often those employees could not recall details or did not have notes to confirm or correct the questioned information. Due to this lack of automation and reliability, errors were unavoidable.

95.      According to CW7, despite the lack of efficiency and unreliability of its accounting system, Akorn did not show any interest in improving it. Rather, the Company was focused on integrating the systems of its two acquisitions, Hi-Tech and VersaPharm, into Akorn's system. Thus, Akorn was attempting to integrate these two new systems without addressing the problems with the current system. And Akorn was ignoring accounting systems, such as Hi-Tech's, that were much better suited to calculating chargebacks and rebates.

96.      CW8 was the Credit Manager at Akorn from October 2014 through August 2015, reporting to Corporate Controller Hebeda. During the hiring process, Hebeda told CW8 that the current Credit Manager's estimates for the Company's reserves, including chargebacks, rebates, and returns, were incorrect and off by seven digits. CW8 understood that the current Credit Manager was losing his job due to these inaccuracies.

97.      CW9 was an Accountant at Akorn from October 2013 to March 2014, reporting to Akorn's Assistant Controller. CW9 stated that Akorn used JD Edwards software to track rebates. In addition, CW9 explained that rebates were not calculated in a consistent way for everyone who distributed and sold Akorn's products. CW9 recalled complications with the JD Edwards software, the way that rebates were calculated, and the way Akorn was trying to track them. Tracking rebates could be complicated because for some wholesalers, the rebate has to be taken

upon sale; while other wholesalers had to wait until the end user was paid before getting the rebate. This led to complications where the timing was off because the timing of when the rebates came through varied from one distributor to the next. CW9 stated that this issue derived from the different negotiated terms of contracts with different parties.

98. According to CW3, in the months after the acquisition of Hi-Tech, Akorn began processing some (but not all) of Hi-Tech's customer payments. At first, Akorn processed direct sales and Hi-Tech processed indirect sales. Only sales to indirect customers involve chargebacks.

99. As CW3 explained, after Akorn acquired Hi-Tech, Akorn changed the way Hi-Tech processed rebates and chargebacks, causing them to begin to back up. CW3 stated that the rebate and chargeback payments were really late, and by the end of 2014 and January 2015, were really backed up. By February or March 2015, some of the payments were a few months late and the total amount owed for the late payments for rebates and chargebacks was between $13 million and $15 million. CW3 observed that some accounts were not paid for three to four months. CW3 further stated that these delays did not comport with Company policy. Rebates were supposed to be processed and paid monthly or quarterly, depending on the terms of the customer's contract with Hi-Tech, and chargebacks were supposed to be processed and paid at the end of each quarter. CW3 repeatedly informed Akorn's Executive Director of Trade Operations, Scott Grossenbach, of the problem. In addition, CW3 discussed the problem with Akorn's independent auditors.

100. CW10 was a Senior Sales Analyst at Akorn from February 2009 through May 2014, reporting to Scott Grossenbach, who was Akorn's Director of Contracts, Pricing, and Financial Operations. The accuracy of Akorn's indirect sales depended on the correct processing of chargebacks. CW10 stated that the calculation of chargebacks was really troublesome, and the

chargeback process had many bugs. There were duplicate chargebacks, missed chargebacks, erroneous data in the system, and software issues. These problems caused the chargeback calculations to fluctuate dramatically. Because the chargebacks were often incorrect, so were Akorn's indirect sales numbers. CW10 stated that it was well known within Akorn that the indirect numbers were untrustworthy and had been a problem for the past year to 16 months. According to CW10, these problems were widely known within Akorn, including at the Company's highest levels.

101. CW11 was a Sales Analyst at Akorn from August 2012 through October 2015, reporting to John Sabat, Akorn's Senior Vice President of National Accounts and Trade Relations. CW11 confirmed that the monthly amounts for Akorn's indirect sales numbers fluctuated retroactively due to the chargeback problem. Indirect sales numbers are tied to chargebacks. For this reason, the indirect sales numbers changed due to late processing of chargebacks, which were then retroactively applied to the revenue totals for the month the sale occurred. CW11 said he was unable to feel comfortable because adjustments could be made at any point. Further, CW11 explained that if chargeback claims came in four months or a year after the sale, they would get applied and the numbers would change. In this way, sales numbers would change from one month to the next. As CW11 observed, Sabat knew that the numbers were never accurate, never had been, and never would be.

102. According to CW6, who worked on the Restatement, revenue deductions were understated in calculating gross-to-net revenue in 2014 due to issues with data entry. CW6 explained that the Company was not mapping data properly, from start to finish, and that the actual data had issues.

103. As CW6 also explained, Akorn provided advanced pricing and discounts to

certain customers. In November 2015, CW6 was assigned to work on a $3.3 million advanced pricing transaction that Akorn personnel had been panicking about. The transaction had occurred in late 2014, but the Company was having trouble substantiating it. CW6 attempted to find final documentation but was unable to do so, which was very troubling. According to CW6, just about everyone on the revenue accounting team worked on trying to substantiate the transaction at some point, but it remained unresolved when CW6 left Akorn in February 2016.

### E.    Akorn's Grossly Inadequate Internal Controls

104.    According to CW9, Akorn received an adverse internal controls report from its independent auditors in 2012, and due to that report, the Company switched audit firms for the 2013 year. CW9 stated that Akorn was hoping that the 2013 audit would be more favorable, which did not turn out to be the case. There were still internal control problems in 2013, CW9 explained, adding that each poor audit indicated the things that Akorn needed to fix in the next year. But CW9 said that the next audit would go just as poorly as the last.

105.    CW12 was a Senior Internal Auditor at Akorn from July 2014 through January 2015, reporting to Ankur Gulati, Manager of Internal Audit. CW12's role included conducting internal audits of both Akorn and Hi-Tech. CW12 immediately began finding problems with the internal controls at the outset of CW12's tenure in July 2014. CW12 stated that Akorn had deficiencies in its calculations for gross to net revenue reserves and that the calculation of such reserves was a significant concern for the Company. According to CW12, Akorn knew about these deficiencies since at least 2013, when KPMG had specifically identified the problem in its 2013 audit. CW12 stated that everyone within Akorn knew it was a big concern, including management, who knew that it needed to be remediated.

106.    As CW12 explained, the Company's process for calculating gross to net revenue

reserves led to inaccuracies, which the Company knew about and was attempting to improve. CW12 laid out some of the internal control weaknesses that contributed to this problem: (1) the manual inputting of wrong numbers or miscalculated numbers into the accounting system leading to miscalculations of gross to net revenue reserves; (2) the improper linking between tabs on Excel spreadsheets leading to miscalculations of the reserves; (3) the establishment of inadequate procedures for management to review the reserve calculations for accuracy; and (4) the Company should have had a system that triggered an investigation for accuracy under certain circumstances, but it did not have one.

107.    According to CW12, during an interim audit conducted in the middle of 2014, Akorn's independent auditors once again identified internal control deficiencies relating to the gross to net revenue reserves. KPMG communicated all gaps and deficiencies to Corporate Controller Hebeda and Akorn's Board of Directors. Based on a meeting that CW12 attended, Defendant Rai was also informed. The Company then set a timetable to correct these gaps and deficiencies.  Later in 2014, Akorn's independent auditor conducted a roll-forward audit to determine whether Akorn had fixed the gaps and deficiencies. KPMG concluded that Akorn had not fixed its reserve calculation deficiencies. These findings were submitted to Defendant Rai, Defendant Dick, Corporate Controller Hebeda, and the Company's Board of Directors.

108.    CW6 stated that Akorn's internal controls were inadequate and that the Company failed to address the deficiencies even after it grew significantly with the acquisitions of Hi-Tech and VersaPharm. According to CW6, because Akorn had failed to integrate the accounting systems of Hi-Tech and VersaPharm, reserves had to be calculated in three separate pieces. Moreover, the way that Hi-Tech was calculating its reserve was very different from the way Akorn was calculating its reserve.

109.    More generally, CW12 stated that Akorn did not have a good process for monitoring the daily controls of financial transactions, and the Company failed to create a culture that conveyed to lower level staff the importance of internal controls.

110.    One fundamental problem, according to CW6, was that Akorn's data entry system lacked a check system to prevent incorrect or incomplete data from being entered. There should be stringent rules in place whenever an accountant enters data into the system. Because there was no such check system, CW6 stated that Akorn wasn't mapping data properly – from start to finish – and the actual data had issues.

111.    For the calculation of revenue reserves and net revenue, CW6 explained that several pieces of data needed to be entered correctly and completely. For example, every drug had a special six-digit ID number and a batch number. The entire JD Edwards system needed checks to make sure the data could not be accepted if the date field was blank or other data was entered incorrectly or not at all. No such checks existed.

112.    As CW6 observed, the revenue accounting team would get numbers from Akorn and then try to calculate the reserves and net revenue, but it would be clear that the data was wrong. For instance, each individual product was assigned an expiration date at sale; no single item could have two expiration numbers. Yet, according to CW6, the team would get two different expiration dates for one product. After tracking down the original data, often it turned out that it had been entered incorrectly or with information missing. Making matters worse, due to deficiencies in Akorn's accounting system and the failed integration of the new acquisitions' accounting systems, the team could not see where the incorrect and partial data was coming from.

113.    CW14 was a Senior Accounting Consultant at Akorn from August 2015 through

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

December 2015, reporting to Jay Mellentine, Akorn's Assistant Controller. CW14 was hired to assist with the Company's Restatement efforts. According to CW14, existing staff at Akorn was overwhelmed by the workload during the integration. The staff responsible for calculating gross to net revenue reserves got overwhelmed, said CW14, and the underlying cause was the additional work associated with assuming the financial responsibilities of the newly acquired companies.

114.    In CW9's view, Akorn's accounting department was understaffed, consisting of only four accountants, an Assistant Controller, the Corporate Controller, and the CFO. Exacerbating the understaffing problem, it was widely believed that Corporate Controller Hebeda did not have the expertise necessary to do his job. According to CW9, this was something the independent auditors suggested, and that CW9 agreed with. CW9 added that this was related to multiple years of poor audit results and the resultant inability to fix it. Hebeda's tenure as Corporate Controller lasted from May 2012 through April 2015, which coincides with the years in which Akorn's internal controls were deemed ineffective. CW9 also did not believe that the Assistant Controller had the experience or background to adequately address the enormity of the problem at Akorn, and CW9 observed that the four junior accountants lacked experience in accounting at public companies and pharmaceutical companies.

        **F.    The Revelation of Akorn's Accounting Fraud and Its Aftermath**

115.    The truth about Akorn's inaccurate financial results and the material weaknesses in its internal and financial controls emerged through a series of partial corrective disclosures. First, on March 2, 2015, the Company filed a Form 12b-25 notifying the SEC that its 2014 annual report would be filed late due to "unforeseen delays in collecting and compiling certain financial and other related data" from its VersaPharm and Hi-Tech subsidiaries, which were not

integrated into the Company's centralized accounting system as of December 31, 2014. Additionally, the Company announced that it had not completed its assessment of the effectiveness of its internal controls, and admitted that it "believe[d] that material weaknesses exist[ed] as of December 31, 2014," and that additional material weaknesses may be identified following its assessment.

