# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE AKORN, INC. SECURITIES LITIGATION | : Case No. 15-CV-01944<br>:<br>: Judge Gary Feinerman<br>: |

## PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
## <u>THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ..........................................................................................3

    A.    Akorn's Business ....................................................................................3

    B.    Defendants' Admitted Accounting Violations........................................4

    C.    Akorn's Admitted Internal Control Deficiencies...................................5

    D.    Witness Accounts of Akorn's Internal Control Deficiencies .................7

    E.    Defendants' Materially False and Misleading Statements......................8

    F.    Akorn's Restatement...............................................................................8

ARGUMENT .............................................................................................................10

I.    The CAC Adequately Alleges Defendants' Materially False or Misleading Statements ...........................................................................................................10

    A.    Akorn's Financial Statements and Defendants' Statements Concerning Net Revenue and Net Income Were Materially False ...................................10

    B.    Defendants' Statements Contained Materially Misleading Omissions ................15

    C.    Defendants' Statements Concerning the Integration of Hi-Tech and VersaPharm Were Materially Misleading ..........................................17

II.    The CAC Adequately Alleges a Strong Inference That Defendants Acted With Scienter ....................................................................................................17

    A.    Akorn's Material Weakness Disclosures Are Not Exculpatory but Instead Raise a Strong Inference of Scienter...........................................18

    B.    The Magnitude of the Restatement and the Nature of Akorn's Violations of GAAP and Its Own Accounting Policies Supports an Inference of Scienter .......21

    C.    The Confidential Witness Allegations Support an Inference of Scienter .............25

    D.    The Resignations at Akorn Support an Inference of Scienter................28

    E.    Defendants' Sarbanes-Oxley Certifications Support an Inference of Scienter......29

    F.    Akorn's History With Its Independent Auditors Supports an Inference of Scienter ..........................................................................................29

G.      Investigations By the SEC and the DOJ Further Support an Inference of
        Scienter .................................................................................................................30

H.      Plaintiff Adequately Pled Akorn's Corporate Scienter...........................................31

I.      Plaintiff's Allegations Together Raise a Strong Inference of Scienter..................31

III.    The CAC Adequately Alleges Loss Causation .................................................................32

IV.     The CAC Adequately Alleges Rai and Dick's Secondary Liability As Control
        Persons .............................................................................................................................35

CONCLUSION ...............................................................................................................................35

## TABLE OF AUTHORITIES

<u>CASES</u>

*Abrams v. Baker Hughes Inc.*,
    292 F.3d 424 (5th Cir. 2002) ........................................................................ 23, 24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................ 10

*Batwin v. Occam Networks, Inc.*,
    2008 WL 2676364 (C.D. Cal. July 1, 2008) .......................................... 19, 29-30, 31

*Crowell v. Ionics, Inc.*,
    343 F. Supp. 2d 1 (D. Mass. 2004) .............................................................. 21, 23

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ............................................................................ 22

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) .............................................................................. 32, 33, 35

*Epstein v. World Acceptance Corp.*,
    No. 6:14-CV-10606-MGL, 2016 WL 4458312 (D.S.C. Aug. 24, 2016) .................... 28, 30

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011) .................................................................................... 33

*Freedman v. Weatherford Int'l Ltd.*,
    No. 12 Civ. 2121 LAK, 2013 WL 5299137 (S.D.N.Y. Sept. 20, 2013) .................... 18, 22

*Gelfer v. Pegasystems, Inc.*,
    96 F. Supp. 2d 10 (D. Mass. 2000) .................................................................... 22

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ............................................................................ 34

*Goldberg v. Household Bank, F.S.B.*,
    890 F.2d 965 (7th Cir. 1989) ............................................................................ 22

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) .................................................................................... 33

*Harden v. Raffensperger, Hughes & Co.*,
    65 F.3d 1392 (7th Cir. 1995) ............................................................................ 13

*Hughes v. Huron Consulting Grp., Inc.*,
   733 F. Supp. 2d 943 (N.D. Ill. 2010) ............................................................... 18, 31

*In re Allied Prods. Corp., Inc. Sec. Litig.*,
   No. 99 C 3597, 2000 WL 1721042 (N.D. Ill. Nov. 15, 2000) ................................. 21

*In re ArthoCare Corp. Sec. Litig.*,
   726 F. Supp. 2d 696 (W.D. Tex. 2010) ................................................................. 21

*In re Bally Total Fitness Sec. Litig.*,
   No. 04 C 3530, 2006 WL 3714708 (N.D. Ill. July 12, 2006) ................................. 22

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005) ................................................................. 11

*In re Career Educ. Corp.*, No. 03 C,
   8884, 2007 WL 1029092 (N.D. Ill. Mar. 27, 2007) ............................................... 22

*In re Crocs, Inc. Sec. Litig.*,
   774 F. Supp. 2d 1122 (D. Colo. 2011) ................................................................. 23

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015) ................................................................. 16

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................... 22

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................. 24

*In re Motorola Sec. Litig.*,
   No. 03 C 287, 2004 WL 2032769 (N.D. Ill. Sept. 9, 2004) ................................... 14

*In re NeoPharm, Inc. Sec. Litig.*,
   705 F. Supp. 2d 946 (N.D. Ill. 2010) ............................................................ 11, 14

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................................... 27

*In re Northfield Labs., Inc. Sec. Litig.*,
   527 F. Supp. 2d 769 (N.D. Ill. 2007) ................................................................. 34

*In re Northfield Labs., Inc. Sec. Litig.*,
   No. 06 C 1493, 2008 WL 4372743 (N.D. Ill. Sept. 23, 2008) ............................ 32, 35

342402.2 AKORN

*In re OCA, Inc. Sec. & Deriv. Litig.*,
No. 05-2165, 2006 WL 3747560 (D. La. Dec. 14, 2006) .................................... 27, 29, 30

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) .................................................................................. 27

*In re Sipex Corp. Sec. Litig.*,
No. C 05-00392 WHA, 2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) .................................... 11

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) .......................................................... 19, 28

*In re Watchguard Sec. Litig.*,
No. C05-678J, 2006 WL 2038656 (W.D. Wash. Apr. 21, 2006) .............................................. 22

*Indosuez Carr Futures, Inc. v. Commodity Futures Trading Comm'n*,
27 F.3d 1260 (7th Cir. 1994) ............................................................................ 12

*Kleinman v. Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013) .............................................................................. 14

*Kohut v. KBR, Inc.*,
No. H-14-1287, 2015 WL 11995250 (S.D. Tex. Sept. 3, 2015) .............................................. 31

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) .............................................................................. 33

*Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
711 F. 3d 754 (7th Cir. 2013) ............................................................................ 25

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ............................................................................ 32

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006) ............................................................................ 24

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
513 F.3d 702 (7th Cir. 2008) ............................................................... 17, 18, 25, 31

*Marks v. CDW Computer Centers, Inc.*,
122 F.3d 363 (7th Cir. 1997) ............................................................................ 11

*Matrix Capital Management Fund, LP v. BearingPoint, Inc.*,
576 F.3d 172 (4th Cir. 2009) ............................................................................ 21

*Matrixx Initiatives, Inc. v. Siracusano,*
   563 U.S. 27 (2011) ................................................................................................. 11

*Mulligan v. Impax Labs., Inc.,*
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ...................................................................... 27

*New Orleans Emps.' Ret. Sys. v. PrivateBankcorp, Inc.,*
   No. 10 C 6826, 2011 WL 5374095 (N.D. Ill. Nov. 3, 2011) .................................... 16

*Norfolk Cnty. Ret. Sys. v. Ustian,*
   No. 07 C 7014, 2009 WL 2386156 & n.5 (N.D. Ill. July 28, 2009) ................... 18, 32

*Omnicare, Inc. v. Lab. Dist. Council Constr. Indus. Pens. Fund,*
   135 S. Ct. 1318 (2015) ........................................................................................... 16

*Ong ex rel. Ong v. Sears, Roebuck & Co.,*
   No. 03 C 4142, 2005 WL 2284285 (N.D. Ill. Sept. 14, 2005) ................................. 20

*Oran v. Stafford,*
   226 F.3d 275 (3d Cir. 2000) ................................................................................... 14

*P. Stolz Family P'ship L.P. v. Daum,*
   355 F.3d 92 (2d Cir. 2004) ..................................................................................... 13

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.,*
   679 F. 3d 952 (7th Cir. 2012) ................................................................................. 24

*Pommer v. Medtest Corp.,*
   961 F.2d 620 (7th Cir. 1992) ............................................................................ 13, 15

*Pugh v. Tribune Co.,*
   521 F.3d 686 (7th Cir. 2008) ............................................................................ 10, 20

*Rehm v. Eagle Fin. Corp.,*
   954 F. Supp. 1246 (N.D. Ill. 1997) ......................................................................... 22

*Roth v. AON Corp.,*
   No. 04-C-6835, 2008 WL 656069 (N.D. Ill. Mar. 7, 2008) .................................... 23

*Roth v. OfficeMax, Inc.,* No. 05 C,
   236, 2006 WL 2661009 (N.D. Ill. Sept. 13, 2006) ................................................. 16

*S.E.C. v. Kelly,*
   663 F. Supp. 2d 276 (S.D.N.Y. 2009) ..................................................................... 11

*Schleicher v. Wendt,*
    618 F.3d 679 (7th Cir. 2010) ......................................................................... 14, 33

*Schlifke v. Seafirst Corp.,*
    866 F.2d 935 (7th Cir. 1989) ............................................................................. 15

*Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.,*
    No. 11 C 8332, 2013 WL 566805 (N.D. Ill. Feb. 3, 2013) ..................................... 25

*Silverman v. Motorola, Inc.,*
    No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ................................ 17

