UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re AKORN, INC. SECURITIES LITIGATION  )
              )  15 C 1944
              )
              )  Judge Gary Feinerman
              )

### MEMORANDUM OPINION AND ORDER

Five individuals bring this suit against Akorn, Inc. and two of its officers, Rajat Rai and Timothy A. Dick, on behalf of themselves and a putative class of others who purchased Akorn stock between May 6, 2014 and April 24, 2015, alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Doc. 82. Defendants move to dismiss the operative complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 86. The motion is denied.

### Background

Akorn is a pharmaceutical company. Doc. 82 at ¶ 3. It made two substantial corporate acquisitions in 2014: Hi-Tech Pharmacal Co., Inc. on April 17, 2014, and VPI Holdings Corp., the parent company of VersaPharm Inc., on August 12, 2014. *Ibid*. At all relevant times, Rai was Akorn's CEO and a director, and Dick was its CFO, Principal Financial Officer, and Principal Accounting Officer. *Id*. at ¶¶ 23-24. Plaintiffs are individuals who purchased Akorn common stock during the class period, which runs from May 6, 2014 through April 24, 2015. *Id*. at ¶¶ 1, 17-21.

In resolving Defendants' Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and

referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Plaintiffs' brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013). The facts are set forth as favorably to Plaintiffs as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at the pleading stage, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

### A.     Akorn's Internal Controls

"Internal control over financial reporting" refers to policies and procedures that "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. GAAP." Doc. 82 at ¶ 47. A corporation's CEO and CFO are responsible for designing or supervising those procedures. *Ibid.*

Akorn suffered from serious internal control problems for many years, beginning in 2012. *Id.* at ¶ 64. Akorn hired independent auditor Ernst & Young to conduct its 2012 year-end audit, which concluded that Akorn "has not maintained effective internal control over financial reporting as of December 31, 2012." *Id.* at ¶ 66. Akorn decided to switch audit firms due to Ernst & Young's "adverse internal controls report," *id.* at ¶ 104, and hired KPMG to conduct its 2013 year-end audit, *id.* at ¶ 69, with the hope that KPMG's report would be "more favorable," *id.* at ¶ 104. That hope was dashed when KPMG concluded that Akorn "has not maintained effective internal control over financial reporting as of December 31, 2013." *Id.* at ¶ 69. KPMG conducted a mid-year audit in 2014 and again identified internal control deficiencies. *Id.* at ¶ 107. Later that year, KPMG conducted a "roll-forward audit" and determined that Akorn had

not remedied the deficiencies it had previously identified. *Ibid*. KPMG conducted Akorn's 2014 year-end audit and concluded, once again, that Akorn "has not maintained effective internal control over financial reporting as of December 31, 2014." *Id*. at ¶ 75. Akorn then dismissed KPMG and hired a different firm, BDO USA, LLP, to conduct its 2015 year-end audit. *Id*. at ¶ 123. BDO concluded that Akorn "did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2015." *Id*. at ¶ 80.

The auditors' conclusions were based on several deficiencies in Akorn's internal controls. For example, the 2013 year-end audit identified the absence of controls designed to validate the data used to calculate gross to net revenue adjustments. *Id*. at ¶ 193. The 2014 year-end audit identified the absence of accurate controls to prevent or detect material errors in the financial statements of acquired subsidiaries. *Ibid*.

Dick and Rai committed in public filings to participate in and closely monitor remediation efforts. Akorn's Form 10-K for the 2012 fiscal year stated:

> We are working to remediate the material weakness. We have begun taking steps and plan to take additional measures to remediate the underlying causes of the material weakness, primarily through the continued development and implementation of formal policies, improved processes and documented procedures, as well as the hiring of additional finance personnel.

Doc. 93-2 at 5. Akorn's Form 10-K for the 2013 fiscal year gave a detailed description of Dick and Rai's remediation plans, Doc. 93-8 at 15, as did Akorn's Form 10-K for the 2014 fiscal year, Doc. 93-21 at 10. Dick and Rai signed both filings, Doc. 93-8 at 16; Doc. 93-21 at 12, but they failed to remediate the key material weaknesses that were identified during the 2013 and 2014 audits. Doc. 82 at ¶¶ 7, 193.

### B. Defendants' Allegedly False and Misleading Statements

Plaintiffs allege that Dick, Rai, and Akorn made a series of false and misleading statements and omissions regarding Akorn's financial results for each quarter in fiscal year 2014

and its acquisitions, and that those statements and omissions resulted in the artificial inflation of Akorn's stock price.

### 1.    2014 First Quarter Financial Results

On May 6, 2014, the day the class period began, Akorn issued a press release titled, "Akorn Reports 2014 First Quarter Results." *Id*. at ¶ 126. The press release asserted that the company's "Key Highlights and Accomplishments" included the following: Akorn "[a]chieved record first quarter consolidated revenue of $90.6 million, an increase of 23% over last year's first quarter"; "[g]enerated record operating cash flow of $23.4 million"; and "[c]ompleted the acquisition of Hi-Tech Pharmacal Co., Inc." *Ibid*. Dick and Rai participated in a conference call that day, during which Rai stated, "We are off to a good start for the year, with nearly $91 million in sales in the first quarter, up 23% from the same quarter last year." *Id*. at ¶ 127. Those figures were included in Akorn's first quarter Form 10-Q, which Dick signed on May 12, 2014. *Id*. at ¶ 128; Doc. 93-12 at 7. In filing the Form 10-Q, both Dick and Rai certified, in accord with Sarbanes-Oxley ("SOX") requirements:

1.    I have reviewed this Quarterly Report on Form 10-Q of Akorn, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Akorn] as of, and for, the periods presented in this report;

4.    … [I] have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to [Akorn], including its consolidated subsidiaries, is made known to us by others

within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of [Akorn's] disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in [Akorn's] internal control over financial reporting that occurred during [Akorn's] most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, [Akorn's] internal control over financial reporting; and

5.    … I have disclosed, based on our most recent evaluation of internal control over financial reporting, to [Akorn's] auditors and the audit committee of [Akorn's] board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [Akorn's] ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in [Akorn's] internal control over financial reporting.