116.    Next, on March 17, 2015, the Company issued a press release announcing that its financial results for the 2014 second and third quarters should no longer be relied upon due to an error in Hi-Tech's opening balance sheet. Specifically, this error in Hi-Tech's opening balance sheet resulted in a chargeback reserve that was overstated by approximately $8.9 million as of April 17, 2014. The correction of the error resulted in an $8.9 reduction in revenue, and a $5.6 million reduction in previously reported net income, goodwill, and retained earnings. The Company maintained that it would issue a restatement of its 2014 second and third quarter financial results, and that it was "actively engaged in remediating [the] material weaknesses" that led to the restatement.

117.    Finally, on April 24, 2015, the Company issued a press release announcing that its financial results for the 2014 second, third, and fourth quarters, as well as the 2014 annual year, should no longer be relied upon due to errors related to the understatement of rebates and other sales allowances that resulted in an overstatement of the Company's net revenue for the affected periods. The Company also announced that it would be restating the affected periods, and that based upon an initial assessment, it believed its net revenue and pretax income from continuing operations was overstated by $20 million to $35 million for the year ending December 31, 2014.

118.    In the wake of the restatement announcement on April 24, 2015, Defendant Dick and Corporate Controller Hebeda lost their positions leading Akorn's accounting operations.

Hebeda had lost his position in April 2015, and Randall Pollard was hired as the new Corporate Controller. Hebeda was appointed Vice President of Finance, a position removed from the accounting function.

119.    On August 4, 2015, Akorn issued a press release announcing that on August 3, 2015, Defendant Dick tendered his resignation as CFO, effective immediately, "to pursue other interests." He has yet to find another position with a company.  Akorn did not have a replacement CFO, and the new Corporate Controller, Pollard, had to fill in as Interim CFO. On October 13, 2015, Akorn announced that Duane Portwood would join the Company as the new permanent CFO, effective October 30, 2015.

120.    CW8 stated that Defendant Dick was asked to resign due to inaccuracies in the financial reports. In CW8's view, it was Dick's responsibility to ensure that the financial statements were accurate, and an approximately $30 million net income error for a company the size of Akorn was far beyond the level of typical acceptability.

121.    Indeed, in Akorn's 2015 Form 10-K filed on May 10, 2016, the Company touted the fact that it had replaced Dick and Hebeda and that a new CFO and new Corporate Controller would be leading the remediation of the many material weaknesses in the Company's internal controls. Undoubtedly referring to Dick and Hebeda, Akorn stated that "the key employees involved in the accounting and financial reporting functions in which misstatements were identified are no longer involved in the accounting or financial reporting functions."

122.    In a press release dated November 4, 2015, Akorn announced that: "The Chicago Regional Office of the [SEC] is conducting an investigation regarding the previously disclosed restatement, internal controls and other related matters. Additionally, the United States Attorney's Office for the Southern District of New York (USAO) has requested information

regarding these matters."

123.    In a Form 8-K filed on January 14, 2016, Akorn announced that its Board of Directors dismissed KPMG as the Company's independent auditor on January 10, 2016, and that on January 14, 2016, the Board approved the engagement of BDO as the new independent auditor.

124.    Among other things, Akorn stated in its January 14, 2016 Form 8-K the following:

> *KPMG advised us that information had come to its attention, that if further investigated may*: (i) materially impact the fairness or reliability of either: a previously issued audit report or the underlying financial statements; or the financial statements issued or to be issued covering the fiscal period(s) subsequent to the date of the most recent financial statements covered by an audit report (including information that may prevent it from rendering an unqualified audit report on those financial statements), or (ii) *cause it to be unwilling to rely on management's representations or be associated with the registrant's financial statements*. KPMG also advised us that, in addition to the Audit Committee's conclusion that our audited consolidated financial statements for the year ended December 31, 2014 and our unaudited condensed consolidated financial statements for the quarters ended June 30, 2014 and September 30, 2014 and the disclosures and related communications for each of these periods should not be relied, information has come to its attention, that if further investigated may significantly impact our unaudited condensed consolidated financial statements for the quarter ended March 31, 2014 and our audited consolidated financial statements for the year ended December 31, 2013.

(Emphasis added.) The Company invited KPMG to furnish its own letter addressed to the SEC concerning this disclosure.

125.    On January 27, 2016, Akorn filed an amendment to its Form 8-K filed on January 14, 2016, attaching KPMG's letter to the SEC relating to its dismissal. This letter made the following clarifications:

> *The information . . . that had come to our attention relates to errors identified by the Company related to understatements of rebates and other sales allowances which have resulted in an overstatement to net revenue and pretax income from continuing operations for the year ended December 31, 2014, and two additional accounting matters identified by the Company's investigation*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

*that warranted further investigation and review: (i) customer payment term modifications and related revenue recognition practices, timing and disclosures for 2013 through 2015, and (ii) returns processing delays in 2015.* We advised the Company that this information necessitated a significant expansion of the scope of our audits, and that information discovered in the Company's investigation or in our expanded audit procedures may: (i) materially impact the fairness or reliability of the Company's unaudited condensed consolidated financial statements as of and for the three months ended March 31, 2014 and consolidated financial statements as of and for the year ended December 31, 2013 or (ii) cause us to be unwilling to rely on management's representations or to be associated with the Company's financial statements, including the previously audited financial statements as of and for the year ended December 31, 2013.

(Emphasis added.)

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.    Akorn Announces 2014 First Quarter Financial Results

126.    The Class Period begins on May 6, 2014, when Akorn issued a press release titled, "Akorn Reports 2014 First Quarter Results."   Therein, the Company, in relevant part, stated:

*- Reports Record Q1 Revenue of $90.6 million and Q1 Adjusted EPS of $0.16 -*
*- Completes Acquisition of Zioptan® ophthalmic solution -*

\*        \*        \*

Akorn, Inc. (NASDAQ: AKRX), a niche generic pharmaceutical company, today reported financial results for the first quarter ended March 31, 2014.

**First Quarter 2014 Key Highlights and Accomplishments**

- Achieved record first quarter consolidated revenue of $90.6 million, an increase of 23% over last year's first quarter.
- Generated record operating cash flow of $23.4 million.
- Completed the acquisition of Hi-Tech Pharmacal Co., Inc. (Hi-Tech) on April 17. The acquisition adds scale, breadth of products and dosage forms, and further diversification of the Company's product portfolio.

\*        \*        \*

Raj Rai, Chief Executive Officer commented, "We are excited with the great start

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

that we've seen for 2014... The acquisition of Hi-Tech further diversifies our niche branded and generic product base and brings with it capabilities that will help us continue to grow and diversify our pipeline and revenue base into the future."

**Financial Results for the Quarter Ended March 31, 2014**

Consolidated revenue for the first quarter of 2014 was $90.6 million, an increase of 23% over the first quarter 2013 consolidated revenue of $73.9 million. The increase in consolidated revenue was largely driven by the newly acquired branded ophthalmic products – Azasite®, Cosopt®, CosoptPF®, and Betimol®. Consolidated gross margin for the first quarter of 2014 was 54.8% compared to 53.0% in the comparable prior year period. The increase in the Company's consolidated gross margin was also due to the newly acquired branded ophthalmic products which generate gross margins higher than the Company's historical average.

Net income for the first quarter of 2014 was $9.8 million, or $0.08 per diluted share, compared to net income of $10.8 million, or $0.10 per diluted share, in the prior year quarter. First quarter 2014 net income included $6.4 million of acquisition-related expenses, the largest component of which was fees incurred pre-close on the Hi-Tech term loan commitments. Non-GAAP adjusted net income for the first quarter of 2014 was $18.4 million, or $0.16 per diluted share, compared to non-GAAP adjusted net income of $14.4 million, or $0.13 per diluted share, in the prior year quarter.

127.    Also on May 6, 2014, Defendants Rai and Dick participated in Akorn's 2014 first quarter conference call.  During the earnings call, Defendant Rai stated: "We are off to a good start for the year, with nearly $91 million in sales in the first quarter, up 23% from the same quarter last year. The growth was driven by the recently acquired branded ophthalmics, as well as market share gains in our base business." In addition, he stated, "We closed the acquisition of Hi-Tech and have initiated the integration process, with the objective to complete the integration of critical function areas by the end of this year."

128.    On May 12, 2014, Akorn filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal first quarter, which was signed by Defendant Dick and reiterated the Company's financial results previously announced on May 6, 2014.  The Form 10-Q also

contained required Sarbanes-Oxley certifications, signed by Defendants Rai and Dick, which

state the following:

1.      I have reviewed this Quarterly Report on Form 10-Q of Akorn, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

129.     The statements set forth in the above paragraphs were false and misleading because: (a) the Company materially overstated the amortization of deferred financing costs by $1.9 million, which artificially inflated net income by $0.3 million; (b) the Company's financial statements were not prepared in accordance with GAAP; and (c) the Company was not timely and adequately taking steps to remediate the material weaknesses in its internal controls, particularly with respect to gross to net revenue calculations, hindering the Company's ability to integrate Hi-Tech and accurately process and account for rebates and chargebacks.

**B.     Akorn Announces the Acquisition of VersaPharm**

130.     On May 12, 2014, Defendants Rai and Dick participated in the "Acquisition of VPI Holdings Corp by Akorn Call." During the call, Defendant Rai stated: "VersaPharm is another strategic transaction in a series of acquisitions that we have completed in the past three years or so and further builds on our long-term strategic plan of advancing the new vision[.]"

131.     The statement in the above paragraph was misleading because it touted the Company's new acquisition of VersaPharm without disclosing that: (a) the Company was

already having problems integrating the accounting system of another acquisition, Hi-Tech, and

failing to implement a system to accurately process and account for rebates and chargebacks ;

and (b) the Company was failing to timely and adequately take steps to remediate the material

weaknesses in its internal controls, particularly with respect to gross to net revenue calculations.

### C.    Akorn Announces 2014 Second Quarter Financial Results

132.    On August 5, 2014, Akorn issued a press release titled, "Akorn Reports

Preliminary 2014 Second Quarter Results."  Therein, the Company, in relevant part, stated:

**- Reports Record Q2 Revenue of $150.7 Million and Adjusted EPS of $0.25; Raises 2014 Outlook -**

Akorn, Inc. (Nasdaq: AKRX), a niche generic pharmaceutical company, today reported preliminary financial results for the second quarter ended June 30, 2014.

**Second Quarter 2014 Key Highlights and Accomplishments**

- Achieved record second quarter consolidated revenue of $150.7 million, an increase of 96% over last year's second quarter and record adjusted net income per diluted share of $0.25, an increase of 79% over last year's second quarter.

*        *        *

**Financial Results for the Quarter Ended June 30, 2014**

Consolidated revenue for the second quarter of 2014 was $150.7 million, an increase of 96% over the second quarter 2013 consolidated revenue of $77.0 million. The increase in consolidated revenue was largely driven by the Hi-Tech acquisition, which contributed $51.5 million in revenue for the partial quarter, as well as by the addition of several branded ophthalmic products which were acquired in late 2013 and early 2014.