*Spears v. Metro. Life Ins. Co.,*
    No. 2:07-CV-88 JVB, 2009 WL 2408928 (N.D. Ind. Aug. 4, 2009) ........................ 34

*Stavros v. Exelon Corp.,*
    266 F. Supp. 2d 833 (N.D. Ill. 2003) ................................................................... 17

*Stocke v. Shuffle Master, Inc.,*
    615 F. Supp. 2d 1180 (D. Nev. 2009) ......................................................... *passim*

*Tabankin v. Kemper Short-Term Glob. Income Fund,*
    No. 93 C 5231, 1994 WL 319185 (N.D. Ill. June 23, 1994) .............................. 12-13

*Teamsters Local 282 Pension Trust Fund v. Angelos,*
    762 F.2d 522 (7th Cir. 1985) ............................................................................. 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ..................................................................................... 18, 32

*U.S. S.E.C. v. Fisher,*
    No. 07 C 4483, 2012 WL 3757375 (N.D. Ill. Aug. 28, 2012) ................................ 22

*Veeco Instruments, Inc. Sec. Litig.,*
    253 F.R.D. 220 (S.D.N.Y. 2006) ........................................................................ 23

*Virginia Bankshares, Inc. v. Sandberg,*
    501 U.S. 1083 (1991) .................................................................................... 12, 14

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tec., Inc.,*
    28 F. Supp. 3d 93 (D. Mass. 2014) ........................................................ 19, 30, 32

## RULES

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 10

Lead Plaintiff Akorn Investor Group (consisting of Lead Plaintiff members Mikolaj Sarzynski, Jonathan A. Golani, Kenny Kinsey, J. Michael Cuniff Jr., and Elizabeth Cuniff) ("Plaintiff"), submit this memorandum of law in opposition to Defendants' motion to dismiss.

## PRELIMINARY STATEMENT

At the heart of this accounting fraud is Defendants' egregiously reckless indifference to correcting a critical problem that they had notice of before the start of the Class Period: Akorn, Inc.'s ("Akorn" or the "Company") failure to establish internal controls to validate the completeness and accuracy of data used to calculate gross to net revenue adjustments. Not only had Defendants identified this material weakness, they had identified straightforward measures to remedy it, such as hiring additional personnel and installing additional software. But Defendants inexcusably failed to effectively implement those measures, despite representing that they were closely monitoring the problem. According to former employees, Akorn's accounting system and practices with respect to calculating gross to net revenue remained dysfunctional and susceptible to material error throughout the Class Period, and the Company's independent auditors informed Chief Executive Officer ("CEO") Rajat Rai ("Rai") and Chief Financial Officer ("CFO") Timothy A. Dick ("Dick") of the continuing deficiencies. Exacerbating the problem, Akorn acquired two subsidiary companies in 2014, making it even more important to remedy the material weakness. Instead, Defendants failed to timely integrate the acquired subsidiaries' accounting systems. Consequently, Akorn disseminated materially false financial results to unwitting investors throughout the Class Period.

Fully aware of the internal control material weakness, Defendants knew, or turned a blind eye to the fact, that federal securities regulations and accounting principles required them to get the gross to net revenue calculations right before disseminating Akorn's financial statements and attesting to their accuracy. Defendants were not even close: in 2014, Akorn's reported net revenue

1

was overstated by $46.9 million, or 8.4%, and its reported net income was overstated by $27.0 million, or a stunning 194.7%. These artificially inflated financial results were the result of accounting violations caused not by subjective judgment, but by the failure to account for all applicable deductions to gross revenue in violation of GAAP and Akorn's own accounting policies, which allowed the Company to meet its annual revenue guidance to analysts.

After the accounting violations came to light, there have been further indications of wrongdoing. Three months after Akorn announced that it would issue a restatement, Dick tendered his resignation, effective immediately. The Company did not have a replacement CFO at the ready, and Dick has yet to find another position. Akorn's Corporate Controller Dave Hebeda ("Hebeda"), was moved to a non-accounting position. Upon issuing its Restatement,[1] Akorn touted the fact that different people were in charge of its accounting. Further, Akorn admitted that it failed to maintain an effective control environment and failed to appropriately remediate material weaknesses on a timely basis. Its independent auditor was dismissed after advising the Company that new information had brought into question whether management's representations could be relied upon. The Securities and Exchange Commission ("SEC") and Department of Justice ("DOJ") have initiated investigations that are ongoing.

Defendants urge the Court to ignore all of these facts and focus myopically on Akorn's disclosures about material weakness in its internal controls. This argument ignores that Defendants represented affirmatively, despite the issues with internal controls, that Akorn's financial statements fairly presented in all material respects the results of the Company's operations and its financial condition, *i.e.*, that its financials were honest. Telling investors that your financial results are accurate when you have engaged in egregiously reckless, if not intentional, conduct, as evident here,

---

[1] The "Restatement" refers to the first restatement on March 17, 2015 and the second restatement on May 10, 2016, collectively.

2

resulting in massive overstatements of revenue and net income which required a restatement under GAAP, is not excused merely because you issued a vague warning about internal controls.

## STATEMENT OF FACTS

### A.  Akorn's Business

Defendant Akorn is a specialty pharmaceutical company that develops, manufactures, and markets prescription pharmaceuticals. ¶ 26.[2] Defendant Rai was, at all relevant times, CEO and a director of Akorn. ¶ 23. Defendant Dick was CFO, Principal Financial Officer, and Principal Accounting Officer of Akorn from June 15, 2009 through August 3, 2015, when he tendered his resignation, effective immediately. ¶ 24. In 2014, Akorn completed the acquisition of two companies: Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") and VPI Holdings Corp. ("VPI"), which is the parent company of VersaPharm Inc. ("VersaPharm"). ¶¶ 31-34.

Akorn sells certain of its pharmaceutical products directly to retinal surgeons, ophthalmologists, and hospitals, but the vast majority of its customers elect to have their contracts managed indirectly, *i.e.*, through the "wholesale channel," whereby wholesalers buy product from Akorn and sell it to end users. ¶ 28. In 2014, a significant portion of Akorn's gross and net sales and its accounts receivable occurred in the wholesale channel. ¶ 29.

To maintain standard pricing between wholesalers, Akorn contracts to sell wholesalers products at predetermined prices, known as the Wholesaler Acquisition Price ("WAP"). ¶ 30. Akorn also contracts to sell certain end users products at predetermined prices. ¶¶ 28, 35. When a wholesaler sells a product to an end user that is subject to a contractual agreement with Akorn, the wholesaler charges the difference between the WAP and the price under the end user's contract to Akorn, a process known as a "chargeback" or "billback." ¶ 35. Akorn also issues other contractual

---

[2] Paragraph ("¶ __") references are to the Consolidated Amended Complaint ("CAC") (Dkt. No. 82). References to "Defs. Br. at __" are to Defendants' brief in support of their motion to dismiss (Dkt. No. 93).

adjustments to its customers, including rebates. *Id*. Pursuant to Akorn's own accounting policies, Akorn is required to track chargebacks, billbacks, and rebates by product number and contract to accurately calculate gross to net revenue reserves and indirect sales. ¶¶ 35, 91, 101.

### B. Defendants' Admitted Accounting Violations

As the Restatement would reveal, Akorn's publicly issued financial statements for the first, second, third, and fourth quarters of 2014 and fiscal year ("FY") 2014 were materially false and prepared in violation of Generally Accepted Accounting Principles ("GAAP") and the Company's own accounting policies. In total for 2014, Akorn artificially inflated its net revenue by 8.4% ($46.9 million) and its net income by a staggering 194.7% ($27.0 million). ¶ 49. Defendants' accounting violations primarily related to the understatement of rebates, chargebacks, and other contractual allowances that must be estimated, reserved, and then deducted from gross revenue to calculate Akorn's net revenue. ¶ 54. But for these accounting violations, the Company would have fallen short of its annual revenue guidance and Wall Street consensus revenue estimates for two of the four fiscal quarters during the Class Period. ¶¶ 50-51.

Specifically, Defendants: (1) overstated Hi-Tech's chargeback reserve by $8.9 million and improperly shifted that overstatement from the balance sheet to the income statement, thereby artificially inflating its net revenue by $8.9 million for the 2014 second quarter (¶ 55); (2) understated the pipeline reserve in 2014 by failing to accurately take into account all potential downstream rebate obligations, resulting in an overstatement of net revenue of $10.5 million in 2014 (¶ 56); (3) understated gross to net revenue reserves in 2014 by failing to estimate certain revenue deductions – namely rebates, bill-backs, failure to supply, price protection penalties, and other contractual adjustments – resulting in an overstatement of net revenue of $21.0 million in 2014 (¶ 57); (4) improperly recognized $2.9 million of revenue for a portion of a transaction with a certain

customer in the fourth quarter of 2014, despite the absence of sufficient evidence to substantiate it (*id.*); and (5) the inaccurate amortization of financing commitment fees, a $1.9 million error that Akorn deemed "material" and overstated first quarter net income by $300,000, or 3.5% (¶ 58).

### C.    Akorn's Admitted Internal Control Deficiencies

During *four consecutive* year-end audits, from 2012 through 2015, three independent audit firms, with management's concurrence, identified material weaknesses in Akorn's internal controls over financial reporting and determined that the controls were ineffective. ¶ 64. Certain of these material weaknesses directly related to the Company's gross to net revenue *mis*calculations that materially inflated revenue and net income and ultimately led to the Restatement.