Doc. 82 at ¶ 128; Doc. 93-12 at 8-9.

Despite Dick and Rai's certifications, the Form 10-Q overstated the amortization of deferred financing costs by $1.9 million, which inflated net income by 3.5%. Doc. 82 at ¶¶ 49, 129. In addition, Akorn's financial statements were not prepared in accordance with GAAP, and Akorn was not taking adequate steps to remediate the material weaknesses in its internal controls. *Id*. at ¶ 129.

### 2. 2014 Second Quarter Financial Results

On August 5, 2014, Akorn issued a press release titled, "Akorn Reports Preliminary 2014 Second Quarter Results." *Id*. at ¶ 132. The press release stated that Akorn "[a]chieved record second quarter consolidated revenue of $150.7 million, an increase of 96% over last year's second quarter and record adjusted net income per diluted share of $0.25, an increase of 79% over last year's second quarter," resulting in $8.5 million of net income. *Ibid*. Dick and Rai participated in a conference call with investors that day, during which they both described Akorn's second quarter financial results. *Id*. at ¶¶ 133-135. Those financial results were included in Akorn's second quarter Form 10-Q, which Dick signed on August 11, 2014. *Id*. at ¶ 136; Doc. 93-15 at 8. The "Management's Discussion and Analysis" section of the Form 10-Q reported organic growth of $9.9 million, representing a growth rate of $12.9% compared to the prior year's second quarter. Doc. 82 at ¶ 136. Dick and Rai also made SOX certifications substantially similar to those reproduced above. *Ibid*.

In reality, Akorn's organic growth rate was 3.6% during this period, not 12.9%. *Id*. at ¶ 137. Akorn's revenue was $133.9 million, 12.6% less than the $150.7 million reported, and its net income was *negative* $1.3 million, not the *positive* $8.5 million reported. *Id*. at ¶ 49. Akorn's financial statements were not prepared in accordance with GAAP, and it was not taking adequate steps to remediate the material weaknesses in its internal controls. *Id*. at ¶ 137.

### 3. 2014 Third Quarter Financial Results

On November 6, 2014, Akorn issued a press release titled, "Akorn Reports Preliminary 2014 Third Quarter Results." *Id*. at ¶ 140. The press release reported consolidated revenue of "$132.7 million, an increase of 62% over the third quarter 2013 consolidated revenue." *Ibid*. On that day's earnings call, Rai described the company's "impressive 11% organic growth." *Id*. at

6

¶ 141.  Dick provided a detailed description of Akorn's financial results, including an explanation of the quarter's $11.7 million GAAP net loss.  *Id*. at ¶ 142.  Akorn's third quarter Form 10-Q, filed on November 10, 2014, reiterated the financial results Dick and Rai reported on November 6 and included the required SOX certifications.  *Id*. at ¶ 144.  In the "Management's Discussion and Analysis" section, Akorn reported organic growth of $10.8 million, a growth rate of 13.2% compared to the prior year's third quarter.  *Ibid*.

In reality, Akorn's organic growth rate was at most 8.3% during this period.  *Id*. at ¶ 145. Its revenue was $127.7 million, 3.9% less than the $132.7 million reported; and its net income was negative $12.3 million, a 5.5% greater loss than the $11.7 million loss reported.  *Id*. at ¶ 49. Akorn's financial statements were not prepared in accordance with GAAP, and it was not taking adequate steps to remediate the material weaknesses in its internal controls.  *Id*. at ¶ 145.

### 4.     2014 Fourth Quarter Financial Results

On February 26, 2015, Akorn issued a press release titled, "Akorn Reports Preliminary Fourth Quarter and Full Year 2014 Results."  *Id*. at ¶ 149.  The press release reported "[t]otal revenue of $227.8 million, up 168 percent versus the prior year period."  *Ibid*.  In the fourth quarter earnings call that day, Dick and Rai relayed detailed information about Akorn's performance and answered questions.  *Id*. at ¶¶ 150-153.  Dick reported fourth quarter net income of $34 million, and both Dick and Rai described the company's "double-digit organic growth."  *Id*. at ¶¶ 152-153.

Akorn's organic growth was not actually "double-digit," and in fact there was no growth at all.  *Id*. at ¶ 154.  Its fourth quarter revenue was $202.9 million, meaning that Dick and Rai overstated Akorn's revenue by 12.3%.  *Id*. at ¶ 49.  Its net income was $18 million, meaning that Dick and Rai overstated Akorn's net income by 90.4%.  *Ibid*.  Akorn's financial statements were

not prepared in accordance with GAAP, and it was not taking adequate steps to remediate the material weaknesses in its internal controls. *Id*. at ¶ 154.

### 5. Acquisitions of Hi-Tech and VersaPharm

As noted, Akorn acquired Hi-Tech and VersaPharm in 2014. *Id*. at ¶ 3. When the class period began on May 6, 2014, Akorn recently had completed the Hi-Tech acquisition. *Id*. at ¶ 32. On May 12, 2014, Dick and Rai announced on a conference call that Akorn would acquire VPI, VersaPharm's parent company. *Id*. at ¶¶ 3, 130. On August 5, 2014, Rai stated during Akorn's second quarter conference call that the company could "anticipate completing the integration of VersaPharm by the end of this year" and was "on track with our plans to fully integrate the [Hi-Tech] business by the end of this year and on track to realize about $20 million in cost synergies by the end of this year." *Id*. at ¶¶ 133-134. On August 12, 2014, Akorn issued a press release announcing the completion of the VersaPharm acquisition. *Id*. at ¶ 138. The press release highlighted the "[s]traightforward integration process due to VersaPharm's outsource manufacturing model." *Ibid*. On November 6, 2014, Rai stated during Akorn's third quarter conference call that the company was "on track with our plans to fully integrate the business that we acquired of Hi-Tech by the end of this year." *Id*. at ¶ 141. On January 12, 2015, during a Q&A session at the JPMorgan Healthcare Conference, Rai stated: "We have some residual integration left on one of the acquisitions. That's the Hi-Tech acquisition. The other acquisitions are fully integrated." *Id*. at ¶¶ 146-147.