Consolidated gross margin for the second quarter of 2014 was 50.9% compared to 54.7% in the comparable prior year period. Second quarter 2014 gross margin included $3.6 million in amortization of the step-up of Hi-Tech's acquired inventory. Excluding this impact, second quarter 2014 gross margin was 53.2%.

Net income for the second quarter of 2014 was $8.5 million, or $0.07 per diluted share compared to net income of $12.6 million, or $0.11 per diluted share in the comparable prior year quarter. Second quarter 2014 net income included a

number of items related to the Hi-Tech and VersaPharm acquisitions, including acquisition and disposition-related expenses, $3.6 million of amortization of inventory step-up, a gain from product divestitures, financing-related fees on the Hi-Tech and VersaPharm term loan commitments, and a loss from discontinued operations for the ECR Pharmaceuticals divestiture. Non-GAAP adjusted net income for the second quarter of 2014, excluding the impact of these items, was $29.3 million, or $0.25 per diluted share, compared to non-GAAP adjusted net income of $15.3 million, or $0.14 per diluted share in the comparable prior year quarter.

133.    On August 5, 2014, Defendants Rai and Dick also participated in Akorn's 2014 second quarter conference call.  During the earnings call Defendant Rai stated:

We achieved record sales of $151 million in the second quarter, or approximately 95% increase from the second quarter of 2013. The adjusted EPS grew to $0.25 a share or an increase of nearly 79% from the same time period in 2013. Our results reflect an outstanding performance all across the board from our base business and the recent acquisitions of the branded ophthalmic products and Hi-Tech. approximately 95% increase from the second quarter of 2013. The adjusted EPS grew to $0.25 a share or an increase of nearly 79% from the same time period in 2013. Our results reflect an outstanding performance all across the board from our base business and the recent acquisitions of the branded ophthalmic products and Hi-Tech.

134.    Regarding the VersaPharm integration, Defendant Rai claimed: "[W]e can anticipate completing the integration of VersaPharm by the end of this year. As stated before, the combination of the acquired product portfolio through VersaPharm along with the Hi-Tech platform creates a strategic and solid growth platform for our company." Regarding "the Hi-Tech integration," he stated: "We are on track with our plans to fully integrate the business by the end of this year and on track to realize about $20 million in cost synergies by the end of this year, which are at the higher end of financial expectations. The transition has gone smoothly, and I'm pleased to report that Hi-Tech's financial performance since closing and through transition has exceeded our initial estimates."

135.    On the same call, Defendant Dick provided the following detailed disclosure of Akorn's financial results:

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

We achieved a record consolidated revenue in the second quarter of 2014 totaling $150.7 million, which is up 96% over the comparable prior year quarter consolidated revenue of $77 million. The increase in consolidated revenue was largely driven by the Hi-Tech acquisition, which contributed $51.5 million in revenue for the partial quarter, as well as by the addition of several branded ophthalmic products, which were acquired in late 2013 and early 2014. Revenue increases also came from strong organic growth in the sales of existing products. Note that the ECR pharmaceuticals business we divested this quarter, was not reflected in revenue, ECR's net results are shown in discontinued operations

*    *    *

Second quarter 2014 Rx segment revenues were $136.2 million versus $67.4 million in the prior-year quarter, an increase of 102%. Rx segment revenue growth came primarily from the Hi-Tech acquisition, as well as acquired branded ophthalmic products and strong organic growth in the sales of existing products. Second quarter 2014 Consumer Health segment revenue was $14.5 million versus $9.7 million in the prior-year quarter, an increase of 50%. Year-over-year growth was driven largely by the Hi-Tech acquisition.

Consolidated gross margin for the second quarter of 2014 was 50.9% compared with 54.7% in the comparable prior-year period. Second quarter 2014 gross margin included $3.6 million in amortization of the step-up of Hi-Tech's acquired inventory. Excluding this impact, second quarter 2014 gross margin was 53.2%. Second quarter 2014 gross margins by segment were as follows: Rx 50% and consumer health 60%.

A $3.6 million in amortization step-up of Hi-Tech's acquired inventory was entirely in the Rx pharmaceutical segment, and excluding this impact, second quarter Rx segment gross margin was 52.5%. It's also worth noting that while the ECR pharmaceutical business we divested was not particularly profitable, at the bottom line it did generate considerably higher gross margins than our overall corporate average, which were not included in this quarter's gross margin.

*    *    *

GAAP net income for the second quarter of 2014 was $8.5 million or $0.07 per diluted share compared to GAAP net income of $12.6 million or $0.11 per diluted share in the comparable prior year quarter. Second quarter 2014 net income included a number of items related to the Hi-Tech and VersaPharm acquisitions including: acquisition related expenses, the $3.6 million of amortization of inventory step up already mentioned, a gain from product divestitures, financing related fees on the Hi-Tech and VersaPharm term loan commitments, and a loss from discontinued operations for the ECR pharmaceuticals divestiture.

Non-GAAP adjusted net income for the second quarter of 2014, excluding the impact of these items, was $29.3 million or $0.25 per diluted share compared to

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

non-GAAP adjusted net income of $15.3 million or $0.14 per diluted share in the comparable prior year quarter. Second quarter 2014 non-GAAP adjusted EBITDA was $55.3 million, compared with $26.8 million in the prior year quarter. These non-GAAP financial measures are defined further in today's earning release under non-GAAP financial measures.

136.    On August 11, 2014, Akorn filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal second quarter, which was signed by Defendant Dick and reiterated the Company's financial results previously announced on August 5, 2014.  The Form 10-Q also contained required Sarbanes-Oxley certifications, signed by Defendants Rai and Dick, substantially similar to the certifications contained in paragraph 128 above.   In the "Management's Discussion and Analysis" section, Akorn reported organic growth of $9.9 million, a growth rate of 12.9% compared to the second quarter of the prior year.

137.    The statements set forth in the paragraphs above were false and misleading because: (a) the Company did not experience 12.9% organic growth, which was actually 3.6% during the second quarter; (b) the Company improperly shifted an $8.9 million overstatement of Hi-Tech's chargeback reserve to the income statement, artificially inflating net revenue by $8.9 million; (c) the Company failed to accurately take into account all potential downstream rebate obligations in the wholesale channel, which materially overstated Akorn's net revenue (by $1.4 million) and net income; (d) the Company failed to reserve certain revenue deductions, namely rebates, billbacks, failure to supply, price protection penalties, and other contractual adjustments, even though they were probable and estimable based on information that was generally known or knowable to the Company, resulting in a material overstatement of net revenue (by $1.7 million) and net income; (e) the Company's financial statements were not prepared in accordance with GAAP; (f) the Company was not "on track" to fully integrate Hi-Tech due to problems integrating its accounting system and the failure to implement a system to

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

accurately process and account for rebates and chargebacks; (g) the Company was not timely and adequately taking steps to remediate the material weaknesses in its internal controls, particularly with respect to gross to net revenue calculations; and (h) the Company was able to beat the Wall Street consensus revenue estimate only due to these accounting violations..

**D.      Akorn Announces the Completion of the VersaPharm Acquisition**

138.    On August 12, 2014, Akorn issued a press release titled, "Akorn Completes Acquisition of VersaPharm." Therein, the Company, provided certain "Key Acquisition Highlights," which included, among other things, a "[s]traightforward integration process due to VersaPharm's outsource manufacturing model."

139.    The statement set forth in the paragraph above was misleading because the Company touted its ability to integrate VersaPharm without disclosing: (a) the Company's problems integrating Hi-Tech's accounting system and the failure to implement a system to accurately process and account for rebates and chargebacks; and (b) the Company's failure to timely and adequately take steps to remediate the material weaknesses in its internal controls, particularly with respect to gross to net revenue calculations.

**E.      Akorn Announces 2014 Third Quarter Financial Results**

140.    On November 6, 2014, Akorn issued a press release titled, "Akorn Reports Preliminary 2014 Third Quarter Results." Therein, the Company, in relevant part, stated:

**Expects Strong Fourth Quarter With Revenues Between $215 Million and $225 Million and Adjusted EPS Between $0.44 and $0.46**

Akorn, Inc. (Nasdaq:AKRX), a niche pharmaceutical company, today reported preliminary financial results for the fiscal third quarter ended September 30, 2014. Consolidated revenues for the third quarter were $132.7 million and included $39.9 million of costs associated with price increases. Excluding these costs, third quarter adjusted net income per diluted share was $0.27. The Company's prior full year guidance for revenue and adjusted net income per diluted share included an estimated $25 million in costs associated with price increases.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**Third Quarter 2014 Key Highlights and Accomplishments**

- Completed the acquisition of VPI Holdings Corp., the parent company of VersaPharm Incorporated, in early August.

*    *    *

Raj Rai, Chief Executive Officer commented, "Our strong business momentum continued this quarter, with double digit organic growth and strong performance from the acquisitions that were completed over the last 12 months. . . .

**Financial Results for the Quarter Ended September 30, 2014**

Consolidated revenue for the third quarter of 2014 was $132.7 million, an increase of 62% over the third quarter 2013 consolidated revenue of $81.9 million. Third quarter 2014 consolidated revenue was reduced by $39.9 million in costs associated with third quarter price increases. The year-over-year increase, excluding the impact of these costs, was largely driven by the Hi-Tech and VersaPharm acquisitions, the addition of several branded ophthalmic products which were acquired in late 2013 and early 2014, as well as strength in Akorn's established base business.

Consolidated gross margin for the third quarter of 2014 was 39% compared with 53% in the third quarter of 2013. In addition to the costs associated with price increases, third quarter 2014 consolidated gross margin included $6.3 million in amortization of the step-up of Hi-Tech and VersaPharm acquired inventories. Excluding the impact of these items, third quarter 2014 gross margin was 57%.

GAAP net loss for the third quarter of 2014 was ($11.7) million, or a loss of ($0.11) per share compared to GAAP net income of $12.2 million, or $0.11 per diluted share in the comparable prior year quarter. Excluding the impact of costs associated with price increases and other non-GAAP adjustments, adjusted net income for the third quarter of 2014 was $32.6 million, or $0.27 per diluted share compared to adjusted net income of $16.7 million, or $0.15 per diluted share in the comparable prior year quarter. Third quarter 2014 adjustments to net income included a number of items described in the GAAP to non-GAAP reconciliation later in this release.

141.   Also on November 6, 2014, Defendants Rai and Dick participated in Akorn's

2014 third quarter conference call.  During the earnings call, Defendant Rai claimed:

We had another solid quarter with strong financial performance. We achieved revenues of $132 million in the third quarter, or adjusted revenues of $172 million before the impact of costs and fees associated with the price adjustments

particularly for the acquired Hi-Tech products. The adjusted revenues for the third quarter represented an increase of nearly 111% from the third quarter of 2014.

Our growth predominantly came from the acquisitions completed in the past 12 months, but more importantly we had an impressive 11% organic growth in the base business. In the third quarter, the costs associated with the price adjustments were much higher than anticipated as we won more than projected customer awards.

\*     \*     \*

Let me now provide you with an update on the key strategic and operational initiatives for 2014. On the acquisition front, as discussed during our last conference call, we are on track with our plans to fully integrate the business that we acquired of Hi-Tech by the end of this year. And are also on track to realize about $20 million in cost synergies by the end of this year, which is at the higher end of initial expectations. We are also in the process of integrating the recently closed VersaPharm acquisition which is also planned to be completed by year end.