Just before the start of the Class Period, Akorn filed its 2013 Form 10-K, which disclosed that the Company failed to "have controls designed to validate the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions. As a result, errors were identified in the underlying data used to support significant estimates and accounting transactions, primarily relating to [*inter alia*] gross to net revenue adjustments[.]" ¶ 67. To remediate this material weakness, Akorn stated that it would add "accounting and internal audit personnel and design, document, and test controls that are intended to validate the completeness and accuracy of the data used in our significant estimates and accounting transactions." ¶ 68. The Company represented that it had already made improvements to its internal controls, including the "implementation of new systems and software applications related to the gross to net revenue process." *Id.* Moreover, Akorn represented that "senior management" was "closely monitoring the implementation of [the] remediation plans." *Id.*

Yet in its 2014 Form 10-K filed just before the end of the Class Period, Akorn again declared its internal controls to be ineffective and identified the very same material weakness relating to the

failure to have controls designed to validate the completeness and accuracy of data used to calculate gross to net revenue. ¶ 71. To remediate this material weakness, Akorn stated that it would take actions that were closely similar to the actions the Company said it would take in its 2013 Form 10-K, including "[c]onduct manual data validation procedures" and "[e]stablish a dedicated revenue accounting team focused primarily on significant gross to net revenue adjustments." ¶ 73. Again with the "oversight of senior management," Akorn represented that it had "begun taking steps" to remediate this and other material weaknesses. *Id.*

Nonetheless, after the end of the Class Period, when Akorn filed its 2015 Form 10-K, Akorn once again disclosed that its internal controls were ineffective and identified the very same material weakness relating to the failure to have controls designed to validate the completeness and accuracy of data used to calculate gross to net revenue. ¶ 76. Akorn also disclosed that it had failed to "maintain an effective control environment" because the Company's accounting and financial reporting personnel lacked sufficient knowledge, experience, and training and because the Company failed to "appropriately remediate existing material weaknesses *on a timely basis*." *Id.* (emphasis added). Akorn's remediation plan included certain actions that were identical to those the Company said it would take in its 2014 Form 10-K, including "[c]onduct manual data validation procedures" and "[e]stablish a dedicated revenue accounting team focused primarily on significant gross to net revenue adjustments." ¶ 79.

Against this backdrop of unremediated material weaknesses, Akorn completed two large acquisitions in 2014 of Hi-Tech and VersaPharm. ¶¶ 31-34. As Akorn acknowledged in its 2014 Form 10-K, the Company "did not have an adequate process or appropriate controls in place to prevent or detect material errors in the financial statements of acquired subsidiaries." ¶ 71.

6

### D.     Witness Accounts of Akorn's Internal Control Deficiencies

Consistent with Akorn's admitted internal control deficiencies, former employees identified additional deficiencies that further contributed to errors in the calculation of the gross to net revenue reserve, including: (1) manual entries without checks to prevent incorrect or miscalculated numbers from being entered; (2) inadequate procedures for management to review reserve calculations for accuracy; and (3) the lack of any system to trigger an investigation for accuracy under certain circumstances. ¶¶ 106, 110-12. During 2014, Akorn's independent auditor at the time, KPMG, reported continuing internal control deficiencies relating to gross to net revenue calculations to Akorn's senior management, including Rai, Dick, and Corporate Controller Hebeda. ¶ 107.

Also consistent with Akorn's material weakness disclosures, former employees stated that the Company lacked the personnel to accurately calculate gross to net revenue adjustments. The accounting department was understaffed generally, and the personnel specifically responsible for making the gross to net revenue calculations were overwhelmed, due in large part to the recent acquisitions of Hi-Tech and VersaPharm. ¶¶ 113-14. Exacerbating the problem, Corporate Controller Hebeda was inadequate for the job, an assessment that the independent auditors shared. ¶ 114.

After completing the acquisitions of Hi-Tech and VersaPharm, Akorn failed to timely integrate the subsidiaries' accounting systems. ¶¶ 83-89. According to former employees, the integration of Hi-Tech's accounting system was repeatedly delayed, and as late as 2016, Akorn and Hi-Tech's accounting data remained stored on separate systems. ¶ 89. Akorn accountants had to pull Hi-Tech accounting data into Excel, make the required calculations, and then input the resulting figures in Akorn's system. ¶¶ 89, 108. These additional steps increased the likelihood of error (¶ 89), especially given the absence of checks to ensure accurate and reliable data. Worse, Akorn's legacy accounting system was outdated and ill-suited for calculating a pharmaceutical company's gross to

7

net revenue adjustments; the system required personnel to make manual entries, which were highly susceptible to error. ¶¶ 92-95.

### E. Defendants' Materially False and Misleading Statements

Due to the accounting violations described above, Akorn reported materially overstated (1) net revenue for the second, third, and fourth quarters of 2014 and FY 2014 (¶¶ 132-33, 135, 137, 140-43, 145-46, 148-54); (2) organic growth for the second, third, and fourth quarters of 2014 (¶¶ 136-37, 140-45, 150, 152-54);[3] and (3) net income for the first, second, third, and fourth quarters of 2014 and FY 2014 (¶¶ 126, 129, 132-33, 135, 137, 145, 148, 149-154). Accordingly, Defendants' statements concerning Akorn's net revenue and net income, including whether the Company met annual guidance and Wall Street consensus estimates, and their representations that Akorn's financial statements were prepared in accordance with GAAP (¶¶ 128-29, 137, 148, 154), were materially false as well.

Defendants made further statements that were materially misleading because they omitted that Akorn failed to: (1) timely and adequately take steps to remediate the material weaknesses in its internal controls, particularly with respect to gross to net revenue deductions (¶¶ 128-29, 131, 137, 139, 145, 148, 154); (2) timely integrate Hi-Tech's and VersaPharm's accounting systems, or otherwise inform shareholders that it was not "on track" to do so by the previously-announced deadline (¶¶ 127, 129, 134, 137-39, 147-48); and (3) implement a system to accurately process and account for rebates and chargebacks across its subsidiaries (*id.*).

### F. Akorn's Restatement

Investors began to learn the truth about Defendants' accounting fraud on March 2, 2015. On that day, Akorn filed a Form 12b-25 notifying the SEC that its 2014 annual report would be filed late

---

[3] Here, "organic growth" means revenue not generated by simply adding Hi-Tech's and VersaPharm's businesses.

due to "unforeseen delays in collecting and compiling certain financial and other related data" from its VersaPharm and Hi-Tech subsidiaries, which were not integrated into the Company's centralized accounting system as of December 31, 2014. ¶ 115. Additionally, the Company announced that it had not completed its assessment of the effectiveness of its internal controls, and admitted that it "believe[d] that material weaknesses exist[ed] as of December 31, 2014," and that additional material weaknesses may be identified following its assessment. ¶ 115. In response to this news, Akorn's stock price fell $4.38, or over 8%, to close on March 3, 2015, at $49.33 per share, on unusually heavy volume. ¶ 156.

Next, on March 17, 2015, Akorn issued its first restatement in the form of a press release announcing that its financial results for the 2014 second and third quarters should no longer be relied upon due to an error in Hi-Tech's opening balance sheet, resulting in a chargeback reserve that was overstated by approximately $8.9 million as of April 17, 2014. ¶ 116. The correction of the error resulted in an $8.9 million reduction in revenue and a $5.6 million reduction in previously reported net income, goodwill, and retained earnings. *Id.* The Company maintained that it would issue a second restatement of its 2014 second and third quarter financial results and that it was "actively engaged in remediating [the] material weaknesses" that led to the first restatement. *Id.*

Then, on April 24, 2015, Akorn issued a press release announcing that its financial results for the 2014 second, third, and fourth quarters, as well as the 2014 annual year, should no longer be relied upon due to errors related to the understatement of rebates and other sales allowances that resulted in an overstatement of the Company's net revenue for the affected periods. ¶ 117. Akorn also announced that it would be restating the affected periods and that based upon an initial assessment, it believed its net revenue and pretax income from continuing operations was overstated by $20 to $35 million for FY 2014. ¶ 117. On this news, shares of Akorn plummeted $12.14 per

342402.2 AKORN

share, nearly 22%, to close on April 27, 2015, at $43.10 per share, on unusually heavy volume. ¶ 161. Stunned market analysts called Akorn's credibility into question. ¶¶ 162-63.

Finally, on May 10, 2016, Akorn filed its 2015 Form 10-K, which included its financial statements for FY 2015 and the restated financial statements for FY 2014. ¶ 164. Ultimately, as a result of the Restatement, $46.9 million of revenue and $27.0 million of net income evaporated, wiping out the vast majority of the Company's net income originally reported during FY 2014, from $40.9 million to just $13.9 million, a reduction of 66%. ¶ 49.

## ARGUMENT

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court "tak[es] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiffs." *Pugh v. Tribune Co.*, 521 F.3d 686, 692 (7th Cir. 2008). "[The] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation and citation omitted). However, "[t]he plausibility standard is not akin to a 'probability requirement.'" *Id.*

## I. The CAC Adequately Alleges Defendants' Materially False or Misleading Statements

### A. Akorn's Financial Statements and Defendants' Statements Concerning Net Revenue and Net Income Were Materially False

Having issued the Restatement, Defendants do not, because they cannot, dispute that the following statements were materially false when made: (i) Akorn's quarterly and annual financial statements; (ii) their statements concerning Akorn's net revenue and net income, including organic business growth and whether the Company met annual guidance and Wall Street consensus estimates; and (iii) their representations that Akorn's financial statements were prepared in accordance with GAAP.

Indeed, the Restatement is, *per se*, evidence that the misstatements are material. *See* Financial

10

Accounting Standards Board ("FASB") Accounting Standards Codification Section ("ASC") 250-10-20; SEC Staff Accounting Bulletin ("SAB") 99. Indeed, under GAAP, "previously issued financial statements should be restated *only* to correct *material* accounting errors that existed at the time the statements were issued." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005) (emphasis added); *see also S.E.C. v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) ("a restatement issues only when the errors are material"); Thus, the Restatement is itself an admission that Akorn's financial statements – along with Defendants' repetition of the financial statements in press releases, calls, and conferences discussing restated net revenue and net income figures – were materially false when made. *See BISYS*, 397 F. Supp. 2d at 437; *In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005).