### C. Corrections of 2014 Financial Results

#### 1. During the Class Period

After the market closed on March 2, 2015, Akorn issued a press release announcing a filing extension for its 2014 Form 10-K. The press release stated that the company had

experienced unforeseen delays in collecting and compiling certain financial and other related data that would be included in the Form 10-K relating to the VersaPharm and Hi-Tech Pharmacal subsidiaries which were not integrated into the Company's centralized accounting department and accounting systems as of December 31, 2014.

In addition, the Company has not yet completed its assessment of the effectiveness of its internal control over financial reporting as of December 31, 2014 due to the aforementioned factors. The Company believes that material weaknesses exist as of December 31, 2014 relating to the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions and accurate and timely reporting of its financial results and disclosures in its Form 10-K. There is a possibility that upon completion of its assessment, the Company may determine that there are additional material weaknesses as of December 31, 2014.

The Company is in the process of completing the Form 10-K and its assessment of the effectiveness of internal control over financial reporting as of December 31, 2014. The finalization of financial information is not expected to result in any material change to previously reported financial statements or the financial results reported in our earnings release on February 26, 2015. Additionally, the Company expects to be able to complete its Form 10-K by the extended deadline of March 17, 2015.

*Id*. at ¶ 155. Shares of Akorn declined $4.38—over 8%—the next day. *Id*. at ¶ 156.

Two weeks later, after the market closed on March 17, 2015, Akorn issued a press release announcing that it filed its Form 10-K and restated its financial results for the second and third quarters of 2014. *Id*. at ¶ 158. The press release stated that the restatement was issued due to an "error … in the fair value allocation of assets acquired and liabilities assumed in connection with the acquisition of Hi-Tech …, which resulted in an overstated chargeback reserve as of April 17, 2014." *Ibid*. It explained that correcting the problem required "a reduction of previously reported revenue by approximately $8.9 million, a reduction of previously reported pre-tax income by approximately $8.9 million and a reduction of previously reported net income, goodwill and retained earnings by approximately $5.6 million, for the Company's three and six month periods ended June 30, 2014." *Ibid*. The press release noted that Akorn was "actively

engaged in remediating its material weaknesses" and planned to take several steps to address the problems that led to the need for a restatement. *Ibid*.

On the last day of the class period, Friday, April 24, 2015, Akorn issued a press release announcing that it would make additional financial restatements "for the annual period ending December 31, 2014 and the quarterly periods ending June 30, 2014, September 30, 2014 and December 31, 2014." *Id*. at ¶ 160. The press release stated that Akorn had uncovered errors "related to understatements of rebates and other sales allowances that have resulted in an overstatement of the Company's net revenue," a "substantial majority" of which were "related to companies and products acquired in 2014, the formation of purchasing alliances among several of the Company's customers and changing competitive dynamics for select acquired products during 2014." *Ibid*. Akorn estimated that its 2014 net revenue and pretax income from continuing operations were overstated by $20 million to $35 million. *Ibid*. The company also announced that it likely would be unable to timely file its Form 10-Q for the first quarter of 2015. *Ibid*. Akorn's stock declined $12.14 per share—nearly 22%—the next trading day, Monday, April 27, 2015. *Id*. at ¶ 161.

## 2. After the Class Period

Dick abruptly resigned on August 3, 2015, *id*. at ¶¶ 24, 119, and the Department of Justice and Securities Exchange Commission commenced investigations into Akorn's "restatement, internal controls and other related matters" in November 2015, *id*. at ¶ 122. On May 10, 2016, after receiving multiple filing extensions, Akorn filed its restated 2014 financial statements along with its 2015 Form 10-K. *Id*. at ¶ 164. The same day, Akorn filed a press release with audited 2015 results and audited and restated 2014 results. *Ibid*. Akorn restated its results for the year ending on December 31, 2014 and for the quarter and year-to-date periods

10

ending on March 31, 2014, June 30, 2014, and September 30, 2014.  *Id*. at ¶ 165.  The
restatements revealed that, in total, Akorn's 2014 revenue had been artificially inflated by 8.4%
and net income by 194.7%.  *Id*. at ¶ 49.  As a result, $46.9 million of revenue and $27 million of
net income "evaporated."  *Ibid*.  The inaccurate financial results that Defendants initially
reported allowed Akorn to beat Wall Street consensus revenue estimates for the second and
fourth quarters of 2014 and to meet the annual revenue guidance it issued on August 5, 2014.  *Id*.
at ¶¶ 50-51.  In reality, Akorn's performance fell short of those standards.  *Ibid*.

> **D.      Risk Disclosures**

Akorn's SEC filings warned that the company had weaknesses in its internal controls that
could result in inaccurate financial reporting.

> **1.      Before the Class Period**

Akorn's 2012 Form 10-K, filed in March 2013, disclosed "a material weakness in
internal control over financial reporting related to deficiencies in the financial statement close
process."  Doc. 93-2 at 5.  After describing the company's plan to remediate the material
weakness, the filing stated: "If our remedial measures are insufficient to address the material
weakness, or if additional material weaknesses or significant deficiencies in our internal control
over financial reporting are discovered or occur in the future, our consolidated financial
statements may contain material misstatements and we could be required to restate our financial
results."  *Ibid*.  Akorn's quarterly SEC filings for the first three quarters of 2013 disclosed that
material weakness, Doc. 93-3 at 5; Doc. 93-4 at 4; Doc. 93-6 at 4, and they also disclosed Dick
and Rai's conclusion that Akorn's "disclosure controls and procedures were not effective at the
reasonable assurance level due to a material weakness in our internal control over financial

reporting" as of March 31, 2013, June 30, 2013, and September 30, 2013. Doc. 93-3 at 4; Doc.