\*     \*     \*

In conclusion, our business continues to have solid growth momentum, as a result of successful execution of our strategic initiatives, coupled with favorable market trends. Our acquisition strategy, in particular, has been delivering strong results while we continue to build a robust product pipeline for long-term growth. Given the continued momentum in the fourth quarter, we expect to achieve a major milestone of crossing $1 billion in annual revenues in the near future.

142.　　During the November 6, 2014 earnings call, Defendant Dick provided the

following detailed disclosure of Akorn's financial results:

Moving on to third-quarter results, consolidated revenue for the third quarter of 2014 totaled $132.7 million, which is up 62% over the comparable prior year quarter consolidated revenue of $81.9 million. Excluding the $39.9 million in pricing related costs, third-quarter revenue was $172.6 million, which is up 111% over the prior year quarter revenue.

The year-over-year increase was largely driven by the Hi-Tech and VersaPharm acquisitions, the addition of several branded ophthalmic products, which were acquired in late 2013 and early 2014, as well as strength in Akorn's base business which was up 11% organically over the prior year quarter, all of this partially offset by the costs associated with price increases.

\*     \*     \*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Third-quarter 2014, our RX pharmaceutical segment revenue was $120 million versus $72.7 million in the prior-year quarter, an increase of 65%, or 120%, excluding pricing related costs. RX pharmaceutical segment revenue growth came primarily from the Hi-Tech and VersaPharm acquisitions, the acquired branded ophthalmic products and strong organic growth in the sales of existing products.

Third-quarter 2014 consumer health segment revenue was $12.7 million versus $9.2 million in the prior year quarter, an increase of 38%. Year-over-year growth in this segment was driven largely by the Hi-Tech acquisition.

Consolidated gross margin for the third quarter of 2014 was 39% compared to 53.4% in the comparable prior-year period. In addition to the pricing related costs, third-quarter 2014 gross margin included $7.2 million in amortization of the step up of Hi-Tech and VersaPharm's acquired inventories as well as accelerated depreciation on planned assets. Excluding these costs, third-quarter 2014 gross margin was 57.3%.

Second-quarter 2014 gross margin by segment were as follows: RX pharmaceuticals, 37.7%; and consumer health, 48.9%. A pricing related costs inventory step-up and accelerated depreciation were entirely in the RX pharmaceutical segment, and excluding these costs, third-quarter RX pharmaceutical segment gross margin was 57.7%.

*     *     *

GAAP net loss for the third quarter of 2014 was $11.7 million or $0.11 per share compared to GAAP net income of $12.2 million or $0.11 per diluted share in the comparable prior year quarter. Third-quarter 2014 GAAP net income included a number of items related to the Hi-Tech and VersaPharm acquisitions, including acquisition related expenses, $6.3 million in amortization of inventory step-up, a gain from product divestitures and financing related fees related to the Hi-Tech and VersaPharm term loans.

As noted earlier, third-quarter GAAP net income also included $39.9 million in costs associated with price increases as well as accelerated depreciation on plant facilities, and finally, $1.1 million in accelerated amortization on Akorn India's customer relationship intangible asset as a result of exiting a number of contract manufacturing relationships we acquired with that acquisition.

Non-GAAP adjusted net income for the third quarter of 2014 excluding the impact of these items was $32.6 million, or $0.27 per diluted share compared to non-GAAP adjusted net income of $16.7 million or $0.15 per diluted say in the comparable prior-year quarter. Third-quarter 2014 non-GAAP adjusted net income lagged behind our expectation of a flat quarter sequentially, inclusive of an anticipated $25 million in cost associated with price increases.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

The main contributors were the slower step up to higher Clobetasol pricing in the quarter, the unusually high in-transit sales that roll over into Q4 and the additional payroll taxes associated with option exercises.

143.     During the November 6, 2014 earnings call, Defendant Dick also had the following exchange with an analyst from Bank of America Merrill Lunch:

Sumant S. Kulkarni:  And then from a longer term perspective, how should we think about organic revenue and or net income growth rate for the Company going forward?

Timothy A. Dick: That's something we'll address certainly when we guide for 2015. I mean, we've now reported two quarters where we've had 10%, 11% organic growth year over year, so we've had certainly strong organic growth this year. Whether that can be sustained with the addition of pipeline approvals on into 2015 and beyond is something that I think is probably best addressed in our 2015 guidance discussion.

144.     On November 10, 2014, Akorn filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal third quarter, which was signed by Defendant Dick and reiterated the Company's financial results previously announced on November 6, 2014.  The Form 10-Q also contained required Sarbanes-Oxley certifications, signed by Defendants Rai and Dick, substantially similar to the certifications contained in paragraph 128 above.    In the "Management's Discussion and Analysis" section, Akorn reported organic growth of $10.8 million, a growth rate of 13.2% compared to the third quarter of the prior year.

145.     The statements set forth in the paragraphs above were false and misleading because: (a) the Company did not experience organic growth of 11% (earnings call) or 13.2% (Form 10-Q), as organic growth was at most 8.3% in the third quarter; (b) the Company failed to accurately take into account all potential downstream rebate obligations in the wholesale channel, which materially overstated Akorn's net revenue (by $8.1 million) and net income; (c) the Company failed to reserve certain revenue deductions, namely rebates, billbacks, failure to supply, price protection penalties, and other contractual adjustments, even though they were

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

probable and estimable based on information that was generally known or knowable to the Company, resulting in a material overstatement of net revenue (by $2.9 million) and net income; (d) the Company's financial statements were not prepared in accordance with GAAP; (e) the Company's integration of Hi-Tech and VersaPharm was plagued by the failure to timely integrate their accounting systems and the failure to implement a system to accurately process and account for rebates and chargebacks; and (f) the Company was not timely and adequately taking steps to remediate the material weaknesses in its internal controls, particularly with respect to gross to net revenue calculations.

**F.      Akorn Participates in the J.P. Morgan Healthcare Conference**

146.    On January 12, 2015, Defendant Rai participated in the J.P. Morgan Healthcare Conference, during which he stated:

> Our financial performance has been outstanding in the last five years. We have seen not only our revenues grew, our margins have expanded, as well as the income going up. We can see from this chart our adjusted revenues have grown 65% compounded over the last four years, 89% for the adjusted EBITDA and 63% for the adjusted EPS. Again, in 2014, we are expected to double our financial performance over 2013.

147.    Defendant Rai also had the following exchange during the Q&A session on January 12, 2015:

> Dana C. Flanders: So, as we head into 2015, can you just talk about your priorities, where your focus is? Is it on integrating some of these assets? Is it kind of looking out at the M&A landscape again or is it just continued execution on the base business front? Can you talk about where you're spending most of your time?
>
> Raj Rai: We have some residual integration left on one of the acquisitions. That's the Hi-Tech acquisition. The other acquisitions are fully integrated. So that's going to be a focus in the first half of the year.

148.    The statements set forth in the paragraphs above were false and misleading because: (a) the Company failed to accurately take into account all potential downstream rebate obligations in the wholesale channel, which materially overstated Akorn's net revenue and net

income; (b) the Company failed to reserve certain revenue deductions, namely rebates, billbacks, failure to supply, price protection penalties, and other contractual adjustments, even though they were probable and estimable based on information that was generally known or knowable to the Company, resulting in a material overstatement of revenue and net income; (c) the Company's financial statements were not prepared in accordance with GAAP; (d) the Company's integration of Hi-Tech and VersaPharm was plagued by the failure to timely integrate their accounting systems and the failure to implement a system to accurately process and account for rebates and chargebacks; and (e) the Company was not timely and adequately taking steps to remediate the material weaknesses in its internal controls, particularly with respect to gross to net revenue calculations.

### G. Akorn Announces 2014 Fourth Quarter and Full Year 2014 Financial Results

149. On February 26, 2015, Akorn issued a corrected press release titled, "Akorn Reports Preliminary Fourth Quarter and Full Year 2014 Results." Therein, the Company, in relevant part, stated:

*- Fourth Quarter GAAP EPS of $0.29; Non-GAAP Adjusted EPS of $0.50 -*

\* \* \*

*- 2015 Non-GAAP Adjusted EPS Guidance of $1.88 - $1.98 -*

\* \* \*

Consolidated revenue for the fourth quarter was $227.8 million and included $12.4 million of costs associated with competitive pricing actions during the fourth quarter. GAAP diluted earnings per share (EPS) was $0.29 in the fourth quarter of 2014, compared to GAAP EPS of $0.14 in the prior year period. Adjusted non-GAAP diluted EPS for the fourth quarter 2014 increased to $0.50 compared to $0.14 in the fourth quarter of 2013.

Consolidated revenue for full year 2014 was $601.9 million and included $52.2 million of costs associated with competitive pricing actions during the second half

of the year. GAAP diluted EPS was $0.38 for the full year 2014, compared to GAAP EPS of $0.46 for the full year 2013. Adjusted non-GAAP diluted EPS for full year 2014 increased to $1.16 compared to $0.55 in full year 2013.

*       *       *

**Fourth Quarter 2014 Key Highlights and Accomplishments**

- Total revenue of $227.8 million, up 168 percent versus the prior year period. Excluding one-time costs associated with competitive pricing actions, adjusted total revenue for the quarter was $240.2 million, up 183 percent versus the prior year period.
- GAAP gross margin of 56.4 percent, compared to 55.3 percent in the prior year period; excluding $7.8 million in costs in the fourth quarter 2014 from amortization of inventory step-up and costs associated with competitive pricing actions, non-GAAP adjusted gross margin was 61.8 percent, up from 55.3 percent in the prior year period.
- GAAP diluted EPS of $0.29, up 107 percent from the prior year period; non-GAAP adjusted diluted EPS of $0.50, up 257 percent from the prior year period.

*       *       *

**2014 Represented a Key Transformative Year for Akorn**

- The Company completed the acquisition of Hi-Tech Pharmacal on April 17, adding over 50 new products to the Akorn portfolio.
- Akorn completed the acquisition of VersaPharm on August 12, complementing the Hi-Tech acquisition through the addition of 20 products along with a robust pipeline of dermatology-focused pipeline products.

150.    Also on February 26, 2015, Defendants Rai and Dick participated in Akorn's

2014 fourth quarter conference call. During the earnings call, Defendant Rai stated:

Akorn reported record preliminary results for the fourth quarter with total adjusted revenue of $240 million and adjusted EPS of $0.50 a share. Before the adjustments, we achieved revenue of $228 million and diluted EPS of $0.29 a share.

Our adjusted revenue of $240 million in the quarter represents more than 183% growth from the fourth quarter 2013, primarily driven by our acquisitions in 2014, which included Hi-Tech, VersaPharm and Xopenex Inhalation Solution and the seasonal impact of higher sales from cough and cold products acquired through Hi-Tech. Also reflected in our fourth quarter sales is the successful resolution of

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

the back orders from the third quarter encountered due to Clobetasol market dynamics and the in-transit sales from the third quarter. More importantly, we achieved a strong top line organic growth for the base Akorn business in the fourth quarter, reflecting continued strength of our core portfolio.