The "materiality requirement is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (internal quotation marks omitted). The Supreme Court has been "careful not to set too low a standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information." *Id.* (internal quotations omitted). By contesting materiality, Defendants are arguing that Akorn's overstatement of revenue by 8.4% and net income by 194.7% in 2014 is trivial and does not significantly alter the total mix of information available to investors. This contention is virtually self-refuting.[4]

Nonetheless, Defendants distort black letter law to argue that Akorn's disclosures about the material weaknesses in its internal controls render the financial misstatements immaterial. Defs. Br.

---

[4] Defendants also ignore that materiality determinations are fact-intensive and "rarely appropriate" on a motion to dismiss. *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997); *see also In re NeoPharm, Inc. Sec. Litig.*, 705 F. Supp. 2d 946, 967 (N.D. Ill. 2010).

at 14. This argument relies on the proposition that "where a securities defendant discloses the very risk that later comes to pass, the resulting inaccuracy in the original statement is considered immaterial." *Id.* (citing *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 530 (7th Cir. 1985) [hereinafter *Angelos*]; *Tabankin v. Kemper Short-Term Glob. Income Fund*, No. 93 C 5231, 1994 WL 319185, at *2 (N.D. Ill. June 23, 1994)). Defendants claim that Akorn's disclosures discredited the financial misstatements "so obviously that the risk of real deception drop[ped] to nil." Defs. Br. at 15 (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)). This argument has no legal merit, and, as a factual matter, Defendants did not disclose the "very risk" that came to pass. On the contrary, they certified to the SEC and the market that the financial statements were accurate.

Defendants seize on the Seventh Circuit's statement in *Angelos* that "an investor cannot close his eyes to a known risk," and there is no liability "[i]f the investor knows enough so that the lie or omission still leaves him cognizant of the risk." 762 F.2d at 530. But as the Seventh Circuit subsequently clarified, this statement means only that "when an investor knows that a representation is false, he cannot act upon it and later claim deception." *Indosuez Carr Futures, Inc. v. Commodity Futures Trading Comm'n*, 27 F.3d 1260, 1265-66 (7th Cir. 1994) (discussing *Angelos*). Thus, in *Angelos*, the Seventh Circuit resurrected the plaintiff's securities claims because, like here, the defendants' lies "were not contradicted by truthful information in the [plaintiff's] possession" – *i.e.*, the plaintiff did not know that the representations were false. 762 F.2d at 530.

Defendants cite another pre-PSLRA case, *Tabankin*, but truncate its relatively narrow holding: "Investors who are disappointed when a disclosed risk comes to pass cannot maintain a securities fraud action *on the general representations that the investment was conservative and prudently managed*." 1994 WL 319185, at *2 (emphasis added). The *Tabankin* court held that such

12

"broad" and "amorphous" representations must be given meaning by reference to more specific disclosures about a fund's investment risks. *Id.* Here, the opposite situation is presented: the misstatements at issue are based on historical financial figures, and Defendants seek to trivialize them by reference to broad and amorphous disclosures about the possibility of a misstatement, while at the same time certifying that the financial statements do not contain any misstatements *Tabankin*, therefore, has no bearing on the instant case.

In fact, the Seventh Circuit has squarely rejected the assertion that investors' knowledge of a risk can render immaterial a misstatement of present or historical fact. For example, in *Pommer v. Medtest Corp.*, 961 F.2d 620 (7th Cir. 1992), the court held that: "[A]n issuer needs to disclose the truth clearly before a lie becomes immaterial. It is not enough that the other party must have recognized a risk. Risks are ubiquitous." *Id.* at 624 (internal citation omitted). To avoid liability, a defendant must "neutralize" the misstatement and "disabuse" investors of it either by disclosing the truth or by expressly disclaiming the misstatement. *Id.* at 624-25. Here, Defendants did neither of these things with respect to their financial misstatements.

By relying on Akorn's disclosures about the risk of financial misstatement as some kind of "cautionary language," Defendants appear to be erroneously invoking the "bespeaks caution" doctrine, which under certain circumstances may render alleged misrepresentations concerning *soft information – e.g.*, opinions and projections – immaterial. *See Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1405 (7th Cir. 1995) (internal citation omitted). It does not, however, allow defendants to duck liability for misstatements of fact, such as historical financial results. *See id.*; *see also P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) (holding that "the misrepresentation of present or historical facts cannot be cured by cautionary language").

Even accepting Defendants' incorrect premise that cautionary language *could* cure financial

13

misstatements, Akorn's material weakness disclosures categorically failed to do so. Disclosing the mere *possibility* of a material misstatement did not adequately warn investors about the *magnitude* of the misstatement – for example, the revelation that Akorn artificially inflated its net income by 194.7% in 2014. *See Pommer*, 961 F.2d at 624 ("Disclosures assist investors in determining the magnitude of risks. Even savvy investors may recover when a bald lie understates the gravity of a known risk."). Moreover, Rai and Dick signed Sarbanes-Oxley ("SOX") certifications attesting that Akorn's financial statements "fairly present[ed] in all material respects the financial condition [and] results of operations" of the Company. *E.g.*, ¶ 128. These attestations are not irrelevant to the materiality analysis, as Defendants claim. Defs. Br. at 15. It is implausible that the material weakness disclosures discredited the financial statements "so obviously that the risk of real deception drop[ped] to nil," *Virginia Bankshares*, 501 U.S. at 1097, while at the same time Defendants were attesting to the accuracy of those very financial statements. *C.f. In re Motorola Sec. Litig.*, No. 03 C 287, 2004 WL 2032769, at *25 (N.D. Ill. Sept. 9, 2004) (holding that corrective information must be "conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements").

The materiality of the financial misstatements – and the inadequacy of Akorn's cautionary language – are objectively demonstrated by the market's response to the Company's announcement on April 24, 2015 that it would be restating its financial results. ¶ 117. *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 155 (2d Cir. 2013) (holding that a stock price drop "tends to establish materiality"); *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000) (stating that a 4% drop in response to a corrective disclosure suggested that investors viewed the undisclosed information as material). Akorn's stock price immediately fell 22% (¶ 188), demonstrating that the financial misstatements were material and not "reflected" in the price of Akorn's stock. *C.f. Schleicher v. Wendt*, 618 F.3d

679, 687 (7th Cir. 2010).

### B. Defendants' Statements Contained Materially Misleading Omissions

Rule 10b-5 "proscribes omissions that render affirmative statements misleading; thus, incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements." *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989); *see also NeoPharm*, 705 F. Supp. 2d at 967 (concluding plaintiffs adequately alleged that NeoPharm's "touting of favorable news and data" about a drug, while failing to disclose that setbacks had significantly delayed its time to market, was a materially misleading omission).

Here, the following statements made by Defendants during the Class Period contained materially misleading omissions: (1) statements touting Akorn's revenues and growth; (2) SOX certifications that the Company's internal controls are "designed . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with [GAAP]";[5] and (3) SOX certifications that "[b]ased on my knowledge, [Akorn's] financial statements, and other financial information included in this report, fairly present in all material respects [its] financial condition [and] results of operations." ¶¶ 128, 136, 144. These statements were "half-truths" because they failed to disclose that Akorn's accounting system and practices relating to gross to net revenue calculations were in total disarray, Defendants were neglecting to implement even straightforward remedial measures, these problems were exacerbated by the Company's feckless attempt to integrate two large acquisitions, and, consequently, the Company's net revenue figures were completely unreliable. *See, e.g.*, ¶¶ 64-89.

---

[5] The materiality of the SOX certification is not undermined by Akorn's disclosure in its 2013 Form 10-K that it failed to have controls "designed to validate the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions." ¶ 67. The Company reassured investors that the "errors were identified" (*id.*) and represented that its internal controls overall provided "reasonable assurance regarding the reliability" of its financial statements. ¶ 128.

Defendants point out that their disclosures "cautioned investors that Akorn's efforts to remediate the material weaknesses might not succeed" and that the remedial plan may be insufficient. Defs. Br. at 18. But that is yet another half-truth: nowhere did Defendants disclose that they were actually failing to implement their remedial plan, and they did not inform investors of the full severity of the problems with Akorn's accounting system and practices. *See Pommer*, 961 F.2d at 624 ("Disclosures assist investors in determining the magnitude of risks.").

The SOX certifications regarding Akorn's internal controls are neither forward-looking nor statements of opinion. The representation that internal controls are "designed . . . to provide reasonable assurance" of GAAP compliance does not contain any signifier of projection or belief. *See* ¶ 128. Accordingly, courts have treated similar SOX certifications as statements of present fact. *See Roth v. OfficeMax, Inc.*, No. 05 C 236, 2006 WL 2661009, at *4 (N.D. Ill. Sept. 13, 2006); *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 782 (E.D. Va. 2015).[6]

As for the SOX certifications regarding the accuracy of Akorn's financial statements, Defendants assert that they are opinion statements and are inactionable because there are no allegations that Defendants Rai and Dick did not actually believe the opinions at the time they were given. Defs. Br. at 16 (citing *Omnicare, Inc. v. Lab. Dist. Council Constr. Indus. Pens. Fund*, 135 S. Ct. 1318, 1326-27 (2015)). Even if SOX certifications are subjective statements, that does not relieve Defendants of liability for misleading omissions. As the Supreme Court held in *Omnicare*:

> A reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion – or otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience.

---

[6] Defendants' other cited case (Defs. Br. at 16) is inapplicable because it involved not SOX certifications but the timing of a bank's decision to write off loans. *New Orleans Emps.' Ret. Sys. v. PrivateBankcorp, Inc.*, No. 10 C 6826, 2011 WL 5374095, at *4 (N.D. Ill. Nov. 3, 2011) ("A hindsight disagreement with management's commercial judgment not to write off loans earlier does not render earlier financial statements false.").