93-4 at 4; Doc. 93-6 at 4. Those three quarterly filings contained this language:

> While the Company believes it will remediate the material weakness prior to
> filing its Form 10-K for the period ending December 31, 2013, the Company
> can provide no assurance at this time that management will be able to report
> that our internal control over financial reporting is effective as of December
> 31, 2013.
>
> Notwithstanding the identified material weakness, management believes
> the consolidated financial statements included in this Quarterly Report on
> Form 10-Q fairly represent in all material respects our financial condition,
> results of operations and cash flows at and for the period presented in
> accordance with U.S. GAAP.

Doc. 93-3 at 5; Doc. 93-4 at 5; Doc. 93-6 at 4.

On March 3, 2014, Akorn notified the SEC that it would be unable to timely file its 2013

Form 10-K due to material weaknesses in its internal controls, stating: "There is a possibility that

upon completion of its testing and assessment of the effectiveness of internal control over

financial reporting, the Company may determine that there are additional material weaknesses."

Doc. 93-7 at 3. When it filed its 2013 Form 10-K on March 14, 2014, Akorn disclosed that it

continued to suffer from material weaknesses in internal control as of December 31, 2013. Doc.

93-8 at 8, 14. It also repeated the warning from its 2012 Form 10-K regarding the possibility that

its "consolidated financial statements may contain material misstatements and [it] could be

required to restate [its] financial results." *Id*. at 8.

### 2. During the Class Period

Akorn's 2014 first, second, and third quarter Form 10-Q filings disclosed that its internal

controls over financial reporting were not effective. Doc. 93-12 at 5; Doc. 93-15 at 5-6; Doc. 93-

18 at 5. Like the 2013 filings, the 2014 quarterly filings stated:

> While the Company believes it will remediate the material weaknesses prior
> to filing its Form 10-K for the period ending December 31, 2014, the
> Company can provide no assurance at this time that management will be able

to report that our internal control over financial reporting is effective as of
December 31, 2014.

Notwithstanding the identified material weakness, management believes
the consolidated financial statements included in this Quarterly Report on
Form 10-Q fairly represent in all material respects our financial condition,
results of operations and cash flows at and for the period presented in
accordance with U.S. GAAP.

Doc. 93-12 at 5; Doc. 93-15 at 6; Doc. 93-18 at 6.

On March 2, 2015, when Akorn announced that it would be unable to timely file its 2014

Form 10-K, Akorn disclosed its belief that material weaknesses "relating to the completeness and

accuracy of underlying data used in the determination of significant estimates and accounting

transactions and accurate and timely reporting of its financial results and disclosures" existed as

of December 31, 2014. Doc. 93-20 at 3. In the 2014 Form 10-K filed on March 17, 2015, Akorn

disclosed that it had material weaknesses, including "inadequate controls in place to prevent or

detect material errors in the financial statements of acquired subsidiaries," as of December 31,

2014. Doc. 93-21 at 5. The Form 10-K included similar language as in previous filings

regarding the possibility of a restatement if remediation proved unsuccessful. *Id.* at 6. And

Akorn's April 24, 2015 announcement of the estimated $20 million to $35 million overstatement

was accompanied by the caveat that those figures "could materially change based on further

review and analysis of the affected periods, including due to potential identification of other

errors." Doc. 93-22 at 2.

## Discussion

### I.  Section 10(b) Claims

Section 10(b) of the 1934 Act makes it

unlawful for any person, directly or indirectly, by the use of any means or
instrumentality of interstate commerce or of the mails, or of any facility of any
national securities exchange … [t]o use or employ, in connection with the
purchase or sale of any security … any manipulative or deceptive device or

13

contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  Pursuant to § 10(b), the SEC promulgated Rule 10b-5, which makes it unlawful

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Rule 10b-5 prohibits only conduct that § 10(b) already renders unlawful. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008); *United States v. O'Hagan*, 521 U.S. 642, 651 (1997).  "In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners*, 552 U.S. at 157.

Plaintiffs' § 10(b) claims are subject to the heightened pleading standards of Rule 9(b), which requires them to plead the "circumstances constituting fraud" with particularity.  Fed. R. Civ. P. 9(b).  This means that Plaintiffs "must describe the who, what, when, where, and how of the fraud."  *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (internal quotation marks omitted).  "This requirement includes the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff."  *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (internal quotation marks omitted).  In addition, under the

Private Securities Litigation Reform Act of 1995 ("PSLRA"), Plaintiffs must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2).

In seeking dismissal of Plaintiffs' § 10(b) claims, Defendants focus on the material misrepresentation, scienter, and loss causation elements, which are considered in turn.

### A. Material Misrepresentation

To satisfy the material misrepresentation element of a § 10(b) claim, a plaintiff must allege that the defendant made a statement that was "*misleading* as to a *material* fact." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). "[T]his materiality requirement is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (internal quotation marks omitted). As just noted, in alleging materiality, a complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

Plaintiffs submit that their complaint meets these requirements as to Defendants' statements about Akorn's 2014 financial performance and the integration of Hi-Tech and VersaPharm. Doc. 82 at ¶¶ 129, 137, 145, 148, 154, 170. Defendants respond that those statements would not have been viewed by reasonable investors as misleading enough to

15

"significantly alter[] the total mix of information made available." *Matrixx Initiatives*, 563 U.S. at 38 (internal quotation marks omitted).