151. During the February 26, 2015 earnings call, Defendant Rai also stated:

[W]e successfully completed the transformative Hi-Tech and VersaPharm acquisitions. Together these deals have transformed Akorn from a niche player in generic ophthalmics and injectables into diversified leader in specialty generics. Through these transactions, we have successfully leveraged our infrastructure, expanded our combined profitability and margins and have realized significant cost synergies as one combined company.

152. On the February 26, 2015 earnings call, Defendant Dick provided the following

detailed disclosure of Akorn's financial results:

[C]onsolidated revenue for the fourth quarter of 2014 totaled $228 million, which is up 168% over the prior-year fourth quarter consolidated revenue of $85 million. Excluding the $12 million in costs associated with competitive pricing actions, fourth quarter revenue was $240 million, which is up 183% over the prior-year quarter.

This year-over-year increase was largely driven by the Hi-Tech and VersaPharm acquisitions, as well as the addition of several branded ophthalmic products in late 2013 and early 2014. Continued double-digit organic growth and the acquisition of Xopenex Inhalation Solution and the Lloyd Animal Health product portfolio in the fourth quarter of 2014.

Fourth quarter revenue also benefited from in-transit sales at the end of the third quarter, which was a net benefit of around $7 million in revenue to fourth quarter, as well as the start of the cough/cold season and a catch-up in Clobetasol sales, which ended Q3 on back order. Closing the fourth quarter, our in-transit revenue normalized to levels closer to our historical norms.

For the full year 2014, consolidated net revenue was $602 million, an 89% increase from 2013. Excluding $52 million in costs associated with competitive pricing actions in the second half of the year, our 2014 consolidated net revenue was $654 million, representing a 106% increase over 2013. All of the factors that drove our fourth quarter revenue increase impacted full year revenue as well.

Fourth quarter 2014 Prescription Pharmaceutical segment revenue was $214 million versus $75 million in the prior year, an increase of 186%, or 202% excluding costs associated with competitive pricing actions, which flow entirely into the Prescription Pharmaceutical segment. Segment growth for Prescription Pharmaceuticals was driven primarily by the Hi-Tech Pharmacal and VersaPharm

acquisitions, the acquired branded opthalmic product, organic growth and, to a lesser extent, the Xopenex acquisition in the fourth quarter of this year.

For the full year 2014, Prescription Pharmaceuticals segment revenue was $552 million compared to $280 million in 2013, an increase of 97%, or 116% excluding costs associated with competitive pricing actions taken in the second half of 2014. The same factors that drove fourth quarter growth drove full-year growth for the Prescription pharmaceutical segment.

Moving to the Consumer Health segment, which includes our over-the-counter branded and private label products, as well as our Animal Health business, fourth quarter revenue was $14.2 million, an increase of 39% from $10 million in revenue in the prior year quarter. Revenue growth in this segment was largely driven by the portfolio of OTC products acquired in the Hi-Tech acquisition and, to a lesser extent, from the animal health products acquired from Lloyd in the fourth quarter of 2014. For the full year 2014, Consumer Health segment revenue was $50 million, a 33% increase from $38 million for the full year 2013.

Consolidated gross margin for the fourth quarter of 2014 was 56.4%, compared to 55.3% in the prior year period. Fourth quarter 2014 gross margin included close to $8 million in amortization of inventory step-up, as well as costs associated with pricing changes. Excluding these costs, fourth quarter 2014 gross margin was 61.8%. For the full year 2014, consolidated gross margin was 50.9%, compared to 54.1% in the prior year period.

In addition to costs associated with competitive pricing actions which impacted net revenue in the second half of the year, 2014 gross margin included close to $22 million in amortization of acquisition inventory step-up, as well as accelerated depreciation on plan assets. Excluding these costs, 2014 gross margin was 57.5%.

Fourth quarter 2014 gross margin in our Prescription Pharmaceuticals segment was 56.3%. With the adjustments noted earlier, adjusted segment gross margin for Prescription Pharmaceuticals was 62.1%. Fourth quarter 2014 gross margin in our Consumer Health segment was 57.3%. These gross margins compare to 2013 fourth quarter gross margins of 49.5% in Prescription Pharmaceuticals and 48.2% in Consumer Health.

For the full year 2014, Prescription Pharmaceuticals gross margin was 50.6%, or an adjusted 57.5%, compared to 54% in 2013. Consumer Health gross margin was 54.5% in 2014, compared to 54.8% in 2013

*       *       *

GAAP net income for the fourth quarter was $34 million, or $0.29 per diluted share, compared to $17 million and $0.14 per diluted share in the prior year period. Non-GAAP adjusted net income for the fourth quarter 2014 was $62

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

million, or $0.50 per diluted share, compared to non-GAAP adjusted net income of $17 million or $0.14 per diluted share in the prior year quarter.

For the year, GAAP net income was $41 million, or $0.38 per diluted share, compared to $52 million and $0.46 per diluted share in 2013. Non-GAAP adjusted net income for the full year 2014 was $143 million, or $1.16 per diluted share, compared to non-GAAP adjusted net income of $63 million, or $0.55 per diluted share, in 2013.

Adjusted EBITDA was $117 million in the fourth quarter of 2014, compared to $31 million in the fourth quarter of 2013. For the year, adjusted EBITDA was $275 million, compared to 2013 adjusted EBITDA of $111 million

153.    During the Q&A portion of the February 26, 2015 earnings call, Defendants Raj and Dick had the following interaction with an analyst from Bank of America Merrill Lynch:

Sumant S. Kulkarni: Could you give us some quantitative color on what the organic versus acquisition driven growth is embedded in the outlook? And also a potential contribution from launches that could be coming in the year?

Raj Rai: So let me answer that question. We've got a double-digit organic growth and obviously our organic growth also factors in the products that we're going to be launching. So that's in the organic growth and a big part of, obviously, our growth is coming from acquisition. I think, Tim, you may want to add something.

Timothy A. Dick: Sure. Sumant, as we've noted now three quarters running we've experienced [low double-digit] organic [growth this] year. And, as Raj mentioned, with the high point products, a few of which got out at the end of 2004, and a couple of which are in the process of being launched, and nine over the course of this. That's certainly going to [fuel] organic growth, as Raj mentioned.

154.    The statements set forth in the paragraphs above were false and misleading because: (a) Akorn's organic growth for the fourth quarter of 2014 was not "double-digit," but actually fell $9.0 million; (b) Akorn had not "realized significant cost synergies as one combined company" because the Company failed to timely integrate its accounting system with those of its new acquisitions and failed to implement a system to accurately process and account for rebates and chargebacks; (c) the Company failed to accurately take into account all potential downstream rebate obligations in the wholesale channel, which materially overstated Akorn's net revenue (by $1.0 million) and net income; (d) the Company failed to reserve certain revenue

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

deductions, namely rebates, billbacks, failure to supply, price protection penalties, and other contractual adjustments, even though they were probable and estimable based on information that was generally known or knowable to the Company, resulting in a material overstatement of net revenue (by $16.5 million) and net income; (e) the Company improperly recognized $2.9 million of revenue in the fourth quarter despite the absence of sufficient evidence to substantiate it; (f) the Company's financial statements were not prepared in accordance with GAAP; (g) the Company was able to beat the Wall Street consensus revenue estimate only due to these accounting violations; (h) the Company was able to meet its annual guidance of $580 million to $600 million, issued on August 5, 2014, only due to these accounting violations; and (i) the Company was not timely and adequately taking steps to remediate the material weaknesses in its internal controls, particularly with respect to gross to net revenue calculations.

## VII.   THE REVELATION OF THE TRUTH ABOUT AKORN'S INACCURATE FINANCIAL RESULTS

### A.      The Truth Begins to Emerge

155.    The truth about Akorn's inaccurate financial results and the material weaknesses in its internal and financial controls emerged through partial corrective disclosures.  First, on March 2, 2015, after the market closed, Akorn issued a press release titled, "Akorn Announces Filing Extension for Form 10-K."  Therein, the Company, in relevant part, stated:

> Akorn, Inc. (Nasdaq:AKRX), today announced that the Company filed a Form 12b-25, Notification of Late Filing with the U.S. Securities and Exchange Commission that allows the Company to extend the deadline to file its Form 10-K for the year ended December 31, 2014. The Company has experienced unforeseen delays in collecting and compiling certain financial and other related data that would be included in the Form 10-K relating to the VersaPharm and Hi-Tech Pharmacal subsidiaries which were not integrated into the Company's centralized accounting department and accounting systems as of December 31, 2014.
>
> In addition, the Company has not yet completed its assessment of the effectiveness of its internal control over financial reporting as of December 31,

2014 due to the aforementioned factors. The Company believes that material weaknesses exist as of December 31, 2014 relating to the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions and accurate and timely reporting of its financial results and disclosures in its Form 10-K. There is a possibility that upon completion of its assessment, the Company may determine that there are additional material weaknesses as of December 31, 2014.

The Company is in the process of completing the Form 10-K and its assessment of the effectiveness of internal control over financial reporting as of December 31, 2014. The finalization of financial information is not expected to result in any material change to previously reported financial statements or the financial results reported in our earnings release on February 26, 2015. Additionally, the Company expects to be able to complete its Form 10-K by the extended deadline of March 17, 2015.

156.    On this news, shares of Akorn declined $4.38, or over 8%, to close on March 3, 2015, at $49.33 per share, on unusually heavy volume.

157.    However, evidencing that the full truth regarding Akorn's inaccurate financial results and weak internal controls had yet to emerge, a "Flash Note" issued by Jeffries on March 3, 2015 stated as follows:

> We spoke with management after the market close. According to the company, the reason for the aforementioned filing deadline was due to unforeseen delays in collecting and compiling certain financial and other related data that would be included in the Form 10K. **The issue at hand is that information related to the Hi-Tech and VersaPharm subsidiaries were not integrated into Akorn's centralized accounting systems as of December 31, 2014.** Previously, management had expected the integration process to be completed last Fall but now anticipates the consolidation of the subsidiaries' financials by the end 1Q15. The consequence was that Akorn's auditors did not have sufficient time to complete their review.
>
> *            *            *
>
> While clearly a potential cause for investor concern, based on management commentary, it appears that the financial reporting delay should be addressed in short order and we eagerly await final submission of Akorn's 10K filing sometime in the next two weeks. **Importantly, management indicated that they don't expect "any material change to previously reported financial statements or the financial results reported in its earnings release on February 26, 2015."**

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

(Emphasis added.)

158.    Next, on March 17, 2015, after the market closed, Akorn issued a press release titled, "Akorn Files Annual Report on Form 10-K for Year Ended December 31, 2014; Restates Second and Third Quarter 2014 Financial Statements."  Therein, the Company, in relevant part, stated:

**Second Quarter and Third Quarter 2014 Restatement Related to an Error in Hi-Tech's Opening Balance Sheet**

During the 2014 year-end audit process, an error was identified in the fair value allocation of assets acquired and liabilities assumed in connection with the acquisition of Hi-Tech Pharmacal Co., Inc. (Hi-Tech), which resulted in an overstated chargeback reserve as of April 17, 2014. The error, which was identified on March 11, 2015, resulted from an overstatement of Hi-Tech's chargeback reserve in connection with applying the acquisition method of accounting at the closing of the Hi-Tech acquisition.