16

135 S. Ct. at 1328. Thus, if a statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself," then the omission creates liability. *Id.* at 1329. Here, Defendants Rai and Dick each attested to the accuracy of Akorn's financial statements while omitting material facts that conflicted with that attestation.

### C. Defendants' Statements Concerning the Integration of Hi-Tech and VersaPharm Were Materially Misleading

Relying on *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 846 (N.D. Ill. 2003), Defendants contend that their statements representing that Akorn was "on track" with its integration efforts are forward-looking. Defs. Br. at 20-21. But *Stavros* is unpersuasive because it was decided before *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (*Tellabs III*), which held that "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Id.* at 705. Post-*Tellabs* authority has not treated "on track" statements as forward-looking. *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *9-*10 (N.D. Ill. Sept. 23, 2008).

Here, for example, the statement, "We are on track with our plans to fully integrate the business" (¶ 134), is a mixed present/future statement. Being "on track" was a representation about Akorn's then-present condition, not future one, and is therefore not entitled to safe harbor protection. These "on track" statements were misleading because they omitted Akorn's problems integrating its acquisitions' accounting systems, rendering net revenue calculations unreliable. *See Silverman*, 2008 WL 4360648, at *10 (stating that "defendants' omissions regarding the problems plaguing the 3G rollout may have rendered misleading their statements that the rollout was 'on track'").

## II. The CAC Adequately Alleges a Strong Inference That Defendants Acted With Scienter

To plead a Section 10(b) claim, a plaintiff must "state with particularity facts giving rise to a

strong inference" of scienter, *i.e.*, that the defendant "either knew the statement was false or was reckless in disregarding a substantial risk that it was false." *Tellabs III*, 513 F.3d at 704. The inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (*Tellabs II*). That inference, however, "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. The inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 323.

### A. Akorn's Material Weakness Disclosures Are Not Exculpatory but Instead Raise a Strong Inference of Scienter

"When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." *Tellabs III*, 513 F.3d at 704; *see also Hughes v. Huron Consulting Grp., Inc.*, 733 F. Supp. 2d 943, 947 (N.D. Ill. 2010) (holding that once defendants became aware of side-agreements amongst selling shareholders, "they certainly had the wherewithal to appreciate" the risk of accounting errors); *Norfolk Cnty. Ret. Sys. v. Ustian*, No. 07 C 7014, 2009 WL 2386156, at *8-*9 & n.5 (N.D. Ill. July 28, 2009) (finding a strong inference of scienter for accounting violations based in part on defendants' knowledge of "red flags indicating . . . material internal control weaknesses").

Based on prior disclosures of ineffective internal controls, courts may infer "that the Company was aware that it was not in a 'position of knowledge' when it filed its earlier financial statements." *See Freedman v. Weatherford Int'l Ltd.*, No. 12 Civ. 2121 LAK, 2013 WL 5299137, at *5-*6 (S.D.N.Y. Sept. 20, 2013). Indeed, when coupled with the failure to remediate, weak internal controls strongly support scienter. *See Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1190-91

(D. Nev. 2009); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 (N.D. Cal. 2009).[7]

For example, in *Stocke*, defendants' disclosure in its restated Form 10-K that "internal control deficiencies still existed," after disclosing the same deficiencies and a remediation plan in a prior Form 10-K, was "sufficient reason to infer that Defendants acted with reckless disregard in failing to rectify its past internal deficiencies." 615 F. Supp. 2d at 1191. Likewise, in *UTStarcom*, an "inference [of scienter] [was] strengthened by the allegations that Defendants were made aware . . . of significant internal control problems relating to revenue recognition[,]" but, "despite this awareness Defendants did not implement the proper control measures and continued to report and certify false revenue data." 617 F. Supp. 2d at 975.

A culpable inference is especially cogent here because over a four year period from 2012 through 2015, three independent auditors determined that Akorn's internal controls were ineffective and suffered from material weaknesses. ¶ 64. Even before the Class Period began, in Akorn's 2013 Form 10-K, Defendants had already identified and disclosed the very material weakness that primarily caused Akorn's accounting violations – namely, the failure to establish controls to validate the completeness and accuracy of the data used to calculate gross to net revenue adjustments. ¶ 67. Yet over two years later, when Akorn filed its 2015 Form 10-K, the Company disclosed that its internal controls were still ineffective and that it had still not remediated the material weakness relating to gross to net revenue adjustments. ¶ 76.

---

[7] *See also Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 17 (D. Mass. 2000) (management letters "warn[ing] of 'material weaknesses in the Company's internal control environment' . . . document[ed] a failure to remedy such practices, [ ] add[ing] to the inference of scienter."); *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tec., Inc.*, 28 F. Supp. 3d 93, 114 (D. Mass. 2014) ("Plaintiffs describe[d] in detail the many instances where the Company acknowledged internal control deficiencies. . . . [T]he consistent failure as to the internal controls makes the scienter inference more compelling."); *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *13 (C.D. Cal. July 1, 2008) ("[A]lthough internal control deficiencies relating to the recognition of revenue had been brought to the attention of [ ] defendants, they failed to correct these deficiencies until several years later and after numerous financial disclosures that overstated the company's quarterly and annual revenues . . . giv[ing] rise to a strong inference of scienter.").

Not only did Akorn fail to remediate the material weakness, it also failed to implement the remedial measures it had identified – notwithstanding the representation that "senior management" was "closely monitoring" implementation. ¶ 68. In its 2013 Form 10-K, the Company stated that it would add "accounting and internal audit personnel and design, document, and test controls," and the Company represented that it had already implemented new systems and software related to the gross to net revenue process. ¶ 68. Yet when Akorn filed its 2014 Form 10-K near the end of the Class Period, the Company stated it would implement remedial measures that were closely similar to those it said it would take in its 2013 Form 10-K, including "[c]onduct manual data validation procedures" and "[e]stablish a dedicated revenue accounting team focused primarily on significant gross to net revenue adjustments." ¶ 73. And when Akorn filed its 2015 Form 10-K, the Company disclosed that it had still not implemented these remedial measures. ¶ 79.[8]

All the more egregious is that, Akorn closed two significant acquisitions in 2014, High-Tech and VersaPharm, without either remediating Akorn's material weakness or implementing an adequate process or appropriate controls to prevent or detect material errors in the financial statements of acquired subsidiaries. ¶ 71.

Although Defendants assert that there is no evidence to suggest that they "abdicated their responsibility to remediate material weaknesses" (Defs. Br. at 24), Akorn's failure to remediate the material weakness in question or even to effectively implement the straightforward remedial measures it had identified over a period of years is either a reckless failure on the part of Defendants

---

[8] Unlike in Defendants' cited authority (Defs. Br. at 32-33), Akorn represented that "senior management . . . are closely monitoring the implementation of these remediation plans." ¶ 68. *Compare Pugh*, 521 F.3d 686 at 695 (only after fraud was discovered did defendants promise to certify figures "in the future"); *Ong ex rel. Ong v. Sears, Roebuck & Co.*, No. 03 C 4142, 2005 WL 2284285, at *19 (N.D. Ill. Sept. 14, 2005) (defendants represented that they "maintained a system of internal controls," not that they were personally involved in remediating any known weaknesses).

or a direct abdication of their responsibilities.[9] Defendants virtually acknowledge this by disclosing in Akorn's 2015 Form 10-K that the Company had failed to maintain an effective control environment; failed to have accounting and financial reporting personnel with sufficient knowledge, experience, and training; and failed to "appropriately remediate existing material weaknesses *on a timely basis*." ¶ 76 (emphasis added).

Defendants' reliance on *Matrix Capital Management Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172 (4th Cir. 2009), for the assertion that Akorn's disclosures were good-faith warnings, is also to no avail. *Matrix* itself recognized that:

> It is appropriate to consider [internal controls] disclosures, which in some contexts will indicate that the defendants were acting in good faith, but in other contexts will indicate that the defendants had knowledge of operational risks (suggesting a lack of good faith).

*Id.* at 185. The facts here raise a strong inference of absence of good faith. Whereas in *Matrix* defendants "may not have had reason to know . . . [that] internal control deficiencies existed," and plaintiffs did not allege facts that implied the Company was "aware of [accounting] problems prior to making or approving financial statements," Akorn knew for years that it suffered from materially weakness, yet failed to implement the very steps that the Company, in its several remediation plans, assured shareholders were being taken. *Id.* at 184, 188. As such, any disclosures of material weaknesses can hardly be characterized as "candid warnings." *See* Defs. Br. at 25.