It is true that not all false statements of fact are misleading. For example, "an investor cannot close his eyes to a known risk, meaning that, when an investor *knows* that a representation is false, he cannot act upon it and later claim deception." *Indosuez Carr Futures, Inc. v. C.F.T.C.*, 27 F.3d 1260, 1266 (7th Cir. 1994) (internal quotation marks omitted) (emphasis added); *see also Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 530 (7th Cir. 1985) ("The investor cannot ask a court to focus on the lie and ignore the remaining pieces of information already available to him (or, in the case of a publicly traded security, already available to others and reflected in the price of the security)."). That said, "an issuer needs to disclose the truth clearly before a lie becomes immaterial. It is not enough that the other party must have recognized a risk. Risks are ubiquitous. Disclosures assist investors in determining the magnitude of risks. Even savvy investors may recover when a bald lie understates the gravity of a known risk." *Pommer v. Medtest Corp.*, 961 F.2d 620, 624 (7th Cir. 1992) (internal citation omitted). Moreover, "[t]rue statements may discredit [a misleading statement] so obviously that the risk of real deception drops to nil," but "a misleading statement will not always lose its deceptive edge simply by joinder with others that are true." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991).

Materiality is a "fact-specific inquiry" that "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic*, 485 U.S. at 240. Accordingly, "the determination of materiality requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact; thus a

16

materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 370 (7th Cir. 1997) (reversing the dismissal of a § 10(b) claim) (brackets and internal quotation marks omitted); *see also Ganino v. Citizens Util. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) ("[W]hen presented with a Rule 12(b)(6) motion, a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.") (internal quotation marks and ellipsis omitted).

### 1. 2014 Financial Results

Plaintiffs argue that the inaccurate 2014 financial results that Defendants reported in SEC filings, conference calls, and press releases were materially misleading. Defendants respond that their disclosures of material weaknesses in Akorn's internal controls provided warnings sufficient to lead reasonable investors to disbelieve Defendants' inaccurate financial reporting.

Akorn's financial statements certainly put investors on notice that Akorn was suffering from substantial internal controls problems. Both before and during the class period, Akorn's Form 10-Ks warned that the company's "disclosure controls and procedures were not effective," Doc. 93-2 at 6; Doc. 93-8 at 14; Doc. 93-21 at 8, and that its "financial statements may contain material misstatements" if material weaknesses in its internal controls persisted. Doc. 93-2 at 5; Doc. 93-8 at 8; Doc. 93-21 at 6. Quarterly filings during the class period likewise warned that "the Company can provide no assurance at this time that management will be able to report that our internal control over financial reporting is effective as of December 31, 2014." Doc. 93-12 at 5; Doc. 93-15 at 6; Doc. 93-18 at 6.

17

At the same time, however, Defendants conveyed to investors that Akorn had actually achieved the financial results that they reported. They did so not only by reporting the inaccurate results, but also by certifying in Akorn's 2014 SEC filings that "[n]otwithstanding the identified material weaknesses, management believes the consolidated financial statements included in this [report] fairly represent in all material respects our financial condition, results of operations and cash flows at and for the period presented in accordance with U.S. GAAP." Doc. 93-12 at 5 ("weakness," not "weaknesses," in original); Doc. 93-15 at 6; Doc. 93-18 at 6; Doc. 93-21 at 8 ("periods," not "period," in original).

Plaintiffs have adequately pleaded that Defendants' statements about Akorn's financial results were materially false or misleading. Defendants overstated Akorn's 2014 financial results by non-trivial margins: revenue by 8.4% and net income by 194.7%. That Akorn issued a restatement to correct those results is further evidence of materiality, as financial accounting standards provide that financial results shall be restated "only when errors are material." *S.E.C. v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009); *see also Roth v. OfficeMax, Inc.*, 2006 WL 2661009, at *4 (N.D. Ill. Sept. 13, 2006) ("Plaintiffs have adequately alleged that these statements were false or misleading because the Company restated its financial results … ."); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005) ("Pursuant to Generally Accepted Accounting Principles ('GAAP'), previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were issued. … [T]he mere fact that financial results were restated is sufficient basis for pleading that those statements were false and misleading.") (internal quotation marks omitted).

The 22% drop in Akorn's stock price within one trading day after some misstatements about Akorn's financial results came to light confirms that those misstatements were material.

*See Kleinman v. Elan Corp.*, 706 F.3d 145, 155 (2d Cir. 2013) ("A drop in stock price ... tends

to establish materiality, *i.e.*, whether reasonable investors would consider the information to be

significant or to have altered the total mix of information affecting their investment decisions.")

(internal quotation marks omitted); *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000)

(observing that a four percent drop in stock price "does suggest that investors viewed this ... as

material."). That Akorn's financial statements were not prepared in accordance with GAAP

further indicates that they were misleading. *See* 17 C.F.R. § 210.4-01(a)(1) ("Financial

statements filed with the Commission which are not prepared in accordance with generally

accepted accounting principles will be presumed to be misleading or inaccurate ... ."). Given

that Defendants' warnings about the possibility of inaccurate reports did not speak to the

*magnitude* of the reports' inaccuracy, and that Akorn's true financial results did not come to light

until after the class period, Defendants' risk disclosures could not have discredited the inaccurate

financial results "so obviously that the risk of real deception drop[ped] to nil." *Virginia

Bankshares*, 501 U.S. at 1097; *see also P. Stolz Family P'ship L.P. v. Daum*, 555 F.3d 92, 96-97

(2d Cir. 2004) (holding that "the misrepresentation of present or historical facts cannot be cured

by cautionary language"); *cf. Ganino*, 228 F.3d at 167 ("[T]he corrective information must be

conveyed to the public with a degree of intensity and credibility sufficient to counter-balance

effectively any misleading information created by the alleged misstatements.") (internal

quotation marks omitted). It follows, at least at the pleading stage, that Defendants' statements

about Akorn's 2014 financial results qualify as material misrepresentations.