The overstatement in the chargeback reserve was caused by a manual error made in preparing the data related to the chargeback reserve whereby there was a duplication of inventory units held by one customer utilized in the calculation of the reserve amount for Hi-Tech products at the acquisition date. The duplication resulted in an overstatement of chargeback reserves by approximately $8.9 million for the opening balance sheet of Hi-Tech as of April 17, 2014. The chargeback reserve at the end of the quarter ended June 30, 2014 was then calculated correctly, resulting in the earlier overstated reserve amount being included in revenue during the quarter ended June 30, 2014. The correction of the error in the quarter ended June 30, 2014 resulted in a reduction of previously reported revenue by approximately $8.9 million, a reduction of previously reported pre-tax income by approximately $8.9 million and a reduction of previously reported net income, goodwill and retained earnings by approximately $5.6 million, for the Company's three and six month periods ended June 30, 2014.

As a result of that error, the Audit Committee of the Akorn Board of Directors, upon the recommendation of the Company's management, concluded that the previously issued financial statements contained in the Company's Quarterly Reports on Form 10-Q for the quarters ended June 30, 2014 and September 30, 2014 should not be relied upon due to an error in the financial statements as of and for the three and six month periods ended June 30, 2014 and as of and for the nine month period ended September 30, 2014, and that those financial statements would be restated to make the necessary accounting adjustments.

The relevant financial statements for the fiscal quarters ended June 30, 2014 and

September 30, 2014 will be restated to make the necessary accounting adjustments in Forms 10-Q/A that the Company expects to file shortly. The error has been corrected in the full year financial statements included in the Company's Annual Report on Form 10-K that will be filed today. In addition, corrected GAAP financial statements (and GAAP reconciliations for adjusted non-GAAP measures) for the year ended December 31, 2014 accompany this release.

The error had the following effects:

**Revenue & Pre-Tax Income Impact.** The error resulted in an overstatement of revenue and pre-tax income of approximately $8.9 million (GAAP and non-GAAP adjusted) for each of the three and six months ended June 30, 2014, as well as the year-to-date results for the nine months ended September 30, 2014 and the preliminary results for the year ended December 31, 2014. *The revenue and pre-tax income (GAAP and non-GAAP adjusted) reported for the three months ended March 31, 2014 and September 30, 2014 and reflected in the preliminary results for the three months ended December 31, 2014 were not impacted by this error.*

**Income Tax Expense Impact.** Because the error resulted in an overstatement of pre-tax income for the affected periods, GAAP and non-GAAP adjusted income tax expense was overstated by approximately $3.3 million for each of the three and six months ended June 30, 2014, as well as the year-to-date results for the nine months ended September 30, 2014 and the preliminary results for the year ended December 31, 2014. *Income tax expense (GAAP and non-GAAP adjusted) reported for the three months ended March 31, 2014 and September 30, 2014 and reflected in the preliminary results for the three months ended December 31, 2014 were not impacted by this error.*

**Net Income & EPS Impact.** The net impact of the error resulted in an overstatement of both GAAP and non-GAAP adjusted net income and GAAP diluted EPS and non-GAAP adjusted diluted EPS, of approximately $5.6 million and $0.05, respectively, for the three and six months ended June 30, 2014, as well as the year-to-date results for the nine months ended September 30, 2014 and the preliminary results for the year ended December 31, 2014. *GAAP diluted EPS and non-GAAP adjusted diluted EPS reported for the three months ended March 31, 2014 and September 30, 2014 and reflected in the preliminary results for the three months ended December 31, 2014 were not impacted by this error.*

**No Impact to Cash & Cash Equivalents.** The error and subsequent restatement is non-cash in nature and does not have an impact on the Company's cash and cash equivalents balances for any of the affected periods or the Company's liquidity or capital position.

The Company will file a Form 8-K today containing additional information on this matter.

**Frequently Asked Questions about the Restatement**

**Q1. What caused the error and subsequent restatement?**

A1. An error in the manual reconciliation of chargeback reserve data for one of the Company's customers resulted in a duplication and overstatement of the chargeback reserve of approximately $8.9 million for the Company's opening balance sheet of Hi-Tech as of April 17, 2014. Specifically, an erroneous query of an electronic data interface was made that overstated the amount of inventory reportedly held by the customer, which in turn caused the Company to overstate chargeback reserves. The chargeback reserve at the end of the quarter ended June 30, 2014 was then calculated correctly, resulting in the earlier overstated reserve amount being included in revenue during the quarter ended June 30, 2014. The error was limited to one customer and only to the process of creating the opening balance sheet of Hi-Tech following the close of the acquisition.

**Q2. What periods does the restatement cover?**

A2. The following table describes the periods affected by the restatement.

| 2014 Periods Affected | 2014 Periods Not Affected |
|---|---|
| Second quarter ended June 30 | Three months ended March 31 |
| - and as a direct result -- | Three months ended September 30 |
| Six months ended June 30 | Preliminary results for three months ended December 31 |
| Nine months ended September 30 | |
| Preliminary results for year ended December 31 | |

**Q3. What impact does the error and subsequent restatement have on Akorn's Income Statement, cash balance or liquidity?**

A3. The effect to the impacted periods (as described in Answer 2 above) is the following:

| Income Statement Metric | Adjustment |
|---|---|
| Revenue | Decrease by $8.853 million in all affected periods |
| Pre-Tax Income | Decrease by $8.853 million in all affected periods |
| Income Tax | Decrease by $3.282 million in all affected periods |
| Net Income | Decrease by $5.571 million in all affected periods |
| Diluted EPS | Decrease by $0.05 in all affected periods |

The error and subsequent restatement is non-cash in nature and does not have an impact on the Company's cash and cash equivalents balances for any of the affected periods or the Company's liquidity or capital position.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**Q4. Is Akorn's 2015 guidance affected by the restatement?**

A4. Akorn's 2015 guidance, furnished as part of the Company's Form 8-K on February 26, 2015 and affirmed in a press release on March 10, 2015, remains unchanged. That guidance calls for revenue between $960 million and $980 million and adjusted non-GAAP adjusted diluted EPS between $1.88 and $1.98.

**Q5. What is Akorn doing to address the situation that led to the restatement?**

A5. In connection with its assessment of the effectiveness of its internal control over financial reporting at December 31, 2014, the Company concluded there were certain material weaknesses in internal control over financial reporting, including an additional material weakness that it had inadequate controls in place to prevent or detect material errors in the financial statements of acquired subsidiaries. The error described herein, which requires the restatement of the Company's condensed consolidated financial statements for the quarter and six-months ended June 30, 2014 and the nine months ended September 30, 2014, is a result of this material weakness. The Company has also concluded that its disclosure controls and procedures were not effective as of December 31, 2014, due to these material weaknesses in its internal control over financial reporting. These conclusions are described further in the Company's Annual Report on Form 10-K, which will be filed today. The Company is actively engaged in remediating its material weaknesses and plans to do the following to address the events that led to the restatement.

- Akorn will conduct manual data validation procedures on certain reports related to gross to net adjustments.
- Akorn will enhance the design of management review controls for gross to net adjustments to increase the level of precision.
- Akorn is in the process of establishing a dedicated revenue accounting team focused primarily on significant gross to net revenue adjustments.
- Akorn will continue to develop and expand upon controls specifically designed to identify material errors within subsidiary financial statements.
- Akorn will deploy appropriate personnel with public company accounting experience at the subsidiary level, as needed.
- Akorn will add dedicated personnel within the finance and accounting departments to focus exclusively on acquisitions and acquisition integration.
- Akorn is in the process of bolstering the Company's information technology department to facilitate faster system integration of acquired entities. The Company anticipates full system integration of Hi-Tech during the second quarter of 2015.

159. Shortly thereafter, on April 15, 2015, JP Morgan initiated coverage of Akorn.

Demonstrating that the full truth of the breadth and severity of the impending restatement had

not yet been disclosed, JP Morgan stated:

> **We believe concerns over material weaknesses in internal controls are largely behind the company**
>
> Akorn found material weaknesses relating to its internal controls over financial reporting and delayed filing its 10-K due to trouble collecting Hi-Tech and VersaPharm financial data.  Since then, Akorn has filed its 10-K with *a very modest ~$9mln revenue and $0.05 earnings impact to 2Q/14 results (relating to Hi-Tech), with no impact to 2015 financial guidance.  We believe this should alleviate concerns and note Akorn is taking steps to remediate its material weaknesses*, including enhancing review systems and hiring the appropriate personnel.

(Bold italicized emphasis added.)

### B.    The Full Truth Emerges: Disclosures at the End of the Class Period

160.    On April 24, 2015, after the market closed, Akorn issued a press release entitled, "Akorn to Make Additional Financial Restatements."  Therein, the Company, in relevant part, stated:

> **Company Affirms 2015 Adjusted Diluted Earnings Per Share Guidance**
>
> Akorn, Inc. (Nasdaq:AKRX) today announced that it will restate its previously issued financial statements for the annual period ending December 31, 2014 and the quarterly periods ending June 30, 2014, September 30, 2014 and December 31, 2014 due to errors identified during the first quarter 2015 financial review process.
>
> On April 20, 2015, the Audit Committee of the Board of Directors of Akorn, Inc. (the Audit Committee), upon the recommendation of the Company's management concluded that the financial statements for the quarterly periods ending June 30, 2014, September 30, 2014 and December 31, 2014 along with the annual period ending December 31, 2014 should not be relied upon because of errors in the financial statements in those associated periods. Furthermore, management's report on the effectiveness of internal control over financial reporting as of December 31, 2014 should no longer be relied upon. Additionally, the opinion of Akorn's independent registered public accounting firm, KPMG LLP (KPMG) on the consolidated financial statements for the year ended December 31, 2014, as well as KPMG's opinion on the effectiveness of the Company's internal control over financial reporting as of December 31, 2014, should no longer be relied upon.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

During the review process with respect to the quarter ended March 31, 2015, the Company identified errors related to understatements of rebates and other sales allowances that have resulted in an overstatement of the Company's net revenue for the affected periods described above. A substantial majority of these errors are related to companies and products acquired in 2014, the formation of purchasing alliances among several of the Company's customers and changing competitive dynamics for select acquired products during 2014.

Akorn is in the process of analyzing the impact of the restatements on its previously reported financial statements, including previously restated results for the quarters ending June 30, 2014 and September 30, 2014. The errors will be corrected through amendments to Forms 10-Q for the fiscal quarters ended June 30, 2014 and September 30, 2014 and Form 10-K for the year ended December 31, 2014. The amended forms will be filed prior to the filing of Akorn's Form 10-Q for the fiscal quarter ended March 31, 2015.