### B. The Magnitude of the Restatement and the Nature of Akorn's Violations of GAAP and Its Own Accounting Policies Supports an Inference of Scienter

Although a restatement alone does not give rise to a strong inference of scienter, the circumstances surrounding the restatement – such as the magnitude of the restatement and the

---

[9] Contrary to Defendants' assertions, CW12's statement that Akorn "set a timetable to correct [ ] gaps and deficiencies" (Defs. Br. at 26) is not evidence that Defendants fulfilled their responsibilities. Setting a timetable, and timely and adequately taking steps to remediate deficiencies, are not the same.

relative simplicity of the issues involved – may contribute significantly to a finding of scienter. *In re ArthoCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 722 (W.D. Tex. 2010); *see also In re Allied Prods. Corp., Inc. Sec. Litig.*, No. 99 C 3597, 2000 WL 1721042, at *5 (N.D. Ill. Nov. 15, 2000); *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 16-17 (D. Mass. 2004) (finding that while a restatement alone does not support scienter, "the Court must ask whether the GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that defendants knowingly or recklessly misled investors") (quotation marks omitted).[10]

"The more serious the [accounting] error, the less believable are defendants protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy." *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997); *see also Gelfer*, 96 F. Supp. 2d at 15 ("The magnitude of the revenue overstatements . . . tends to support a strong inference of scienter."); *Freedman*, 2013 WL 5299137, at *5 ("[T]he magnitude of the error is further supportive of defendants' scienter"); *U.S. S.E.C. v. Fisher*, No. 07 C 4483, 2012 WL 3757375, at *13 (N.D. Ill. Aug. 28, 2012) ("[I]t is long settled that a magnitude of reporting errors lend weight to allegations of recklessness where defendants were in position to detect the errors.") (quotation marks omitted). Indeed, when significant GAAP violations are described with particularity in the complaint, as here, they provide "powerful" indirect evidence of scienter because, "[a]fter all, books do not cook themselves." *In re McKesson HBOC, Inc. Sec.*

---

[10] Plaintiff does not rely on the Restatement "standing alone" to establish scienter. Thus, Defendants' cited cases are inapplicable. *See* Defs. Br. at 30-31 (*DiLeo v. Ernst & Young*, 901 F.2d 624, 626-27 (7th Cir. 1990) (nonperforming loans did not, alone, suggest fraud); *Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 967 (7th Cir. 1989) (plaintiff admitted he had "no evidence" of scienter); *In re Watchguard Sec. Litig.*, No. C05-678J, 2006 WL 2038656, at *12 (W.D. Wash. Apr. 21, 2006) ("Plaintiffs offer[ed] little more than [the Company's] restatement" to support scienter); *In re Career Educ. Corp.*, No. 03 C 8884, 2007 WL 1029092, at *8-*9 (N.D. Ill. Mar. 27, 2007) (other than a restatement, none of the alleged facts indicated scienter); *In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2006 WL 3714708, at *7-*8 (N.D. Ill. July 12, 2006) (at times, revenue was understated and losses overstated, and allegations of accounting errors were "vague and unspecific").

22

*Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000).

Additionally, when GAAP violations have the effect of overstating revenue, the inference of scienter is particularly strong. *See In re Veeco Instruments, Inc. Sec. Litig.*, 253 F.R.D. 220, 231-32 (S.D.N.Y. 2006) ("[A]ccounting manipulations involving premature revenue recognition . . . are especially indicative of conscious misbehavior since such violations do not commonly occur inadvertently, but instead suggest a conscious decision to improperly recognize revenue.") (quotations marks omitted); *Roth v. AON Corp.*, No. 04-C-6835, 2008 WL 656069, at *7 (N.D. Ill. Mar. 7, 2008) ("[S]ignificant overstatements of revenue tend to support the conclusion that the defendants acted with scienter."). This is especially true when overstated revenue allows a company to "achieve consensus estimates." *Stocke*, 615 F. Supp. 2d at 1191.

Akorn's massive Restatement ultimately revealed that in FY 2014 the Company inflated its net revenue by 8.4% and its net income by 194.7%. ¶¶ 49, 117, 164. Whereas the *Crowell* court found that a 32.5% downward revision in a company's annual net income to be indicative of scienter, Akorn's downward revision of its 2014 net income by 66% is twice as large. *See* 343 F. Supp. 2d at 18 ("What matters most to investors is income[.]"). Substantially all of these accounting violations had the same effect – to artificially *increase* net revenue. And they allowed Akorn to beat Wall Street consensus revenue estimates for the second and fourth quarters of 2014, and meet its 2014 annual revenue guidance. ¶¶ 50-51. These circumstances surrounding the Restatement bolster a strong inference of scienter.

Although Defendants cite *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002), for the proposition that Akorn's accounting errors could "easily [have] arise[n] from negligence, oversight or simple mismanagement" (Defs. Br. at 31), the Fifth Circuit held that it was "the nature of the [types] of accounting errors at [the company] . . . i.e., uncollectable accounts receivable,

inventory write downs and unrecorded employee compensation," that indicated negligence. *See also In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1150 (D. Colo. 2011) ("Courts have recognized that decisions about write-downs involve the exercise of subjective judgments that do not lend themselves to allegations of securities fraud.") (citing *Abrams*, 292 F. 3d. at 433).

In contrast, Akorn's accounting violations were caused not by complex, subjective accounting judgments but mainly by the widespread failure to simply take into account all applicable deductions to gross revenue, in violation of GAAP and its own accounting policies. ¶¶ 55-58. Especially given that Defendants were fully aware of the gross to net revenue problem before the Class Period, these are not the type of accounting errors presumed to be the result of mere negligence. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 637-38 (E.D. Va. 2000) (finding that because GAAP rules and accounting policies related to revenue recognition and contingencies are "relatively simple," it was "likely that Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard").

Defendants' authority for the proposition that Akorn's ability to meet consensus revenue estimates by inflating its revenue is not indicative of scienter because "a temporary inflation of stock prices" does not establish fraud is inapposite. Defs. Br. at 32; *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F. 3d 952 (7th Cir. 2012). In *Plumbers*, defendants' desire "to keep their jobs, improve their bonuses, and increase the value of their stock options" did not support scienter. 679 F. 3d at 956. Plaintiff here does not attempt to establish scienter based on motive, which is not required under *Tellabs II*; instead, Plaintiff asserts that Akorn's ability to meet consensus revenue estimates by artificially inflating its revenue is one of the circumstances surrounding the Restatement that supports scienter. *See Stocke*, 615 F. Supp. 2d at 1191.

24

### C. The Confidential Witness Allegations Support an Inference of Scienter

When relying on the statements of confidential witnesses ("CWs"), a plaintiff must allege facts "support[ing] the probability that a person in the position occupied by the source would possess the information alleged." *Tellabs I*, 437 F.3d at 596. It is sufficient to allege each CW's job title, period of employment, and job responsibilities. *Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332, 2013 WL 566805, at *17 (N.D. Ill. Feb. 3, 2013).

"Evidence in the form of particularized allegations by knowledgeable former employees . . . add[s] to the inference of scienter." *Crowell*, 343 F. 3d at 16; *see also Tellabs III*, 513 F.3d at 711 ("'[C]onfidential sources' . . . are important sources for the allegations not only of falsity but also of scienter."). Defendants argue that in analyzing evidence from a CW, a court must consider that they "may be ill-informed, may be acting from spite rather than knowledge [or] may be misrepresented." Defs. Br. at 30 (citing *Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F. 3d 754, 759 (7th Cir. 2013)). But Defendants ignore that in *Livonia*, the district court discounted a vague reference to "internal e-mails" because plaintiffs implied, but failed to identify, the existence of any CW. 711 F.3d at 759. Further, after allowing plaintiffs to amend their complaint to include allegations from a sole CW, the court, on the basis of the CW's allegations, denied defendants' motion to dismiss. *Id.* Only after the court discovered that the CW had *never worked* at the company did it dismiss the complaint. *Id.* at 759-60.

Here, no less than fourteen CWs report persistent, materially weak internal controls and dysfunctional accounting systems and practices at Akorn during the Class Period. CWs allege that Akorn: (i) improperly calculated gross to net revenue reserves, chargebacks,[11] and rebates;

---

[11] To the extent that Plaintiff conflates chargebacks and billbacks, which Defendants allege are payments to wholesalers and rebates to end customers, respectively, this discrepancy only further evidences employees' own confusion, and thus, Akorn's material weaknesses. *See* Defs. Br. at 28.

(ii) suffered from materially weak internal controls since at least 2012, and failed to remediate these weaknesses; and (iii) failed to timely integrate its accounting system with those of Hi-Tech and VersaPharm, or to implement a system to prevent or detect accounting errors at Hi-Tech and VersaPharm. ¶¶ 83-84,114.

Numerous CWs explained that errors in the calculation of chargebacks and rebates were unavoidable given the lack of automation in the Company's accounting system and the manual input of financial data without controls to prevent the input of incorrect or incomplete data, and *See* ¶¶ 90-103, 110. According to CW6, a Senior Analyst in Revenue Accounting at Akorn who worked on the Restatement, these data entry issues resulted, at least in part, in understated revenue deductions and inaccuracies in gross-to-net revenue calculations. ¶¶ 102-03. Additionally, according to CW12, a Senior Internal Auditor at Akorn, the Company knew about deficiencies in its calculations for gross-to-net revenue reserves since at least 2013, when KPMG specifically identified the problem in its 2013 audit; but according to CW6, Akorn failed to address these deficiencies even after it grew significantly with the acquisitions of Hi-Tech and VersaPharm in 2014. ¶¶ 103-113. Further, according to CW9, an accountant at Akorn, Akorn's accounting department was severely understaffed and Corporate Controller Hebeda did not have the expertise necessary to do his job. ¶ 114. Finally, six different CWs all explained that the integration of Akorn's legacy accounting system with the accounting systems of VersaPharm and Hi-Tech was repeatedly delayed, which according to CW6, substantially complicated the calculation of chargeback reserves. ¶¶ 83-89.

Akorn's Restatement corroborates the above CW allegations by acknowledging that: (i) "[t]he Company understated the rebate reserve related to inventory in the wholesale channel"; (ii) "[t]he Company identified errors in its estimates and year-end cutoff related to certain revenue deductions, namely rebates, billbacks . . . and other contractual adjustments"; (iii) material

weaknesses in Akorn's internal controls persisted through December 31, 2015; and (iv) the Company failed to "maintain an effective control environment" because its accounting and financial reporting personnel lacked sufficient knowledge, experience, and training and because the Company failed to "appropriately remediate existing material weaknesses on a timely basis." ¶¶ 76, 167-69.