## 2. Integration of Hi-Tech and VersaPharm

Plaintiffs also argue that Defendants' inaccurate statements regarding Akorn's integration

of Hi-Tech and VersaPharm were materially misleading. For example, during Akorn's 2014

second quarter conference call on August 5, 2014, Rai said that the company was "on track with

our plans to fully integrate the [Hi-Tech] business by the end of this year and on track to realize about $20 million in cost synergies by the end of this year." Doc. 82 at ¶¶ 133-134. During Akorn's third quarter conference call on November 6, 2014, Rai said that the company was "on track with our plans to fully integrate the business that we acquired of Hi-Tech by the end of this year." *Id*. at ¶ 141. At the JPMorgan Healthcare Conference on January 12, 2015, Rai said, "We have some residual integration left on one of the acquisitions. That's the Hi-Tech acquisition. The other acquisitions are fully integrated." *Id*. at ¶¶ 146-147. Plaintiffs allege that those statements were materially misleading because Dick and Rai failed to disclose the problems they encountered in integrating the acquisitions, which ultimately contributed to significant inaccuracies in Akorn's reported financial performance. *Id*. at ¶¶ 137, 148. Defendants respond that their statements about the integration of Hi-Tech and VersaPharm were forward-looking statements protected by the PSLRA.

The PSLRA carves a safe harbor for forward-looking statements by executive officers that were (1) "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or (2) "immaterial." 15 U.S.C. § 78u-5(c)(1)(A); *see also* 15 U.S.C. § 78u-5(i)(1) (defining "forward-looking statement"). However, "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir. 2008). The question here is whether, as Defendants assert, statements about Akorn's integration efforts being "on track" fall within the PSLRA safe harbor or, as Plaintiffs assert, those statements were "mixed present/future" statements that are "not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Tellabs*, 513 F.3d at 705.

20

The statements about Akorn's integration efforts being "on track" convey a forward-looking belief about the *future* integration of the acquisitions, but they also convey that the *current* state of the integration efforts had progressed to a point that made it reasonably likely for Akorn to complete the integration process by a certain time. *See Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) (treating language about the company being "on track" as "statements of present fact that could be considered material"). The forward-looking portions of the "on track" statements are nonactionable because they were accompanied by meaningful cautionary language. *E.g.*, Doc. 93-14 at 4 ("These forward-looking statements may involve a number of risks and uncertainties which may cause the company's results to differ materially from such statements."); Doc. 93-17 at 4 (same). But "the part[s] of the statement[s] that refer[] to the present" are, by definition, not forward-looking and thus not covered by the PSLRA safe harbor. *Tellabs*, 513 F.3d at 705.

The question then becomes whether Plaintiffs have adequately alleged that the portion of the "on track" statements that conveyed a statement of present fact were materially false or misleading. The complaint alleges that Akorn "was not 'on track' to fully integrate Hi-Tech due to problems integrating its accounting system and the failure to implement a system to accurately process and account for rebates and chargebacks." Doc. 82 at ¶ 137. It also alleges that the failure to timely integrate Akorn's subsidiaries had a detrimental effect on the accuracy of Akorn's financial statements. *E.g.*, *id.* at ¶¶ 8 ("Akorn was unable to timely integrate its accounting system with those of its new acquisitions, which resulted in inaccuracies in the reserve accounts at Hi-Tech and VersaPharm."), 83 ("Akorn's accounting violations stem in part from the Company's failure to timely integrate its accounting system with those of its new acquisitions in 2014, Hi-Tech and VersaPharm[,] without having a system in place to prevent or

detect material errors in the financial statements of acquired subsidiaries—particularly with respect to gross to net revenue adjustments.").  These allegations give rise to the inference that reasonable investors would consider false statements about Akorn's integration efforts being "on track" to substantially affect the "total mix" of information upon which they would make investment decisions.  *See Silverman*, 2008 WL 4360648, at \*10 (treating similar language as sufficiently misleading to withstand a motion to dismiss).  Thus, Plaintiffs have adequately pleaded materiality with respect to the "on track" statements.

For the same reasons, reasonable investors could view Rai's January 12, 2015 statement—"We have some residual integration left on one of the acquisitions.  That's the Hi-Tech acquisition.  The other acquisitions are fully integrated."—to be materially false or misleading.  This statement plainly made representations about current facts, so it is not covered by the safe harbor.  *See Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 965 (N.D. Cal. 2014) ("Because the Court concludes that the statements identified in the FAC on what Plaintiffs rely to state their claim are, at least in part, statements of present or historical fact and not forward-looking, the Court concludes that the PSLRA safe harbor does not apply and need not address whether Defendants' cautionary language was 'meaningful.'"); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478 (S.D.N.Y. 2010) ("Nor does the PSLRA safe harbor provision for forward-looking statements render these alleged misstatements non-actionable.  Many of the alleged misstatements are not forward-looking because they either state a present or historical fact alone or incorporate forward-looking aspects into statements of present or historical fact.").  In any event, Defendants have forfeited the point, since their briefs do not refer to Rai's January 12, 2015 statement.  *See Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012)

("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance a specific point in support of a general argument … .").

### B.    Scienter

"To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Matrixx*, 563 U.S. at 48 (internal quotation marks omitted).  Scienter is "demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007); *see also Costello v. Grundon*, 651 F.3d 614, 634 (7th Cir. 2011) (defining "scienter" as "intent to deceive or reckless disregard for the truth").  The PSLRA requires securities fraud plaintiffs to allege "with particularity facts giving rise to a strong inference that [each] defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  Although "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud," *Tellabs*, 513 F.3d at 710, the determination of corporate scienter "must focus on the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making … ) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment," *Pugh v. Tribune Co.*, 521 F.3d 686, 697 (7th Cir. 2008) (internal quotation marks omitted).  As the Supreme Court has instructed, the scienter inquiry

> is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. … To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.  The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even the "most plausible of competing inferences." … A

> complaint will survive … only if a reasonable person would deem the
> inference of scienter cogent and at least as compelling as any opposing
> inference one could draw from the facts alleged.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007) (internal citations

omitted).