**Initial Assessment of Impact**

While the exact impact to the Company's financial statements has not been determined, based on management's preliminary assessment, the errors related to the understatements of rebates and other sales allowances are estimated to have resulted in an overstatement to net revenue and pretax income from continuing operations of $20 million to $35 million for the year ending December 31, 2014. The allocation of the impact of the errors among the affected quarterly periods has not been determined. The estimated impact of the errors could materially change based on further review and analysis of the affected periods, including due to potential identification of other errors. Additional material weaknesses in the internal control over financial reporting may be identified in connection with known or potential errors noted above. In concert with determining the ultimate impact to the Company's financial statements, Akorn is working to remediate the issues that caused these errors.

**Timely Filing of First Quarter Financials Is Not Expected**

Akorn anticipates that it will not be able to file its Form 10-Q for the first quarter of 2015 in a timely manner because of the pending restatements to prior-period results. While the Company plans to request a five-day extension to file its Form 10-Q with the U.S. Securities and Exchange Commission, the Company does not anticipate it will meet the extended deadline.

**Independent Investigation Commissioned by the Audit Committee**

The Audit Committee will be conducting an independent investigation into the circumstances surrounding the errors that resulted in the misstatements, which will involve retaining outside advisors to assist in the investigation.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**Akorn Affirms 2015 Earnings Guidance**

Akorn affirms its 2015 earnings per share guidance issued on February 26, 2015 calling for adjusted diluted EPS of between $1.88 and $1.98.

161.    On this news, shares of Akorn declined $12.14 per share, nearly 22%, to close on April 27, 2015, at $43.10 per share, on unusually heavy volume.

162.    The market was stunned, and the credibility of Akorn's management was called into question. Gabelli & Co. commented, in part, as follows:

> *Credibility concerns.* One month after a delayed 10-K filing and restatement (lowering 2014 revenue by $8.9M and EPS by $0.05), Akorn is facing another restatement. The company's initial assessment implies a $0.10-0.20 reduction to 2014 EPS, but the full review will likely take several months and suspend reporting of Q1 results. The company is maintaining 2015 EPS guidance ($1.88-1.98) but not confirming revenue guidance ($960- 980M). The company also announced the hiring of additional executives in finance, compliance, and operations, but these are unlikely to be enough to offset the damage to management's credibility. While the current management team has done an impressive job turning the company around over the last 6+ years, these restatements could lead to calls for new management with more experience leading a company with $1B+ sales.

163.    Additionally, less than two weeks after issuing a report stating that it "believe[d] concerns over material weaknesses in internal controls [were] largely behind the company" and the impact of a restatement on revenue and earnings would be "modest," JP Morgan issued a second report lowering its December 2015 price target and stating:

> Last Friday, Akorn announced additional financial restatements relating to the understatement of rebates and other sales allowances (i.e. overstating net revenues) mostly on recently acquired companues and products, with the initial assessment a 10-15% impact to 2014 EPS. *We expect shares to come under pressure this morning and likely to remain range bound until we have greater clarity on timing of remediation and full extent of these errors*.

(Emphasis added.)

## C.    Post Class Period Disclosures: Akorn Issues Its Restatement

164.    Following the Company's announcement on April 24, 2015 that it would restate

certain financial results, Akorn sought and received multiple extensions to filing such a restatement. Eventually, after the market close on May 10, 2016, Akorn filed a comprehensive Annual Report on Form 10-K for the year ended December 31, 2015, which contained the consolidated financial statements for the year ended December 31, 2015 and consolidated restated financial statements for the year ended December 31, 2014, and also filed a press release with the audited 2015 and audited and restated 2014 results, and non-GAAP financial measures.

165.    In the Company's 10-K filed after the market close on May 10, 2016, Akorn disclosed that it had restated its consolidated financial statements for the year ended December 31, 2014 and for the quarter and year to date periods ended March 31, 2014, June 30, 2014, and September 30, 2014.

166.    Akorn disclosed that its restatement related primarily to errors in estimates for rebates and contractual allowances: "The restatements principally adjusts Akorn's accounting of net revenue and pretax income from continuing operations as a result of identified errors primarily related to understatements of rebates and contractual allowances."

167.    Expanding on its accounting violations and restatement adjustments, the Company further disclosed the following:

> In connection with the foregoing, upon the recommendation of Akorn's management and Board of Directors, the Audit Committee commenced an independent investigation which included review of accounting errors and other issues involving transactions related to sales to wholesalers, direct purchasers and other related transactions. The Audit Committee investigation also identified two additional accounting matters that warranted further examination and review, and the investigation was expanded to cover these matters: (i) customer payment term modifications and related revenue recognition practices, timing and disclosures for 2013 through 2015 and (ii) returns processing delays.

> *        *        *

> The following errors were identified by the Audit Committee and the Company and are corrected through the restatement of the three months ended March 31,

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

2014, three and six months ended June 30, 2014, the three and nine months ended September 30, 2014 and the year ended December 31, 2014:

(a)     The Company understated the rebate reserve estimate related to inventory in the wholesale channel (the "pipeline reserve"). Historically, the Company estimated the downstream rebate obligation related to inventory on hand with wholesalers at period end based on contractual rebate rates applied to quantity and value of reported inventory on hand at wholesalers. This allowed for the appropriate recognition of net revenue as the downstream liabilities were recorded in the same period as the sale. In 2014, the pipeline reserve calculated by the Company reflected most fees owed to wholesalers, but it did not accurately take into account the entire population of potential downstream rebate obligations, which significantly changed subsequent to the acquisitions completed in the year, and general consolidation in the industry during that period. The Company subsequently revised its pipeline reserve calculation to include the entire population of potential downstream rebate obligations. The Company's revised calculation resulted in an increased pipeline reserve, increasing rebates and contractual allowances and decreasing net revenue. These pipeline reserve errors resulted in a reduction of net revenues of $1.4 million in the three month period ended June 30, 2014, $8.1 million and $9.5 million in the three and nine month period ended September 30, 2014 and $1.0 million and $10.5 million in the three and twelve month period ended December 31, 2014, respectively.

(b)     The Company identified errors in its estimates and year-end cutoff related to certain revenue deductions, namely rebates, billbacks, failure to supply, price protection penalties and other contractual adjustments. It is the Company's policy to recognize liabilities such as those discussed above when probable and estimable in accordance with US GAAP. The items were determined to be errors as the information necessary to record the reserves for these items was generally known or knowable as of the financial statement dates. The recognition of these gross to net revenue reserves resulted in an increased rebate and contractual allowance reserves and decreased net revenue. These estimates and cut-off errors resulted in a reduction of net revenues of $1.7 million in the three month period ended June 30, 2014, $2.9 million and $4.6 million in the three and nine month period ended September 30, 2014 and $16.5 million and $21.0 million in the three and twelve month period ended December 31, 2014, respectively. In addition, for a portion of a transaction with a single customer, revenue was recognized despite a lack of sufficient evidence on which to properly recognize such revenue in accordance with ASC 605 — "Revenue Recognition," which error resulted in a reduction of net revenues of $2.9 million in the three and twelve month period ended December 31, 2014.

168.    The Company also expanded the disclosure of its accounting policy for "Chargebacks and Rebates" to include accounting for other contractual adjustments to revenue:

> Other adjustments consist primarily of price adjustments, also known as "shelf-stock adjustments" and "price protections," which are both credits issued to reflect increases or decreases in the invoice or contract prices of the Company's products. In the case of a price decrease a credit is given for product remaining in customer's inventories at the time of the price reduction. Contractual price protection results in a similar credit when the invoice or contract prices of the Company's products increase, effectively allowing customers to purchase products at previous prices for a specified period of time. Amounts recorded for estimated shelf-stock adjustments and price protections are based upon specified terms with direct customers, estimated changes in market prices, and estimates of inventory held by customers. The Company regularly monitors these and other factors and evaluates the reserve as additional information becomes available. Other adjustments also include prompt payment discounts.

169.    Finally, Akorn disclosed that its internal control system was ineffective, and that the Company and its management had failed to comply with SEC regulations and the requirements of COSO.  In its 2015 Form 10-K, Akorn's management specifically disclosed that its internal control over financial reporting was not effective as of December 31, 2015.  The Company had control deficiencies related to the recording of revenue, which was deemed to be a material weakness.  Akorn described this material weakness in item 9A of its 2015 Form 10-K that was filed with the SEC on May 10, 2016.

## VIII.  AKORN'S VIOLATIONS OF GAAP RULES IN ITS FINANCIAL STATEMENTS FILED WITH THE SEC

170.    During the Class Period, the Company's financial statements and Defendants' statements about the Company's financial results were false and misleading given that: (a) the financial information was not prepared in conformity with GAAP, and (b) the financial information was not a fair presentation of the Company's operations due to the Company's improper accounting for net revenues and gross to net revenue reserves.

171.    Given these accounting irregularities, the Company announced financial results

that were in violation of GAAP and the following principles:

(a)    The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, 10);

(b)    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, 34);

(c)    The principle that "financial reporting should provide information about the economic resources of Akorn, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, 40);

(d)    The principle that "financial reporting should provide information about Akorn' financial performance during a period" was violated (FASB Statement of Concepts No. 1, 42);

(e)    The principle that "financial reporting should provide information about how management of Akorn has discharged its stewardship responsibility to owners (stockholders) for the use of Akorn resources entrusted to it" was violated (FASB Statement of Concepts No. 1, 50);

(f)    The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, 58-59);

(g)    The principle that "completeness, meaning that nothing is left out of the

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, 79);

(h)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, 95);

(i)     The principle that revenue can be recognized only when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price to the buyer is fixed or determinable, and collectability is reasonably assured (ASC 605-10-S99);

(j)     The principle that a contingent loss accrues and must be recorded if it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements, and the amount of loss can be reasonably estimated (ASC 450-10-20, 450-20-25-2, 450-20-25-5, 450-20-30-1); and

(k)     The principle that consideration provided by a vendor to a customer is generally presumed to be a reduction of the selling prices and is reported as a reduction of revenue (ASC 605-50-20, 650-50-45-2, 650-50-45-4).

172.     The adverse information during the Class Period and detailed above was in violation of SEC Regulation G, General rules regarding disclosure of non-GAAP financial measures (§ 244.100).

## IX.     <u>CLASS ACTION ALLEGATIONS</u>

173.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Akorn's

common stock between May 6, 2014 and April 24, 2015, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

174.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Akorn's common stock was actively traded on the Nasdaq exchange (the "NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Akorn shares were traded publicly during the Class Period on the NASDAQ. As of March 31, 2016, Akorn had 119,430,000 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Akorn or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

175.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

176.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

177.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, financials, operations and management of Akorn;

- whether the Individual Defendants caused Akorn to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Akorn common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of those damages.

178. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

179. The market for Akorn's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Akorn's securities traded at artificially inflated prices during the Class Period. On

April 23, 2015, the Company's stock closed at a Class Period high of $55.92 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Akorn's securities and market information relating to Akorn, and have been damaged thereby.

180. During the Class Period, the artificial inflation of Akorn's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Akorn's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Akorn and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

181. At all relevant times, the market for Akorn's securities was an efficient market for the following reasons, among others:

(a)     Akorn stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Akorn filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Akorn regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases

on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Akorn was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

182.    As a result of the foregoing, the market for Akorn's securities promptly digested current information regarding Akorn from all publicly available sources and reflected such information in Akorn's stock price. Under these circumstances, all purchasers of Akorn's securities during the Class Period suffered similar injury through their purchase of Akorn's securities at artificially inflated prices and a presumption of reliance applies.