Defendants argue that CW statements regarding inaccurate gross to net revenue reserves, chargebacks, and rebates do not establish Defendants' notice of these irregularities. Defs. Br. at 29-30. Yet from 2012 through 2015, various auditors all informed Defendants of material weaknesses in Akorn's internal controls. *See* II.A, *supra*. Further, when numerous CWs all tell the same story, it "indicate[s] an acute awareness within [the company] . . . making it highly unlikely that [Defendants] were unaware" of any irregularities. *See In re New Century*, 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008); *see also In re OCA, Inc. Sec. & Deriv. Litig.*, No. 05-2165, 2006 WL 3747560, at *18 (D. La. Dec. 14, 2006) (holding that when multiple CWs all identified an accounting problem, "it would have been virtually impossible for defendants to not have known of the ongoing problems with, and, ultimately, the falsity of the company's [financial] figures.").

Defendants also argue that certain statements from CWs who left Akorn either near the beginning of the Class Period or after the Class Period ended should be rejected. Defs. Br. at 27. The case law is clear, however, that because these CWs were employed during the relevant period, their testimony is relevant and can be relied upon for pleading purposes. *See, e.g., Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 953 (N.D. Cal. 2014) (accepting testimony of confidential witnesses over a "relevant period" preceding the class period by years); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (finding "[p]re-class [period] data" to be "relevant" for purposes of establishing knowledge "at the start of the class period."). CW4 provides evidence of Akorn's difficulties integrating acquired companies – a problem that existed before, and during the

Class Period, and which five other CWs all attest to – and CW10 provides evidence of inaccurate chargeback calculations – an error that the Company itself admitted to in its Restatement. ¶¶ 87, 100, 167-69. Likewise, CW6 and CW14 were hired to assist with the Restatement, thereby allowing them to identify accounting errors that occurred during the Class Period, and making them uniquely knowledgeable of the very facts at the heart of this case. *See* ¶¶ 89, 105.

Finally, contrary to Defendants' assertions, CWs' statements regarding the integration of VersaPharm and Hi-Tech demonstrate that Defendants were, at a minimum, reckless in their failure to timely complete the task or to implement a system to prevent or detect accounting errors at their subsidiaries. Defs. Br. at 28; ¶ 83.

### D. The Resignations at Akorn Support an Inference of Scienter

Resignations or terminations raise an inference of scienter when "accompanied by additional evidence of the defendant's 'wrongdoing.'" *See Ross v. Career Educ.*, No. 12 C 276, 2012 WL 5363431, at *10 (N.D. Ill. Oct. 30, 2012); *see also UTStarcom*, 617 F. Supp. 2d at 975-76 ("Although proximate resignations of high-ranking officers or directors do not alone support scienter, when corporate reshuffling occurs in tandem with financial restatements, these changes add one more piece to the scienter puzzle.") (citation omitted); *Epstein v. World Acceptance Corp.*, No. 6:14-CV-10606-MGL, 2016 WL 4458312, at *12 (D.S.C. Aug. 24, 2016) (considering "the resignation of the Company's three most senior executive officers" as part of its "holistic analysis determining the existence of scienter.").

Here, in the wake of the Restatement, Defendant Dick resigned from his positions as CFO, Principal Financial Officer, and Principal Accounting Officer, before a  replacement was even selected. ¶ 24. CW8, a Credit Manager at Akorn during the Class Period who reported directly to Corporate Controller Hebeda, stated that Defendant Dick's resignation was premised on his failure

to ensure the accuracy of financial reporting at Akorn. ¶ 199. Similarly, Hebeda lost his position as Corporate Controller. ¶ 118. Thereafter, Akorn explained, "the key employees involved in accounting and financial reporting functions in which misstatements were identified are no longer involved in the accounting or financial reporting functions." ¶ 121.

### E. Defendants' Sarbanes-Oxley Certifications Support an Inference of Scienter

"Courts have found that certifications filed under the [Sarbanes-Oxley Act] may provide additional evidence of scienter if the certifications were false and misleading and the defendant knew that, or was deliberately reckless in issuing the certifications." *Stocke*, 615 F. Supp. 2d at 1190; *OCA*, 2006 WL 3747560, at *22. Where, as here, "certifications show that both defendants stated that they designed and evaluated [the company's] disclosure controls to ensure that they worked to provide them with material information . . . while at the same time failing to disclose serious, unremediated internal control problems[,]" it supports an inference of scienter. *See OCA*, 2006 WL 3747560, at *22; ¶ 128. Any attempt by Defendants to qualify their certification by disclosing certain weak internal controls does not detract from an inference of scienter given that Defendants' disclosures did not inform shareholders that the Company was not timely and adequately taking steps to remediate these internal weaknesses. *See id.*

### F. Akorn's History With Its Independent Auditors Supports an Inference of Scienter

A company's "history of dealing with its auditors" may contribute to an inference of scienter. *OCA*, 2006 WL 3747560, at *22; *see also Batwin*, 2008 WL 2676364, at *13. In *Batwin*, there was a "strong inference of scienter" when the auditor "notified [ ] defendants of [the company's] internal control deficiencies . . . and rather than correct these deficiencies, the [ ] defendants terminated the auditor . . . and failed to correct [the company's] internal control deficiencies until several years later and after numerous financial disclosures that overstated the company's quarterly and annual

revenues." 2008 WL 2676364, at *13.

Even more suspicious than the facts in *Batwin*, here, Defendants were notified by *multiple* auditors of internal control deficiencies, but rather than curing these deficiencies, Akorn terminated its auditors and continued to issue financial statements that overstated Akorn's revenue and net income. *See* II.A, *supra*. Specifically, Akorn engaged Ernst & Young LLP ("E&Y") in 2012, but according to CW9, after Akorn received an adverse internal controls report from E&Y, it terminated its relationship with E&Y. ¶ 104. Thereafter, fishing for a favorable audit report, Akorn engaged KPMG. *See* ¶¶ 80, 104. Akorn's gamble did not pay off, and KPMG also identified material weaknesses in Akorn's controls in 2013 and 2014. *Id.* Yet again, rather than curing its internal control deficiencies, Akorn terminated its relationship with KPMG, forcing KPMG to announce that it had identified errors "related to understatements of rebates and other sales allowances[,] which have resulted in an overstatement to net revenue." ¶ 124-25. Finally, Akorn engaged BDO USA, LLP ("BDO"), which like the auditors before it, also identified internal control deficiencies in 2015. Three auditors in nearly as many years is a "history of dealing with [] auditors" that indicates scienter. *See OCA*, 2006 WL 3747560, at *22.

### G. Investigations By the SEC and the DOJ Further Support an Inference of Scienter

Although a government investigation alone is not sufficient to establish scienter, it is "one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter." *Washtenaw*, 28 F. Supp. 3d at 115-16 (collecting cases); *see also Epstein*, 2016 WL 4458312, at *12 (considering "government scrutiny and investigation" as part of its "holistic analysis determining the existence of scienter."). Here, the Chicago Regional Office of the SEC is conducting an investigation of Akorn regarding the Company's restatement, internal controls, and other related matters. ¶ 122. The United States Attorney's Office ("USAO") for the Southern District of New York has similarly

30

requested information. *Id*. Taking a "holistic view" of the scienter allegations, the presence of not one, but two government investigations is yet another "piece of the puzzle" indicating scienter.

### H.  Plaintiff Adequately Pled Akorn's Corporate Scienter

Even if the Court were to conclude that the CAC failed to allege scienter for Defendants Rai and Dick,[12] which in light of the above facts it should not, a plaintiff may "draw a strong inference of corporate scienter without…nam[ing] the individuals who concocted and disseminated the fraud." *Tellabs III*, 513 F.3d at 708, 710. In *Tellabs III*, the alternative hypothesis that "a cascade of innocent mistakes, or acts of subordinate employees, either or both resulting in a series of false statements [] [was] far less likely than the hypothesis of scienter at the corporate level at which the statements were approved." *Id*. Here, as in *Tellabs III*, the alternative hypothesis—that a "cascade of innocent mistakes" resulted in widespread, egregious accounting errors  and materially weak controls that went unremediated for years—is far less likely than the hypothesis that Akorn's corporate management knew of, or recklessly disregarded, accounting errors and weak internal controls, and thereafter approved a series of false statements. When the totality of Plaintiff's allegations are considered collectively, the inference of corporate scienter becomes overwhelming.

### I.  Plaintiff's Allegations Together Raise a Strong Inference of Scienter

Defendants' repeated contentions, strewn throughout their brief, that a certain type of allegation cannot raise or contribute to a strong inference of scienter, are simplistic, overbroad, and contrary to settled law. As explained by one court in this District:

> [B]oth sides have marshalled abundant authority for their respective positions on the strengths of the individual categories. While the reasoning in these cases may be instructive, however, *none suggests a dispositive bright-line rule*. Nor could they: the

---

[12] References in the CAC to "Individual Defendants" (*see* ¶¶ 126-154) do not undermine the sufficiency of Plaintiff's scienter allegations given that the CAC identifies a factual basis for inferring scienter as to Defendants Rai and Dick, and attributes false statements to each. *See Kohut v. KBR, Inc.*, No. H-14-1287, 2015 WL 11995250, at *12 (S.D. Tex. Sept. 3, 2015).

> Supreme Court has taken pains to make clear that "the inquiry is inherently comparative," and competing inferences must be assessed on the basis of the underlying facts, taken as a whole.

*Hughes*, 733 F. Supp. at 943(emphasis added); *see also Washtenaw*, 28 F. Supp. 3d at 111 ("Considered *holistically*, the facts set forth by Plaintiffs add up to a strong inference of scienter, as is required under the Reform Act.") (emphasis added). Here, Defendants' repeated attempts to argue that no allegedly fraudulent act, *on its own*, supports scienter, should be rejected. *See Tellabs II*, 551 U.S. at 324; *Norfolk*, 2009 WL 2386156, at *11.