Plaintiffs contend that Defendants acted "knowingly or recklessly and for the purpose and

effect of concealing Akorn's financial well-being and prospects from the investing public and

supporting the artificially inflated price of its securities." Doc. 82 at ¶ 208. Defendants respond

that the more plausible inference is that "Defendants made good-faith efforts to keep investors

informed of the risks that Akorn may not remediate its control weaknesses, integrate Hi-Tech

and VersaPharm and misstate its financial information … ." Doc. 93 at 30. The court's task is to

compare the plausibility of each of those inferences based on the complaint's factual allegations.

Plaintiffs point to several allegations that, considered together, raise a cogent and

compelling inference of scienter. Dick and Rai had the duty to design or supervise Akorn's

internal controls over financial reporting. Doc. 82 at ¶ 47. Under their leadership, Akorn

suffered from serious deficiencies in its internal controls for several years. *Id*. at ¶¶ 64-77.

Three independent auditing firms concluded that Akorn's internal controls were ineffective, *id*. at

¶¶ 66, 69, 75, 80, but Defendants dismissed the first two firms instead of remediating the

weaknesses that those firms uncovered, *id*. at ¶¶ 64-77, 104, 107, 123. Akorn's internal control

deficiencies were well-known among employees, *id*. at ¶¶ 94-96, 99-101, 104-07, 109, and

known to Dick and Rai personally, *id*. at ¶¶ 67, 71, 107. Moreover, Dick and Rai knew that

those deficiencies could cause inaccuracies in Akorn's reported financial performance. Doc. 93-

2 at 5; Doc. 93-8 at 8; Doc. 93-21 at 6. But Dick and Rai did not remediate those deficiencies,

even though many of the remedial measures they described in public filings were not particularly

complex, such as hiring additional personnel. Doc. 82 at ¶¶ 68, 76. Instead, they exacerbated

preexisting problems by acquiring subsidiaries without enabling the company's accounting department to prepare accurate financial statements. *Id*. at ¶¶ 8, 55, 70, 83, 89, 95. Dick and Rai did disclose that Akorn had deficient internal controls, but they also falsely represented that the company's 2014 financial results were accurate and prepared in accordance with GAAP notwithstanding those deficiencies. Doc. 93-12 at 5; Doc. 93-15 at 6; Doc. 93-18 at 6; Doc. 93-21 at 8. Assuming that Plaintiffs' allegations are true, Dick and Rai would not have had a good-faith basis to make those representations, which gives rise to the inference that it was, at the very least, reckless for them to convey to investors that Akorn's financial performance was substantially better than it actually was. *See Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *9 (N.D. Ill. July 28, 2009) ("A stronger competing inference is that the individual defendants knew, or at least were recklessly unaware, that there were glaring accounting problems within the company that needed to be concealed from or minimized to investors, analysts, and regulators."); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1191 (D. Nev. 2009) (finding a strong inference of scienter "given the filing of Shuffle Master's 2005 10-K, and indication that a Remediation Plan would be implemented to guard against further errors, as noted in Defendants' [SOX] certifications, together with the subsequent internal deficiencies discovered in conjunction to Shuffle Master's Restated 2006 10-K"); *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *13 (C.D. Cal. July 1, 2008) (observing that "significant violations of GAAP, taking place over an extended period of time, give rise to a strong inference of scienter," and finding that strong inference based in part on the allegation that the defendants "terminated [their independent auditor] and kept in place the improper accounting practices").

The nature and extent of Defendants' misrepresentations of the 2014 financial results make the inference of scienter even more reasonable. As noted, Dick and Rai reported 2014

revenue that was artificially inflated by 8.4% and 2014 net income that was artificially inflated by 194.7%—significant inaccuracies. Doc. 82 at ¶ 49; *see S.E.C. v. Fisher*, 2012 WL 3757375, at *13 (N.D. Ill. Aug. 28, 2012) ("[I]t is long settled that a magnitude of reporting errors lend weight to allegations of recklessness where defendants were in a position to detect the errors.") (internal quotation marks omitted); *Ustian*, 2009 WL 2386156, at *9 ("Although it is possible that the individual defendants knew nothing about the content of their representations, this is far from a reasonable inference, let alone a cogent one given the extent of the individual defendants' alleged departures from the truth."); *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 18 (D. Mass. 2004) (finding a strong inference of scienter because, among other things, "[w]hat matters most to investors is income … , and the restatement led to a downward revision of income" by 32.5%). Moreover, Akorn's accounting violations had the near-uniform effect of *increasing* its reported revenue and net income, Doc. 82 at ¶ 49, unlike what one might expect from a random series of innocent mistakes. Importantly, those violations made the difference between failure and success in meeting the annual revenue guidance that Akorn issued on August 5, 2014, *id*. at ¶ 51, and Wall Street consensus revenue estimates for two quarters of 2014, *id*. at ¶ 50. *See Stocke*, 615 F. Supp. 2d at 1191 (finding scienter adequately pleaded where "the mistakes allowed the Company's reported earnings to achieve consensus estimates"). Further reinforcing the case for scienter is the allegation that Dick resigned in the wake of the restatement, before a replacement CFO was selected. Doc. 82 at ¶¶ 24, 119, 199; *see Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *10 (N.D. Ill. Oct. 30, 2012) (observing that "the timing of [a corporate officer's] resignation lends weight to a finding of scienter"). That the SEC and DOJ initiated investigations provides additional support for finding that scienter has been adequately pleaded. Doc. 82 at ¶ 122; *see Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93,

115 (D. Mass. 2014) ("[G]overnment investigation[s] can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter.").