183.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XI.    <u>LOSS CAUSATION</u>

184.    The disclosure of Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

185.    During the Class Period, Plaintiff and the Class purchased Akorn's common stock at artificially inflated prices and were damaged thereby.  The price of the Company's common stock significantly declined when the misrepresentations made to the market, and/or the

information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed in two partial disclosures on March 2, 2015 and April 24, 2015, causing investors' losses.

186.    On March 3, 2015, after Akorn announced that it was extending its deadline to file its 2014 10-K, disclosing for the first time that that it had experienced what the Company characterized as unforeseen delays in collecting and compiling critical data relating to the VersaPharm and Hi-Tech subsidiaries, and further disclosing that it believed that accounting-based material weaknesses existed as of December 31, 2014, shares of Akorn declined $4.38 per share, or over 8%, to close on March 3, 2015 at $49.33 per share, on unusually heavy volume.

187.    On the same day, online investor site *The Motley Fool* reacted with a headline noting that "Akorn Got Crushed Today" and stating "that there's nothing to like about the company's admission that it has material weaknesses in its accounting operations." Yet this pessimism was nonetheless buoyed by the incorrect belief – fomented by Akorn – that the Company "w[ould] be able to file within the 15 day extension period."

188.    However, on April 24, 2015, after Akorn disclosed that its historical financial statements in 2014 would once again need to be restated and its Form 10-Q would not be filed on time, shares of Akorn declined another $12.14 per share, nearly 22%, to close on April 27, 2015 at $43.10 per share, on unusually heavy volume.

189.    On the next trading day on April 27, 2015, *The Street.com*, a financial news and services website, quoted analyst David Amsellem as stating that, "Though management does not believe the accounting issues will impact 1Q15 results, and it is sticking with its 2015 guidance, there is in our view far too large of a credibility gap to simply take those statements at face value. We believe that significant management changes will be needed to restore Akorn's

credibility and further find it difficult to envision how these missteps will not result in a change in the CFO position[.]"

## XII.    ADDITIONAL SCIENTER ALLEGATIONS

190.    As alleged herein, Individual Defendants acted with scienter in that Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth elsewhere herein in detail, Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Akorn, his control over, and/or receipt and/or modification of Akorn's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Akorn, participated in the fraudulent scheme alleged herein.

191.    First, the sheer magnitude of Akorn's restatement supports an inference of scienter.  In total, the Company has disclosed that it artificially inflated its revenue 8.4% and its net income a staggering ***194.7%***.   As a result of the Restatement, $46.9 million revenue and $27.0 million of net income evaporated.   The Restatement wiped out the vast majority of the Company's net income originally reported during the 2014 fiscal year, reducing it from $40.9 million to just $13.9 million.  It is unfathomable that the Individual Defendants were unaware of the significant accounting violations and grossly inadequate internal controls that led to such an enormous restatement of financial results. Indeed, if the Individual Defendants were unaware of these accounting violations, such ignorance would be severely reckless.

192.     Second, the financial results were consistently inflated, thereby enabling the Company to beat Wall Street consensus revenue estimates for the 2014 second and fourth quarters.   Indeed, *nearly all* of the errors identified in the Restatement had the effect of artificially inflating net revenue and income, while virtually none of the errors identified in the Restatement had the  effect of understating net revenue or income.

193.     Third, the Individual Defendants had clear notice of the material weaknesses in the Company's internal controls, yet failed to remediate these weaknesses.  From 2012 through 2015, three independent audit firms audited Akorn's internal control over financial reporting. Each time, with management's concurrence, the independent auditor determined that the Company's internal controls were ineffective and suffered from material weaknesses.  Certain of the identified material weaknesses directly related to the accounting violations acknowledged by the Restatement. For example, during the ***2013*** audit, the Company identified the absence of controls designed to validate the completeness and accuracy of data, leading to errors in the data used to calculate gross to net revenue adjustments, as a material weakness. And during the 2014 audit, the Company identified the absence of adequate process or controls to prevent or detect material errors in the financial statements of acquired subsidiaries as another material weakness. Yet by the end of 2015, Defendants had still failed to remediate these deficiencies.

194.     The Company did set forth steps to remediate these weaknesses in various Remediation Plans.  Certain of these steps were directly related to the very accounting violations that later led to the Restatement.  For example, in the 2014 Remediation Plan, Akorn represented that it would: (1) ***conduct data validation on certain reports related to gross to net revenue adjustments*** and inventory, (2) ***establish a dedicated revenue team to focus primarily on significant gross to net revenue adjustments***, and (3) ensure that all systems relied upon in the

financial reporting process are subject to ***Information Technology General Controls (ITGCs)
which are intended to prevent system changes that could affect the completeness and accuracy
of the data used***. However, despite representing that it had made improvements to its internal
controls, the Company failed to implement any of these steps by the end of 2015. Indeed, the
Individual Defendants abdicated their responsibility to remediate material weaknesses in Akorn's
internal controls concerning gross to net revenue calculations, inevitably resulting in materially
overstated revenues and earnings figures.

195.    Fourth, the Individual Defendants' knowledge of the Company's grossly
inadequate internal controls is also confirmed by confidential witnesses. CW12, a Senior
Internal Auditor at Akorn from July 2014 through January 2015 stated that Akorn had
deficiencies in its calculations for gross to net revenue reserves and that the calculation of such
reserves was a significant concern for the Company. According to CW12, Akorn knew about
these deficiencies since at least 2013, when KPMG specifically identified the problem in its 2013
audit. CW12 reiterated that it was a big concern, everyone knew that it was a big concern,
including management, who knew that it was a big concern that needed to be corrected.

196.    Fifth, the Individual Defendants' scienter is also apparent from their own
admissions, throughout the Class Period, that they closely monitored and evaluated the
operations and accounting underlying Akorn's financial statements. These admissions support
Individual Defendants' knowledge or reckless disregard that their public statements were false
and misleading

197.    For example, just before the Class Period started, Defendants made the following
representations to investors regarding "Remediation Plan for Material Weakness in Internal
Control over Financial Reporting":

- "With the oversight of senior management and our audit committee, we have begun taking steps and plan to take additional measures to remediate the underlying causes of the material weaknesses";

- "With respect to completeness and accuracy concerns, management intends to add additional accounting and internal audit personnel and design, document, and test controls that are intended to validate the completeness and accuracy of the data used in our significant estimates and accounting transactions"; and

- "senior management and our audit committee are closely monitoring the implementation of these remediation plans"

198.    In addition, the Company's 2014 10-K disclosed that: "*[m]anagement obtains certain wholesaler inventory reports to aid in analyzing the reasonableness of the chargeback allowance*."

199.    Finally, in the wake of the Restatement, both CFO Dick and Corporate Controller Hebeda lost their positions leading Akorn's accounting operations.  CW8, a Credit Manager at Akorn from October 2014 to August 2015 who reported directly to Hebeda, stated that Defendant Dick's resignation was premised on his general failure to make certain that Akorn's financial statements were accurate, as well as the fact that he presided over a $30 million error that was internally characterized as being far beyond the level of typical acceptability.

200.    In addition to the numerous allegations throughout the Complaint demonstrating Defendants' scienter, and for the reasons further detailed herein, each of the Individual Defendants had knowledge of or recklessly disregarded that the public statements and documents the Company issued or disseminated were materially false and misleading. Defendants Rai and Dick also undertook the affirmative obligation to obtain knowledge in order to ensure that the

Company's disclosures to the market were truthful by executing Sarbanes-Oxley certifications, which stated, *inter alia*, that Akorn's financial statements did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report …."

## XIII.  NO SAFE HARBOR

201.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Akorn who knew that the statement was false when made.

## XIV.  CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

202.   Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

203.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Akorn's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

204.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Akorn's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

205.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Akorn's financial well-being and prospects, as specified herein.

206.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Akorn's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state

material facts necessary in order to make the statements made about Akorn and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

207.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

208.    The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Akorn's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated

by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

209.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Akorn's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Akorn's securities during the Class Period at artificially high prices and were damaged thereby.

210.   At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Akorn was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Akorn securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

211.   By virtue of the foregoing, Defendants have violated Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder.

212.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

213.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

214.    The Individual Defendants acted as controlling persons of Akorn within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

215.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged

herein, and exercised the same.

216.    As set forth above, Akorn and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XV.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XVI.    <u>JURY TRIAL DEMAND</u>

Plaintiff hereby demands a trial by jury.

Dated: July 5, 2016        Respectfully submitted,


**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Joshua L. Crowell*
Lionel Z. Glancy
Robert V. Prongay
Joshua L. Crowell (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150

**POMERANTZ LLP**
Patrick V. Dahlstrom
Louis C. Ludwig
POMERANTZ LLP
10 South LaSalle Street
Chicago, Illinois 60603
312-377-1181
pdahlstrom@pomlaw.com
lcludwig@pomlaw.com

*Co-Lead Counsel*

**LAWRENCE, KAMIN, SAUNDERS &
UHLENHOP, L.L.C.**
John S. Monical
Peter E. Cooper
Mitchell B. Goldberg
300 S. Wacker Drive, Suite 500
Chicago, Illinois 60606
(312) 372-1947

*Liaison Counsel for Plaintiff*


CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**PROOF OF SERVICE BY ELECTRONIC POSTING PURSUANT TO NORTHERN DISTRICT OF ILLINOIS ECF AND LOCAL RULES**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.

On July 5, 2016, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of Illinois, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 5th day of July, 2016, at Los Angeles, California.

_s/ Joshua L. Crowell_
Joshua L. Crowell

## Mailing Information for a Case 1:15-cv-01944 In re Akorn, Inc. Securities Litigation

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Peter E. Cooper**
  pcooper@lksu.com,shennessey@lksu.com,aterry@lksu.com

- **Joshua L. Crowell**
  jcrowell@glancylaw.com,info@glancylaw.com

- **Patrick Vincent Dahlstrom**
  pdahlstrom@pomlaw.com,mjsteven@pomlaw.com

- **Timothy A. Duffy**
  tduffy@kirkland.com,christina.pietsch@kirkland.com

- **Mitchell Benjamin Goldberg**
  mgoldberg@lksu.com,jjones@lksu.com

- **Devon McKechan Largio**
  dlargio@kirkland.com,ashley.pflaumer@kirkland.com,christina.pietsch@kirkland.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Louis Carey Ludwig**
  lcludwig@pomlaw.com

- **Francis P. Mcconville**
  fmcconville@pomlaw.com

- **John Scott Monical**
  jmonical@lksu.com,jjones@lksu.com,aterry@lksu.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com

- **Kevin Francis Ruf**
  kevinruf@gmail.com

- **Casey E. Sadler**
  csadler@glancylaw.com,info@glancylaw.com

- **Daniel Slifkin**
  dslifkin@cravath.com,mao@cravath.com,omadhany@cravath.com,mboggess@cravath.com,kdacey@cravath.com,dstuart@cravath.com,cgreenberg@cravath.com

- **Leigh Handelman Smollar**
  lsmollar@pomlaw.com

- **David M. Stuart**
  dstuart@cravath.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)