Plaintiff adequately alleges that: (i) materially weak internal controls existed at Akorn since at least 2012, and despite setting forth steps to remediate these weaknesses, they persisted through the end of 2015; (ii) Akorn violated GAAP and its own accounting policies, and these violations had the effect of inflating Akorn's 2014 revenue by 8.4% and net income by 194.7% , which enabled Akorn to achieve Wall Street consensus and its own revenue guidance; (iii) numerous CWs attest to widespread accounting errors and material weaknesses at Akorn; (iv) Akorn executives resigned in the wake of the Restatement; (v) Defendants filed false and misleading SOX certifications; (vi) Akorn hired three different independent auditors in four years; and (vii) the SEC and the USAO are actively investigating Akorn for fraud. "The way in which [these facts] fit together and reinforce one another strongly suggests a conscious course of conduct." *See Crowell*, 343 F. Supp. at 16.

## III.   The CAC Adequately Alleges Loss Causation

Pleading loss causation is "not meant to impose a great burden upon a plaintiff," and for pleading purposes, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 3471 (2005). Under a fraud-on-the-market theory of loss causation, a plaintiff must allege "that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of

the stock declined once the market learned of the deception." *In re Northfield Labs., Inc. Sec. Litig.*, No. 06 C 1493, 2008 WL 4372743, at *5 (N.D. Ill. Sept. 23, 2008). Loss causation may be "pled on a theory of partial disclosures." *Dura*, 544 U.S. at 342; *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009) ("Thus, loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that *an entire series of partial disclosures caused the stock price deflation*.") (emphasis added).

Here, the CAC alleges the following partial corrective disclosures:

- On March 2, 2015, the Company notified the SEC that the filing of its 2014 annual report would be delayed (¶¶ 115, 155-56).

- On March 17, 2015, the Company announced that it would restate its financial results for the 2014 second and third quarters due to an error in Hi-Tech's opening balance sheet that overstated its chargeback reserve by $8.9 million as of April 17, 2014 (¶¶ 116, 158).

- After the market close on April 24, 2015, the Company announced that its financial results for the second, third, and fourth quarters, as well as the 2014 annual year, should no longer be relied upon due to errors related to the understatement of rebates and other sales allowances that resulted in an overstatement of net revenue. The Company also announced that it would be restating the affected periods, and that based upon an initial assessment, it believed its net revenue and pretax income from continuing operations was overstated by $20 million to $35 million for the year ending December 31, 2014 (¶¶ 117, 160-61).

- After the market close on May 10, 2016, Akorn issued the Restatement. (¶¶ 164-69).

As issues of loss causation are factual matters often requiring expert testimony, they generally are not proper to resolve on a motion to dismiss. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2406 (2014) (loss causation need not be proven until later stages of the litigation, *i.e.*, trial); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) ("Loss causation is a fact-based inquiry"). This is particularly true when loss causation is pled on a theory of partial disclosures. *See Schleicher*, 618 F.3d at 686 (recognizing that "when true and false statements are made together it is often impossible to disentangle the effects with any confidence"); *see also Dura*, 544 U.S. at 343 (referring to "the tangle of factors affecting price"). Contrary to Defendants'

assertions (Defs. Br. at 40-41), any disaggregation of the stock drops for each of the above alleged partial disclosures should be performed by trial experts, and not decided on a Rule 12(b)(6) motion.

Defendants argue that while Plaintiff adequately alleges misstatements relating to Akorn's Q1 2014 financials, Defendants never made an isolated, express admission regarding *that particular quarter's* results followed by a drop.[13] Defs. Br. at 34. Defendants' hairsplitting fails because both the March 2, 2015 and April 24, 2015 disclosures revealed defects in Akorn's FY 2014 financials, which, by definition, include Q1 2014. The April 24, 2015 announcement, in particular, included an estimated overstatement "**for the year** ending December 31, 2014." ¶¶ 117, 160 (emphasis added). Defendants do not contest that shares of Akorn fell in the wake of the March 2, 2015 and April 24, 2015 disclosures *(*¶¶ 11, 161), rendering their argument moot.

Additionally, Defendants argue that Plaintiff is barred from alleging the correction of the error in Hi-Tech's opening balance sheet, which was disclosed in the first restatement on March 17, 2015, as a corrective disclosure because the price of Akorn's stock did not decline in response to that information. Defs. Br. at 34. However, Plaintiff alleges *a series* of partial disclosures that culminated in the announcement of a second restatement on April 24, 2015, which would cover the same period as the first restatement, albeit much more expansively. *Compare* ¶ 55 *with* ¶¶ 56-58; *see also* ¶ 163 (contrasting optimistic report issued by JP Morgan after the first restatement on March 17, 2015, with a more pessimistic report after the announcement of a second restatement on April 24, 2015). Accordingly, unlike in *In re Northfield Labs., Inc. Sec. Litig.*, 527 F. Supp. 2d 769 (N.D. Ill. 2007), in which plaintiffs failed to plead loss causation as to one statement when they tied the stock drop to

---

[13] Defendants' cited authority is inapposite. *See* Defs. Br. at 34-35 (citing *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (finding that a leakage model was improperly presented to the jury, but failing to consider what was required to prove loss causation *at the pleading stage*.") and *Spears v. Metro. Life Ins. Co.*, No. 2:07-CV-88 JVB, 2009 WL 2408928 (N.D. Ind. Aug. 4, 2009) (finding that plaintiffs failed to allege what losses, if any, were caused by defendants' misrepresentations)).

34

a news article that was not the alleged corrective disclosure, here, Plaintiff has tied Defendants' partial corrective disclosures to various stock drops, which culminated in the stock drop on April 24, 2015 when the full truth became known. *See* Defs. Br. at 35; *see also Northfield*, 2008 WL 4372743, at *6 (finding that plaintiffs' second amended complaint cured the defect by tying the alleged corrective disclosure, rather than the news article, to the stock drop, and thus, adequately pled loss causation). Such an approach is expressly permitted by *Dura*, given that Akorn's disclosures in the first restatement on March 17, 2015 fell short relative to the information supplied by the announcement of a second restatement on April 24, 2015, thereby diluting the impact of a full disclosure. 544 U.S. at 342. As alleged in the CAC, the first restatement on March 17, 2015 omitted entire categories of adjustments relating to Akorn's organic revenue. Finally, Defendants do not cite any authority requiring that each granular aspect of a partial disclosure have a corresponding drop, particularly where, as here, information was dribbled out for purposes of ensuring a soft landing.

## IV. The CAC Adequately Alleges Rai and Dick's Secondary Liability As Control Persons

Defendants do not dispute that the CAC sufficiently pleads that Rai and Dick were control persons of the Company, and therefore liable for Akorn's primary violations under Section 20(a) of the Exchange Act. ¶¶ 213-16. Instead, Defendants argue that the control person claims should be dismissed for lack of a primary violation. *See* Defs. Br. at 35. Because those claims are sufficiently alleged, however, Defendants cannot establish any pleading deficiency in the control person claims.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. Should the Court grant the motion in whole or in part, Plaintiff respectfully requests leave to replead.

342402.2 AKORN

Dated: October 4, 2016

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**


By: *s/ Joshua L. Crowell*

Lionel Z. Glancy
Robert V. Prongay
Joshua L. Crowell (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150
info@glancylaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Louis C. Ludwig
POMERANTZ LLP
10 South LaSalle Street
Chicago, Illinois 60603
312-377-1181
pdahlstrom@pomlaw.com
lcludwig@pomlaw.com

*Co-Lead Counsel*

**LAWRENCE, KAMIN, SAUNDERS & UHLENHOP, L.L.C.**
John S. Monical
Peter E. Cooper
Mitchell B. Goldberg
300 S. Wacker Drive, Suite 500
Chicago, Illinois 60606
(312) 372-1947

*Liaison Counsel for Plaintiff*

36

**PROOF OF SERVICE BY ELECTRONIC POSTING PURSUANT TO NORTHERN DISTRICT OF ILLINOIS ECF AND LOCAL RULES**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.

On October 4, 2016, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of Illinois, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 4th day of October, 2016, at Los Angeles, California.


*s/ Joshua L. Crowell*
Joshua L. Crowell

## Mailing Information for a Case 1:15-cv-01944 In re Akorn, Inc. Securities Litigation

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Peter E. Cooper**
  pcooper@lksu.com,shennessey@lksu.com,aterry@lksu.com

- **Joshua L. Crowell**
  jcrowell@glancylaw.com,info@glancylaw.com

- **Patrick Vincent Dahlstrom**
  pdahlstrom@pomlaw.com,mjsteven@pomlaw.com

- **Timothy A. Duffy**
  tduffy@kirkland.com,christina.pietsch@kirkland.com

- **Mitchell Benjamin Goldberg**
  mgoldberg@lksu.com,jjones@lksu.com

- **Devon McKechan Largio**
  dlargio@kirkland.com,ashley.pflaumer@kirkland.com,christina.pietsch@kirkland.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Louis Carey Ludwig**
  lcludwig@pomlaw.com

- **Francis P. Mcconville**
  fmcconville@pomlaw.com

- **John Scott Monical**
  jmonical@lksu.com,jjones@lksu.com,aterry@lksu.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com

- **Kevin Francis Ruf**
  kevinruf@gmail.com

- **Antony L. Ryan**
  aryan@cravath.com

- **Casey E. Sadler**
  csadler@glancylaw.com,info@glancylaw.com

- **Daniel Slifkin**
  dslifkin@cravath.com,mao@cravath.com,omadhany@cravath.com,mboggess@cravath.com,kdacey@cravath.com,dstuart@cravath.com,cgreenberg@cravath.com

- **Leigh Handelman Smollar**
  lsmollar@pomlaw.com

- **David M. Stuart**
  dstuart@cravath.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing. You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)