It is true, as Defendants submit, that the complaint's factual allegations can also give rise to the inference that Dick and Rai were attempting in good faith to balance the objectives of candid disclosure with those of running a successful and ambitious company. They did not conceal the auditors' reports or the risk that Akorn's ineffective internal controls might cause inaccuracies in its financial reporting; rather, they disclosed those problems and associated risks, and they presented detailed remediation plans in SEC filings. Doc. 93-2 at 5-7; Doc. 93-3 at 4-5; Doc. 93-4 at 4-5; Doc. 93-6 at 4; Doc. 93-8 at 8, 14-16; Doc. 93-20 at 3; Doc. 93-21 at 5-6, 8, 10-11. Some steps may have been taken to remediate those weaknesses, though whatever steps were taken ultimately proved inadequate. And it is not as if Dick and Rai reaped professional rewards for misleading investors, as the restatement led to Dick's resignation and government investigations. Doc. 82 at ¶¶ 119, 122, 199. As the Seventh Circuit has recognized, it is not in management's interest to cause a *temporary* inflation in stock price. *See Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012).

The court has carefully reviewed the complaint and weighed the competing inferences. Ultimately, it would not be unreasonable to infer that Dick and Rai acted with mere carelessness. But that inference is not *more* plausible or compelling than the inference that they acted recklessly or intentionally; rather, the inference that they acted with scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. It follows that Plaintiffs have adequately pleaded Dick's and Rai's, and therefore Akorn's, state of mind.

###### C.     Loss Causation

The PSLRA requires plaintiffs to "prov[e] that the act or omission of the defendant alleged to violate [the securities laws] caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  "To prove this element of the claim, the plaintiffs had the burden to establish that the price of the securities they purchased was 'inflated' … and that it declined once the truth was revealed."  *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015).  "Loss causation is a fact-based inquiry" that need not be proven until later stages of litigation.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011) (holding that loss causation need not be proven until after the class certification stage); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (referring to the "tangle of factors affecting price").  Because pleading loss causation is "not meant to impose a great burden upon a plaintiff," loss causation allegations need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura*, 544 U.S. at 347; *see also Pub. Emps. Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 325 (5th Cir. 2014) ("To plead loss causation in a private securities action, the complaint need only allege facts that support an inference that Defendants' misstatements and omissions concealed the circumstances that bear upon the loss suffered such that Plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud.").

Defendants argue that Plaintiffs have failed to make such allegations as to the correction of an error in Akorn's first quarter 2014 financial statements.  That is wrong.  The complaint alleges losses immediately following two corrective disclosures: the March 2, 2015 press release announcing a filing extension for Akorn's 2014 Form 10-K (the 8% stock price drop), Doc. 82 at

28

¶¶ 155-156, and the April 24, 2015 press release announcing that Akorn would make additional restatements "for the annual period ending December 31, 2014 and the quarterly periods ending June 30, 2014, September 30, 2014 and December 31, 2014" (the 22% stock price drop), *id*. at ¶¶ 160-161. The first disclosure revealed the possibility that Akorn's 2014 financial statements were defective; the second confirmed that Akorn's financial results for the 2014 *annual* period—which necessarily included the first quarter of 2014—contained material misstatements. Accordingly, the complaint does enough, at least at the pleading stage, to link the first quarter results to the losses alleged. *See Amedisys*, 769 F.3d at 325-26 ("Whether the connection … may ultimately be found too attenuated at a later stage in litigation is a highly fact intensive inquiry that need not be reached at this point. … Where the Complaint sets forth specific allegations of a series of partial corrective disclosures, joined with the subsequent fall in Amedisys stock value, and in the absence of any other contravening negative event, the plaintiffs have complied with *Dura*'s analysis of loss causation."); *Better v. YRC Worldwide Inc.*, 2012 WL 4433500, at *9-10 (D. Kan. Sept. 25, 2012) (applying *Dura* to find loss causation adequately pleaded).

Defendants' next argument, that Plaintiffs have not alleged loss causation as to the correction of an error in Hi-Tech's opening balance sheet, is wrong as well. Recall that the first restatement, issued on March 17, 2015, explained that the 2014 second and third quarter results had to be restated because of an error in Hi-Tech's balance sheet, Doc. 82 at ¶ 158, and that the announcement on April 24, 2015 of a second restatement revealed that those results would need to be restated again for different (but related) reasons, *id*. at ¶ 160 (alleging that a "substantial majority" of Akorn's newly discovered errors were "related to companies and products acquired in 2014, among other factors"). Plaintiffs need not plead loss causation at such a granular level as to link each explanation for Akorn's accounting errors to an immediate stock price drop. *See*

*Dura*, 544 U.S. at 347 ("[I]t should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009) ("Thus, loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation."); *Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 994-95 (7th Cir. 2007) (defining loss causation as "the fact that the defendant's actions had *something to do with* the drop in value") (emphasis added). It is enough that Plaintiffs have alleged a stock price drop following the April 24 disclosure that revealed errors in the same financial statements that had been restated the previous month due to the discovery of an error in Hi-Tech's balance sheet. Plaintiffs have provided Defendants "with some indication of the loss and the causal connection that [they have] in mind," which is all that is required at this stage. *Dura*, 544 U.S. at 347.

## II.    Section 20(a) Claims

Section 20(a) extends liability to "[e]very person who, directly or indirectly, controls any person liable" under § 10(b). 15 U.S.C. § 78t(a). Defendants' only argument for dismissal of the § 20(a) claims is that the complaint does not properly allege § 10(b) claims. Because the § 10(b) claims are adequately pleaded, the § 20(a) claims may proceed as well.

## Conclusion

Defendants' motion to dismiss is denied. They shall answer the operative complaint by March 27, 2017. The discovery stay, *see* 15 U.S.C. § 78u-4(b)(3)(B), is lifted.

March 6, 2017

_____
United States District Judge