**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

IN RE AKORN, INC. SECURITIES
LITIGATION

Case No. 15 C 1944

Honorable Gary Feinerman

**MEMORANDUM OF LAW IN SUPPORT OF**
**LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**POMERANTZ LLP**
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: 312-377-1181

**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100  Los
Angeles, California 90067
Telephone: 310 201-9150

*Lead and Proposed Class Counsel*

**LAWRENCE, KAMIN, SAUNDERS &**
**UHLENHOP, L.L.C.**
300 S. Wacker Drive, Suite 500
Chicago, Illinois 60606

*Liaison Counsel for Plaintiff*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ...................................................................................3

PROCEDURAL HISTORY....................................................................... 7

ARGUMENT ..................................................................................... 8

I.   Standard for Class Certification ................................................. 8

II.  The Proposed Class Meets the Prerequisites of Rule 23(a).............................. 9

    A.  Numerosity.................................................................. 10

    B.  Commonality................................................................ 10

    C.  Typicality .................................................................12

    D.  Adequacy.................................................................. 13

III. The Proposed Class Meets the Requirements of Rule 23(b)(3)................................. 14

    A.  Predominance ...............................................................14

        1.  *Basic* Presumption of Class-Wide Reliance ...............................15

            (a) Presumption of NASDAQ's Efficiency............................... 16

            (b) *Cammer* Factors of Market Efficiency................................17

                (i)      Weekly Trading Volume .......................................18

                (ii)     Analyst Coverage................................................ 18

                (iii)    Market Makers and Arbitrage Activity................................... 19

                (iv)     Form S-3 Eligibility................................................ 19

                (v)      Price Reaction to New, Material Information........................ 20

                (vi)     Other Factors of Market Efficiency........................... 21

         2.  *Affiliated Ute* Presumption of Class-Wide Reliance ...............................22

3.   Calculation of Class-Wide Damages ...........................................................23

B.   Superiority.....................................................................................................23

IV. Proposed Class Counsel Satisfies Rule 23(g) ...................................................24

CONCLUSION ...............................................................................................................25

## TABLE OF AUTHORITIES

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)................... 3, 15, 21, 22

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...................................................... 8, 13

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013) ....... 8, 9, 14, 16

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ......................................................................2, 15

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975).................................................................... 22

*Brieger v. Tellabs, Inc.*, 245 F.R.D. 345 (N.D. Ill. 2007) .........................................................12

*Brosious v. Children's Place Retail Stores*, 189 F.R.D. 138 (D.N.J. 1999) ..........................23

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ........................................... 16, 17, 18, 21

*Cooper v. Pac. Life Ins. Co.*, 229 F.R.D. 245 (S.D. Ga. 2005) ............................................... 21

*De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225 (7th Cir. 1983)............................... 12

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)................................................................ 9

*Erica P. John Fund v. Halliburton, Inc.*, 131 S. Ct. 2179 (2011)....................................... 8, 15

*Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90 (S.D.N.Y. 2009)........................................ 21

*Garfinkel v. Memory Metals, Inc.*, 695 F. Supp. 1397 (D. Conn. 1988) .............................. 10

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014)................................... 15

*Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259 (N.D. Cal. 2011) ..........................................16

*Ingram v. Corporate Receivables, Inc.*, No. 02 C 6608, 2003 WL 21982152
(N.D. Ill. Aug. 19, 2003) ........................................................................................................23

*In re Accredo Health, Inc. Sec. Litig.*, 2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006) ....... 17

*In re Bank of Am. Corp. Sec., Deriv., & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
281 F.R.D. 134 (S.D.N.Y. 2012) ........................................................................................... 10

*In re Bank One Sec. Litig./First Chicago S'holder Claims*, No. 00 CV 0767, 2002
WL 989454 (N.D. Ill. May 14, 2002)........................................................................... 8, 12, 14

*In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240 (N.D. Cal. May 6, 2013)................ 14

*In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196 (E.D. Pa. 2008) ............................................ 20, 21

*In re Dynegy Inc. Sec. Litig.*, 226 F.R.D. 263 (S.D. Tex. 2005)............................................ 11

*In re Groupon, Inc. Sec. Litig.*, 2014 WL 5245387 (N.D. Ill. Sept. 23, 2014) .......................9

*In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260 (N.D. Ala. 2009).................................. 16

*In re Heckmann Corp. Sec. Litig.*, 2013 WL 2456104 (D. Del. June 6, 2013)....................... 20

*In re IndyMac*, 286 F.R.D. 226 (S.D. N. Y. 2012) ................................................................14

*In re Initial Public Offering Sec. Litig.*, 544 F. Supp. 2d 277 (S.D.N.Y. 2008) ..................... 17

*In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38 (S.D.N.Y. 2012) ..................................................15

*Keele v. Wexler*, 149 F.3d 589 (7th Cir. 1998) ....................................................................10

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001)........................................................ 20

*Lumen v. Anderson*, 280 F.R.D. 451 (W.D. Mo. 2012) ........................................................16

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586 (N.D. Ill. 2009)............... 12, 13

*McCabe v. Crawford & Co.*, 210 F.R.D. 631 (N.D. Ill. 2002) ................................................ 10

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ........................ 8, 9

*Nauman v. Abbott Labs.*, No. 04 C 7199, 2007 WL 1052478 (N.D. Ill. Apr. 3, 2007).......... 21

*Neil v. Zell*, 275 F.R.D. 256 (N.D. Ill. 2011) ........................................................................11

*Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336 (C.D. Cal. 2015) ....................................... 21

*Roth v. Aon Corp.*, 238 F.R.D. 603 (N.D. Ill. 2006) ......................................................... *passim*

*Schleicher v. Wendt*, 618 F.3d 679 (7th Cir. 2010) ........................................................9, 11, 22

*Schleicher v. Wendt*, No. 1:02-CV-1332-DFH-TAB, 2009 WL 761157
(S.D. Ind. Mar. 20, 2009)..................................................................................... 17, 18

*SEC v. Gorsek*, 222 F. Supp. 2d 1099 (C.D. Ill. 2001) ........................................................21

*Silverman v. Motorola*, 259 F.R.D. 163 (N.D. Ill. 2009)...................................................... 13

*Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.*, No. 01 Civ. 11814(LAP), 2004 WL 2997957(S.D.N.Y. Dec. 27, 2004) ........................................................................ 10

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898, 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) ....................................................... 16

*Thomas v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160-JST, 2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ........................................................................................20

*Todd v. STAAR Surgical Co.*, No. CV-14-05263-MWF-RZ, 2017 WL 821662 (C.D. Cal. Jan. 5, 2017) ........................................................................................... 16

*Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005) ............................................. 20

*Wagner v. NutraSweet Co.*, 95 F.3d 527 (7th Cir. 1996) ................................. 12, 13

*Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ............................................. 9

*Weiner v. Quaker Oats Co.*, No. 98 C 3123, 1999 WL 1011381 (N.D. Ill. Sept. 30, 1999) .... 8

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. CV 13-6731, 2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) .......................................................... 16

## PRELIMINARY STATEMENT

Lead Plaintiff Akorn Investor Group (consisting of members Mikolaj Sarzynski, Jonathan A. Golani, Kenny Kinsey, J. M. Cunniff Jr., and Elizabeth Cunniff) ("Lead Plaintiff") requests certification of the following class:

> All persons or entities who purchased or acquired shares of Akorn, Inc.'s common stock between May 6, 2014 and April 24, 2015, and who were damaged thereby (the "Class").

As alleged in the Consolidated Amended Class Action Complaint (Dkt. No. 82) ("Complaint"), all members of the Class have claims under the Securities Exchange Act of 1934 ("Exchange Act") that are amenable to common proof. Additionally, Lead Plaintiff moves that its members (with the exception of Kenny Kinsey) be appointed Class Representatives and that Co-Lead Counsel, Glancy Prongay & Murray LLP ("Glancy") and Pomerantz LLP ("Pomerantz"), be appointed Class Counsel. Finally, the proposed Class satisfies all of the prerequisites of Federal Rule of Civil Procedure 23(a) and the requirements of Rule 23(b)(3):

**Numerosity.** With over 103 million shares freely tradable throughout the Class Period – May 6, 2014 through April 24, 2015, inclusive – and over 7,203,270 million shares (on average) traded weekly, there can be no reasonable dispute that numerosity is established.

**Commonality.** This action arises out of a common course of conduct, namely the misrepresentations and omissions made to all investors in Akorn's financial statements, filings with the Securities and Exchange Commission ("SEC"), press releases, earnings calls, and investor conferences during the Class Period. All claims center around common questions of law and fact, including but not limited to:

- whether Defendants' statements to investors misrepresented material facts about Akorn's business, operations, financials, and management;

- whether Defendants acted knowingly or recklessly in making false and misleading statements and omissions;

- whether the prices of Akorn common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein;

- whether Class members have sustained damages, and, if so, what is the proper measure of those damages; and

- whether the Individual Defendants were control persons of Akorn.

**Typicality.** The proposed Lead Plaintiff members and proposed Class Representatives suffered injuries of the same type as other Class members, stemming from exactly the same events, practices, and unlawful conduct by Defendants. Like other Class members, they purchased shares during the Class Period at inflated prices and subsequently suffered losses when the truth was revealed. Therefore, Lead Plaintiff members were impacted by the same materially false and misleading statements as other members of the Class.

**Adequacy.** All Lead Plaintiff members are willing to represent absent Class members, to monitor the litigation and supervise proposed Class counsel, and to participate in discovery. Moreover, they suffered injuries due to the same materially false and misleading statements and the same conduct that caused the Class's injuries. Thus, there is no antagonism between the proposed representatives and the Class. Moreover, Lead Plaintiff has selected two highly experienced securities class action law firms to represent the Class.

**Predominance.** The common issues identified above predominate over individual issues, and a trial would not be sidetracked by adjudicating each Class member's reliance. Class-wide reliance is presumed under the *Basic* "fraud-on-the-market" presumption because, as demonstrated by the analysis of Lead Plaintiff's expert, Dr. Zachary Nye, Akorn common stock traded in an efficient market throughout the Class Period.[1] See Expert Report of Zachary Nye, Ph.D., dated May 5, 2017 ("Nye Rpt."), attached as Exhibit 1 to the Declaration of Patrick V.

---

[1] *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988) & pp. 15-16, *infra*.

Dahlstrom ("Dahlstrom Decl."), filed concurrently herewith. Class-wide reliance is also presumed under the *Affiliated Ute* presumption because the securities claims involve omissions of material fact.[2]

**Superiority.** Class adjudication is superior to myriad individual suits. It would maximize judicial efficiency, allow all the claims to be heard in one court, and, given the prohibitive costs of litigation, be the only realistic opportunity to adjudicate Defendants' violations of federal securities laws for the many Class members who suffered relatively smaller investment losses. Moreover, there would be no difficulty in maintaining this action as a class action.

Finally, the appointment of Glancy and Pomerantz as Class Counsel is appropriate under Fed. R. Civ. P. 23(g). Glancy and Pomerantz have significant experience in handling class actions and other complex litigation, including the securities claims asserted in this action, and have expertise in the applicable law. The firms have identified, investigated, and adequately pled the claims in this action, already committing substantial time, effort, and resources to representing the Class through active prosecution of this litigation. Glancy and Pomerantz have fairly and adequately represented the interests of the Class and will continue to do so.

<u>**STATEMENT OF FACTS**</u>

Akorn is a specialty pharmaceutical company that develops, manufactures, and markets prescription pharmaceuticals. ¶ 26.[3] Akorn completed the acquisition of Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") and VPI Holdings Corp. ("VPI"), which is the parent company of VersaPharm Inc. ("VersaPharm"), in 2014. ¶¶ 31-34. Akorn maintains standard pricing between wholesalers by contracting to sell wholesalers' products at the predetermined Wholesaler Acquisition Price ("WAP"). ¶ 30. Akorn also contracts to sell certain end users products at predetermined prices.

---

[2] *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) & p. 22, *infra*.

[3] Except where noted, citations to "¶ __" refer to the numbered paragraphs of the Complaint.

¶¶ 28, 35. When a wholesaler sells a product to an end user that is subject to a contractual agreement with Akorn, the wholesaler charges the difference between the WAP and the price under the end user's contract to Akorn, a process known as a "chargeback" or "billback." ¶ 35. Akorn also issues other contractual adjustments to its customers, including rebates. *Id*. Chargebacks, billbacks, rebates, and other contractual price adjustments are deducted from gross revenue to calculate Akorn's net revenue.[4]

In violation of Generally Accepted Accounting Principles ("GAAP") and its own accounting policies, Akorn publicly issued materially false financial statements for each quarter of 2014 and fiscal year ("FY") 2014. Among other GAAP violations, Defendants:

- overstated Hi-Tech's chargeback reserve by $8.9 million and improperly shifted that overstatement from the balance sheet to the income statement, thereby artificially inflating its net revenue by $8.9 million for the second quarter of 2014 (¶ 55);

- understated the pipeline reserve in 2014 by failing to accurately take into account all potential downstream rebate obligations, resulting in an overstatement of net revenue of $10.5 million in 2014 (¶ 56);

- understated gross to net revenue reserves in 2014 by failing to estimate certain revenue deductions – namely rebates, bill-backs, failure to supply, price protection penalties, and other contractual adjustments – resulting in an overstatement of net revenue of $21.0 million in 2014 (¶ 57);

- improperly recognized $2.9 million of revenue for a portion of a transaction with a certain customer in the fourth quarter of 2014, despite the absence of sufficient evidence to substantiate it (*id.*); and

- inaccurately amortized financing commitment fees, a $1.9 million error that Akorn deemed "material" and that overstated first quarter net income by $300,000, or 3.5% (¶ 58).

In addition, the following categories of disclosures made by Defendants during the Class Period contained material misrepresentations and omissions: (1) statements touting Akorn's

---

[4] On April 24, 2017, Akorn filed a press release with the SEC on Form 8-K disclosing that Fresenius Kabi AG had agreed to acquire Akorn for approximately $4.3 billion, or $34.00 a share, plus the assumption of approximately $450 million of debt, with the transaction expected to close by early 2018. https://www.sec.gov/Archives/edgar/data/3116/000095015717000499/form8k.htm

revenues and growth; (2) Sarbanes-Oxley ("SOX") certifications that the Company's internal controls are "designed . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with [GAAP]"; (3) SOX certifications that "[b]ased on my knowledge, [Akorn's] financial statements, and other financial information included in this report, fairly present in all material respects [its] financial condition [and] results of operations"; and (4) statements touting the integration of Hi-Tech and VersaPharm.

As Defendants' own disclosures state, Akorn's internal controls over financial reporting were ineffective during the 2012-2015 period and had material weaknesses directly relating to the reliability and accuracy of Akorn's gross to net revenue calculations. ¶¶ 64-82. These material weaknesses included the failure to "have controls designed to validate the completeness and accuracy of underlying data used" to calculate "gross to net revenue adjustments" and the failure to have the accounting systems and personnel in place to accurately calculate such adjustments. ¶¶ 67, 71, 76. Further, Akorn failed to have the controls "to prevent or detect material errors in the financial statements of acquired subsidiaries," such as Hi-Tech and VersaPharm. ¶¶ 71, 76. Throughout this period, Defendants represented that Akorn was taking steps to remediate these material weaknesses with the "oversight of senior management." ¶ 68.

Lead Plaintiff alleges and intends to prove that Defendants knew or recklessly disregarded that Akorn had not remediated the material weaknesses in its internal controls and that they persisted throughout 2014. Indeed, Akorn's outside auditor informed Defendants of this fact sometime during that year. ¶ 107. Numerous confidential witnesses attest to widespread accounting errors and material weaknesses at Akorn caused by, among other things, its inadequate accounting system, the failure to complete the integration of Hi-Tech's and

5

VersaPharm's accounting systems, understaffed accounting and financial reporting departments overwhelmed by the recent large acquisitions, and an ineffective Corporate Controller. ¶¶ 83-114. As a result, Akorn's GAAP violations described above inflated Akorn's originally-reported revenue by 8.4% and net income by 194.7% in 2014, enabling Akorn to meet Wall Street consensus for two quarters and its own annual revenue guidance. In the wake of Akorn's restatement announcement, its Chief Financial Officer, Dick, suddenly resigned; its Corporate Controller was moved to a non-accounting position within the Company; its outside auditor was replaced; and both the SEC and the U.S. Attorney's Office initiated investigations.

The market only began to learn of Defendants' accounting fraud on March 2, 2015, when Akorn filed a Form 12b-25 notifying the SEC that its 2014 annual report would be filed late due to "unforeseen delays in collecting and compiling certain financial and other related data" from VersaPharm and Hi-Tech, which were not yet integrated into the Company's centralized accounting system as of December 31, 2014. ¶ 115. Additionally, the Company announced that it had not completed its assessment of the effectiveness of its internal controls, it "believe[d] that material weaknesses exist[ed] as of December 31, 2014," and additional material weaknesses may be identified following its assessment. ¶ 115. In response to this news, Akorn's stock price fell $4.38, or over 8%, to close on March 3, 2015, at $49.33 per share. ¶ 156.

Akorn issued its first restatement in a press release announcing that its previously disclosed financial results for the second and third quarters of 2014 should no longer be relied upon due to an error in Hi-Tech's opening balance sheet, resulting in a chargeback reserve that was overstated by approximately $8.9 million as of April 17, 2014. ¶ 116. The correction of the error resulted in an $8.9 million reduction in revenue and a $5.6 million reduction in previously reported net income, goodwill, and retained earnings. *Id.* The Company maintained that it

would issue a second restatement of its 2014 second and third quarter financial results and that it was "actively engaged in remediating [the] material weaknesses" that led to the first restatement.

Then, on April 24, 2015, Akorn issued a press release announcing that its financial results for the second, third, and fourth quarters of 2014, as well as FY 2014, should no longer be relied upon due to the understatement of rebates and other sales allowances resulting in an overstatement of the Company's net revenue for those periods. ¶ 117. Akorn also announced that it would be restating the affected periods and that based upon an initial assessment, it believed its net revenue and pretax income from continuing operations was overstated by $20 to $35 million for FY 2014. ¶ 117. On this news, shares of Akorn plummeted $12.14 per share, nearly 22%, to close on April 27, 2015, at $43.10 per share, on unusually heavy volume. ¶ 161. Stunned market analysts called Akorn's credibility into question. ¶¶ 162-63.

Finally, on May 10, 2016, Akorn filed its 2015 Form 10-K, which included its financial statements for FY 2015 and the restated financial statements for FY 2014. ¶ 164.

## PROCEDURAL HISTORY

The first shareholder complaint was filed on March 4, 2015. Dkt. No. 1. On August 18, 2015, Lead Plaintiff moved for the consolidation of the various cases that had been filed against Defendants, its appointment as lead plaintiff, and the appointment of its attorneys, Glancy and Pomerantz, as lead counsel. Dkt. No. 52. On August 24, 2015, this Court entered an order granting Lead Plaintiff's motion. Dkt. No. 57.

On July 5, 2016, after completing an extensive investigation, Lead Plaintiff filed the Complaint, which is the operative complaint in this litigation. Dkt. No. 82. On August 9, 2016, Defendants moved to dismiss all claims asserted in the Complaint. Dkt. No. 86. After the motion was fully briefed and considered, and oral argument was held, the Court entered an order on March 6, 2017 denying the motion to dismiss in its entirety and lifting the stay of discovery

7

imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Dkt. No. 112.

No longer bound by the discovery stay, Lead Plaintiff has wasted no time in advancing this litigation and aggressively pursuing discovery on behalf of the Class. It has served its initial set of document requests and interrogatories upon all Defendants, and it is in the process of responding to Defendants' discovery requests.

## ARGUMENT

### I.     Standard for Class Certification

The Supreme Court has long recognized that securities fraud claims are well-suited for class treatment. *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (predominance of common issues "is a test readily met in certain cases alleging . . . securities fraud"). In securities fraud class actions, the Supreme Court continues to issue decisions favoring certification. *See, e.g.*, *Erica P. John Fund v. Halliburton, Inc.*, 131 S. Ct. 2179, 2186 (2011) ("*Halliburton I*") (vacating appellate court denial of class certification); *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013) (affirming order upholding class certification). Likewise, "[i]t is established law in the Northern District of Illinois and the Seventh Circuit that class certifications are the preferred method of dealing with securities fraud cases." *Roth v. Aon Corp.*, 238 F.R.D. 603, 605 (N.D. Ill. 2006); *see also In re Bank One Sec. Litig./First Chicago S'holder Claims*, No. 00 CV 0767, 2002 WL 989454, at *2 (N.D. Ill. May 14, 2002) ("The Seventh Circuit . . . has liberally construed Rule 23 in shareholder suits."). Courts recognize that there is a "strong public policy favoring class certification in securities fraud litigation." *Weiner v. Quaker Oats Co.*, No. 98 C 3123, 1999 WL 1011381, at *5 (N.D. Ill. Sept. 30, 1999).

To be certified, a proposed class must satisfy the four prerequisites of Rule 23(a) as well as one of the three provisions in Rule 23(b). *See Messner v. Northshore Univ. HealthSystem*,

669 F.3d 802, 811 (7th Cir. 2012). The party seeking certification bears the burden of establishing these elements but need only do so by a preponderance of the evidence. *Id.* While class certification analysis must be "rigorous," *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), the Supreme Court has warned lower courts not to disturb the policy balance struck by Congress in the PSLRA by requiring proof of merits issues:

> Nor did Congress decree that securities-fraud plaintiffs prove each element of their claim before obtaining class certification. Because Congress has homed in on the precise policy concerns raised in Amgen's brief, "[w]e do not think it appropriate for the judiciary to make its own further adjustments by reinterpreting Rule 23 to make likely success on the merits essential to class certification in securities-fraud suits."

*Amgen*, 133 S. Ct. at 1194-95 (quoting *Schleicher v. Wendt*, 618 F.3d 679, 686 (7th Cir. 2010)).

"'[T]he court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits.'" *In re Groupon, Inc. Sec. Litig.*, 2014 WL 5245387, at *2 (N.D. Ill. Sept. 23, 2014) (quoting *Messner*, 669 F.3d at 811).

Instead, on a motion to certify, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather, whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). As discussed below, the Rule 23 requirements are easily satisfied in this case.

## II.     The Proposed Class Meets the Prerequisites of Rule 23(a)

Rule 23(a) requires the moving party to demonstrate that the proposed class satisfies the following four prerequisites:

- the class is so numerous that joinder of all members is impracticable [numerosity];

- there are questions of law or fact common to the class [commonality];

- the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and

- the representative parties will fairly and adequately protect the interests of the class [adequacy].

Fed. R. Civ. P. 23(a). The proposed Class amply meets these requirements.

## A. Numerosity

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While "there is no 'bright line' test for numerosity, a class of forty is generally sufficient[.]" *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002). Numerosity is evidenced by the fact that between 103.9 million to 113.9 million shares were outstanding and freely tradable during the Class Period. Nye Rpt. ¶¶ 24, 56. "In securities fraud class actions relating to publicly owned and nationally listed corporations, 'the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period.'" *Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.*, No. 01 Civ. 11814(LAP), 2004 WL 2997957, at *3 (S.D.N.Y. Dec. 27, 2004) (quoting *Garfinkel v. Memory Metals, Inc.*, 695 F. Supp. 1397, 1401 (D. Conn. 1988)); *see also In re Bank of Am. Corp. Sec., Deriv., & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 138-39 (S.D.N.Y. 2012) (same). Here, the approximately 103 million shares outstanding and tradable during the Class Period is more than 14 times higher than the 7 million traded shares found to establish numerosity in *ACLN*. *See* 2004 WL 2997957, at *3.

## B. Commonality

Rule 23(a) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This commonality requirement "has been characterized as a low hurdle, easily surmounted." *Roth*, 238 F.R.D. at 606 (quotations and citation omitted). It is satisfied by showing "a common nucleus of operative fact," *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998), which is found where "the defendants have engaged in standardized conduct towards

10

members of the proposed class[.]" *id. See also Neil v. Zell*, 275 F.R.D. 256, 260 (N.D. Ill. 2011).

As Judge Easterbrook has explained, common issues are generally present in securities fraud litigations:

> Whether the statements are false is one common question. Whether the falsehoods are intentional (*i.e.*, whether each defendant acted with the required state of mind) is another. Whether the falsehoods affected the stock's price is a third. (If investors already know the truth, false statements won't affect the price.) Whether the magnitude of any effect shows that the false information was "material" is a fourth. There will be some person-specific issues, such as when (and how many shares) a given investor purchased or sold. Timing of each person's transactions, in relation to the timing of the supposedly false statements, determines how much a given investor lost (or gained) as a result of the fraud. But these questions can be resolved mechanically. A computer can sort them out using a database of time and quantity information.

*Schleicher*, 618 F.3d at 681; *see also In re Dynegy Inc. Sec. Litig.*, 226 F.R.D. 263, 276 (S.D. Tex. 2005) (stating that common questions "concerning the presence of false statements and/or omissions of material fact in the registration statement . . . satisfy Rule 23(a)(2)'s commonality requirement"). Consequently, securities fraud claims "regularly proceed[] as a class action." *Schleicher*, 618 F.3d at 681.

Commonality is established here because during the Class Period Defendants made uniform misrepresentations and omissions to all Akorn common stock investors, including the overstatement of Akorn's financial results issued for each quarter of 2014. In particular, the Complaint raises common questions of fact and law that include but are not limited to:

- whether the overstatement of net revenue, earnings, and other figures reported in Akorn's quarterly and FY 2014 financial statements were material;

- whether Defendants' disclosures regarding Akorn's financial results and growth, disclosures regarding the integration of Hi-Tech and VersaPharm, and the Individual Defendants' SOX certifications contained any materially false or misleading statements or omissions;

- whether Defendants knew or recklessly made the misrepresentations and omissions at issue;

11

- whether Defendants' misrepresentations and omissions at issue caused the losses suffered by the Class; and

- whether the Individual Defendants were control persons of Akorn during the Class Period.

*See, e.g.,* ¶ 134. Thus, the "low hurdle" of commonality is easily surmounted in this case.

### C. Typicality

Like commonality, the typicality requirement is "liberally construe[d]" in favor of the movant. *Roth*, 238 F.R.D. at 606. Under Rule 23(a)(3), "the typicality requirement primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 598 (N.D. Ill. 2009); *see also De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (same). This prerequisite is satisfied where a plaintiff alleges that a defendant has "committed the same unlawful acts affecting the entire class." *Bank One*, 2002 WL 989454, at *4. Typicality is closely related to commonality and is usually met where commonality is established. *Id.* Typicality is "determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members[.]" *Makor*, 256 F.R.D. at 598 (quoting *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996)). Thus, when analyzing typicality, "courts focus on the conduct of the defendant and determine whether the putative class representative and the members of the putative class claim similar injuries due to the defendant's alleged actions." *Brieger v. Tellabs, Inc.*, 245 F.R.D. 345, 350 (N.D. Ill. 2007).

Here, the claims and injuries of the proposed class representatives are typical of the claims and injuries of the proposed Class because they arise out of and result from the same unlawful course of conduct by Defendants. ¶¶ 49-169. All suffered damages caused by the same

false and misleading statements that Defendants made during the Class Period. The legal theories upon which the proposed class representatives' claims are premised apply equally to absent Class members, who suffered the same type of harm. Therefore, typicality is satisfied.

### D. Adequacy

Rule 23(a)'s final prerequisite is that the class representative must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is satisfied where: (1) the class representatives do not "have interests antagonistic to those of the class'" and (2) the class representatives are willing and able to vigorously pursue the litigation on behalf of the class, and have retained attorneys that are "qualified, experienced and able to conduct the litigation." *Roth*, 238 F.R.D. at 606-07 (quotations and citation omitted). The focus of the adequacy inquiry is uncovering conflicts of interest between proposed class representatives and the class they seek to represent. *Amchem*, 521 U.S. at 625.

In this case, the proposed class representatives meet this standard. The Court-appointed Lead Plaintiff has sizable financial losses arising from Defendants' misconduct during the Class Period. Its members (with the exception of Mr. Kinsey) are willing to prosecute the claims in this litigation on behalf of absent Class members and to do so jointly. They have been, and will remain, informed of important developments in this litigation.[5] And no Lead Plaintiff member has any interest antagonistic to the Class.

Lead Plaintiff has retained attorneys who are "qualified, experienced and able to conduct the litigation." *See Roth*, 238 F.R.D. at 606-07. Both Glancy and Pomerantz have extensive experience in securities class action lawsuits and has achieved great results for clients in the past.

---

[5] "[I]t is well established that in complex actions such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance on the expertise of counsel is to be expected." *Makor*, 256 F.R.D. at 601 (quoting *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 118 (S.D.N.Y.2008) (collecting cases)); *see also Silverman v. Motorola*, 259 F.R.D. 163, 173 (N.D. Ill. 2009) (same).

*See* Dahlstrom Decl. at internal Exhibits 2 & 3. The experience of these two firms has previously been found sufficient by many other federal courts, and this experience will ensure that the Class receives the best legal representation available.

### III. The Proposed Class Meets the Requirements of Rule 23(b)(3)

Having met each of the four prerequisites of Rule 23(a), Lead Plaintiff must also show that the proposed class satisfies the requirements of one of the provisions of Rule 23(b). Fed. R. Civ. P. 23. Lead Plaintiff seeks certification under Rule 23(b)(3), which requires a finding "that the questions of law or fact common to class members predominate over any questions affecting only individual members [predominance], and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy [superiority]." Fed. R. Civ. P. 23(b)(3). Both requirements are satisfied here.

#### A. Predominance

To determine whether common questions predominate, "courts look to whether there is a common nucleus of operative facts." *Bank One*, 2002 WL 989454, at *7 (citation and quotation omitted). Rule 23(b)(3) "focuses on the relationship between the common and individual issues." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 246 (N.D. Cal. May 6, 2013) (citation omitted). While predominance requires a more rigorous showing than does commonality, it "does not require a plaintiff to show that there are no individual issues." *In re IndyMac*, 286 F.R.D. 226, at 236 (S.D. N. Y. 2012) (citation omitted). Instead, predominance is concerned with "whether the putative named plaintiffs can, through their individualized cases, offer proof on a class-wide basis." *Roth*, 238 F.R.D. at 607.

With respect to Lead Plaintiff's claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5, the elements of falsity, materiality, scienter, and loss causation are subject to class-wide proof and not required to be shown at the class certification stage. *See Amgen*, 133 S. Ct. at

1191 (holding that materiality of misrepresentations and omissions "is a question common to all members of the class"); *Halliburton I*, 131 S. Ct. at 2185 (holding that it was in error to require securities plaintiff "to show loss causation as a condition of obtaining class certification"); *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) (stating that all elements of a Section 10(b) claim, "other than reliance in cases that are not premised on fraud-on-the-market, are subject to class wide proof in securities litigation").

Further, as discussed below, class-wide reliance is properly presumed under both the *Basic* fraud-on-the-market presumption and the *Affiliated Ute* presumption, negating any concern that any individualized questions of reliance might predominate in this action.

### 1.    *Basic* Presumption of Class-Wide Reliance

Lead Plaintiff is entitled to rely on the rebuttable fraud-on-the-market presumption of class-wide reliance adopted by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). The Seventh Circuit has articulated the theory underlying *Basic*:

> When someone makes a false (or true) statement that adds to the supply of available information, that news passes to each investor through the price of the stock. And since all stock trades at the same price at any one time, every investor effectively possesses the same supply of information. The price both transmits the information and causes the loss. This approach, dubbed the fraud-on-the-market doctrine, supplants 'reliance' as an independent element by establishing a more direct method of causation.

*Schleicher*, 618 F.3d at 682. *See also Basic*, 485 U.S. at 241-42 (holding that in an efficient market, "[m]isleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements").

"[T]o invoke the *Basic* presumption, a plaintiff must prove that: (1) the alleged misrepresentations were publicly known; (2) they were material; (3) the stock traded in an efficient market; and (4) the plaintiff traded the [security] between when the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134

S. Ct. 2398, 2413 (2014). First, Defendants' misrepresentations were publicly known because they were made in Akorn's SEC filings, press releases, earnings calls, and investor conferences. Second, although materiality must ultimately be proved at trial to invoke the *Basic* presumption, such "proof is not a prerequisite to class certification." *Amgen*, 133 S. Ct. at 1191. Third, Lead Plaintiff purchased Akorn common stock during the Class Period, prior to the corrective disclosures. And fourth, as shown below, Akorn's common stock traded in an efficient market.

### (a)    Presumption of NASDAQ's Efficiency

NASDAQ, where Akorn stock is traded, is "one of the two largest stock exchanges in the United States, the largest electronic-equity securities trading market in the United States, and one of the largest stock exchanges in the world." *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012). It is such a large, open, and developed market that several courts have concluded that if a stock is listed on NASDAQ, then there is a rebuttable presumption that the stock trades in an efficient market. *E.g.*, *Todd v. STAAR Surgical Co.*, No. CV-14-05263-MWF-RZ, 2017 WL 821662, at *10 (C.D. Cal. Jan. 5, 2017) (stating that "there a presumption that stocks traded on the NASDAQ are efficient"); *Lumen*, 280 F.R.D. at 459 ("It would be remarkable for a court to conclude NASDAQ is not an efficient market—which is why securities traded on NASDAQ are often presumed to be traded on an efficient market.") (quotation and citation omitted).[6]

At the very least, the listing of a stock on NASDAQ weighs strongly in favor of finding market efficiency. *See W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. CV 13-

---

[6] *See also Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 269 (N.D. Cal. 2011) ("[]Plaintiffs made a *prima facie* showing that the fraud-on-the-market presumption of reliance applied because Plaintiffs sufficiently established that Akeena's stock was actively traded on an efficient market-the NASDAQ."); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) (holding that "'at a minimum, there should be a presumption—probably conditional for class determination—that certain markets are developed and efficient for virtually all the securities traded [on NASDAQ]'") (quoting *Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989)); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898, 2006 WL 2161887, at *8 (S.D.N.Y. Aug. 1, 2006) (stating that if a security is listed on NASDAQ, "the market for that security is presumed to be efficient.").

6731, 2016 WL 4138613, at *12 (E.D. Pa. Aug. 4, 2016) (collecting cases); *In re Initial Public Offering Sec. Litig.*, 544 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2008) (stating that "the federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency"); *In re Accredo Health, Inc. Sec. Litig.*, 2006 WL 1716910, at *8 (W.D. Tenn. Apr. 19, 2006) (stating that, "the overwhelming case authority holds that securities listed on the NASDAQ trade in an efficient market").

### (b)    *Cammer* Factors of Market Efficiency

While the Supreme Court has not adopted a specific standard for determining whether a market is efficient enough to apply the *Basic* presumption, many courts have employed the so-called *Cammer* factors, which are:

> (1) whether the stock trades at a high weekly volume; (2) whether securities analysts report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration form S-3, as opposed to Form S-1 or S-2; and (5) whether there are empirical facts showing a causal relationship between unexpected corporate events or public releases and a subsequent response in the stock price.

*Schleicher v. Wendt*, No. 1:02-CV-1332-DFH-TAB, 2009 WL 761157, at *5 (S.D. Ind. Mar. 20, 2009) (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)). As demonstrated more fully in Dr. Nye's expert report on market efficiency, all of these *Cammer* factors, along with three additional factors that have been applied by courts, establish that Akorn's common stock traded in an efficient market throughout the Class Period.

### (i)    Weekly Trading Volume

> [T]he existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market . . . because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.

*Cammer*, 711 F. Supp. at 1286. "[T]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one." *Id.* at 1293. During the Class Period, Akorn's average weekly share trading volume, as a percentage of shares outstanding, was 6.7%—more than 3 times the threshold for a "strong presumption" of market efficiency. Nye Rpt. ¶ 24. Moreover, Akorn's annualized share turnover ratio was 330.7%, more than 5 times higher than the average annualized turnover ratio for all stocks listed on the New York Stock Exchange ("NYSE"). *Id.* at ¶ 25.

### (ii) Analyst Coverage

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor's] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors. . . . In this way the market price of the stock would be bid up or down to reflect the financial information contained in the [auditor's] reports, as interpreted by the securities analysts.

*Cammer*, 711 F. Supp. at 1286. During the Class Period at least 19 securities analysts, many from the most prominent firms on Wall Street, followed Akorn and collectively issued more than 150 reports on the Company. Nye Rpt. ¶ 30. In addition, Akorn received extensive coverage in the media and at investor conferences. *Id.* at ¶ 31.

### (iii) Market Makers and Arbitrage Activity

"The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. Throughout the Class Period, Akorn was actively traded by at least 136 market makers. Nye Rpt. ¶ 36. Further, as Dr. Nye explains, the level of short interest, the degree of institutional ownership, and the tightness of bid/ask spreads for a stock are indicators of arbitrage activity. *Id.* at ¶ 37. During the Class Period, the average short interest for Akorn common stock was 9.81%

18

of the shares outstanding, compared to the 3.25% average short interest of shares outstanding for NYSE-listed stocks. *Id.* at ¶ 39. Over 278 institutional investors held Akorn common stock at the end of each Class Period quarter, with the average bid/ask spread for Akorn common stock much lower than that of a sample of 100 randomly selected NASDAQ stocks. *Id.* at ¶¶ 41, 43.

### (iv)    Form S-3 Eligibility

SEC Form S-3 is a simplified security registration form that allows an issuer of stock to incorporate by reference its prior SEC filings. The explicit rationale for this form "is that information on companies which file on Form S-3 is widely available in the market and therefore need not be disseminated in the prospectus." *Cammer*, 711 F, Supp. at 1284-85; *see also* SEC Release No. 6331, 1981 WL 30765, at *4 (Aug. 6, 1981) ("This form is predicated on the Commission's belief that the market operates efficiently for these companies, *i.e.*, that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place."). Based on Akorn's filing of multiple Forms S-3 before the Class Period, it appears that Akorn was a Form S-3 eligible filer during the Class Period.

### (v)    Price Reaction to New, Material Information

"[S]howing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price . . . is the essence of an efficient market and the foundation for the fraud on the market theory." 71 F. Supp. at 1287. "A direct test of market efficiency is to conduct what is known as an 'event study' to examine whether security prices respond to new material information released to the market. Expert economists commonly use event studies in securities litigation to correlate the disclosure of new material information to security price response." Nye Rpt. ¶ 49.

Dr. Nye performed a standard event study to determine whether Akorn's financial releases during the Class Period caused prompt and measurable reactions in its stock price, after controlling for contemporaneous market and industry effects. *Id.* ¶ 50. On the event dates that new, materially *positive* information about Akorn was disclosed, there was a statistically significant increase in the stock price. *Id.* ¶ 52. On the event dates that new, materially *negative* information about Akorn was disclosed, there was a statistically significant decline in the stock price. *Id.* Thus, Dr. Nye's event study shows that "a strong cause-and-effect relationship existed between the information disclosed on the event dates and resulting stock price movements," supporting the finding that "Akorn's stock price reflected the information disclosed to the market, and promptly responded to material, unexpected news." *Id.* ¶ 53.[7]

### (vi)  Other Factors of Market Efficiency

Courts have deemed a large market capitalization and a large public float (*i.e.*, the percentage of shares outstanding held by the public rather than insiders) as indicators of market efficiency. *See In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 212 (E.D. Pa. 2008); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). Akorn's market capitalization, which ranged between $2.39 billion and $6.37 billion during the Class Period, was near the 90th percentile among the approximately 2,300 companies listed on NASDAQ. Nye Rpt. ¶ 53. In addition, Akorn's public float ranged from 67.9% to 69.7% during the Class Period.

Finally, "[a] security exhibits autocorrelation if the change in price of the security on a given day provides an indication of [*i.e.*, is statistically correlated with] what the change in price

---

[7] Courts have previously certified shareholder class actions relying in part on event studies performed by Dr. Nye. *See, e.g., Thomas v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160-JST, 2016 WL 7406418, at *7 (N.D. Cal. Dec. 22, 2016); *In re Heckmann Corp. Sec. Litig.*, 2013 WL 2456104, at *1 (D. Del. June 6, 2013).

for the security will be on the following day." *DVI*, 249 F.R.D. at 213. Courts have recognized that the absence of autocorrelation indicates market efficiency. *See id.* (explaining that "if new information about a company is incorporated slowly into the price of a security, then the security will exhibit autocorrelation, suggesting an inefficient market"); *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 356 (C.D. Cal. 2015) (holding that low autocorrelation favored a finding of market efficiency). Akorn's common stock did not exhibit statistically significant autocorrelation during the Class Period. Nye Rpt. ¶ 58.

*     *     *     *

Each of the five *Cammer* factors, three additional factors recognized by courts, and its listing on NASDAQ all unambiguously weigh in favor of finding that Akorn's common stock traded in an efficient market throughout the Class Period, thereby supporting the application of the *Basic* presumption of class-wide reliance.

### 2. *Affiliated Ute* Presumption of Class-Wide Reliance

A presumption of class-wide reliance also exists regarding Defendants' omissions. In *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), the Supreme Court held that where a plaintiff alleges "a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153-54. *See also SEC v. Gorsek*, 222 F. Supp. 2d 1099, 1109 (C.D. Ill. 2001) ("[T]he case law in the Seventh Circuit is clear. Reliance is presumed in omission cases under Section 10(b) and Rule 10(b)(5)."); *Nauman v. Abbott Labs.*, No. 04 C 7199, 2007 WL 1052478, at *2 (N.D. Ill. Apr. 3, 2007); *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 106 (S.D.N.Y. 2009); *Cooper v. Pac. Life Ins. Co.*, 229 F.R.D. 245, 259 (S.D. Ga. 2005).

Here, Lead Plaintiff alleges that Defendants made statements—including statements touting Akorn's revenues and growth, the Individual Defendants' SOX certifications, and statements touting Akorn's integration of Hi-Tech and VersaPharm—that were materially misleading because Defendants omitted that had Akorn failed to: (1) timely and adequately take steps to remediate the material weaknesses in its internal controls, particularly with respect to gross to net revenue deductions (¶¶ 128-29, 131, 137, 139, 145, 148, 154); (2) timely integrate Hi-Tech's and VersaPharm's accounting systems, or otherwise inform shareholders that it was not "on track" to do so by the previously-announced deadline (¶¶ 127, 129, 134, 137-39, 147-48); and (3) implement a system to accurately process and account for rebates and chargebacks across its subsidiaries (*id.*). These allegations are sufficient to invoke the *Affiliated Ute* presumption at the class certification stage.

### 3. Calculation of Class-Wide Damages

It is well-settled that individual damages issues do not defeat predominance in securities class actions. *See Schleicher*, 618 F.3d at 685 ("The possibility that individual hearings will be required for some plaintiffs to establish damages does not preclude certification."); *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) (same). Dr. Nye's expert report provides a "general economic framework for quantifying per-share damages on a class-wide basis" in securities actions, ultimately concluding that "[d]amages incurred by purchasers of Akorn common stock during the Class Period can be calculated on a class-wide basis." Nye Rpt. ¶¶ 59, 63. As the Seventh Circuit has recognized, once the class-wide damages are established, each investor's damages calculation "usually can be established mechanically." *Schleicher*, 618 F.3d 679 at 682.

### B. Superiority

The factors pertinent to the second prong of Rule 23(b)(3), superiority, include: (1) "the class members' interests in individually controlling the prosecution or defense of separate

22

actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Here, each of these factors demonstrates that a class action is the superior method for adjudicating the Class's securities claims.

First, Akorn's harmed investors would benefit from class treatment instead of having to litigate separate actions:

> [C]lass actions are often the most fair and practical vehicle for plaintiffs' claims in securities fraud suits because those who have been injured are in a poor position to seek legal redress . . . [B]ecause individual claims might be small in monetary value, they might not be prosecuted on an individual basis due to the costs of litigation.

*Roth*, 238 F.R.D. at 608 (quoting *Brosious v. Children's Place Retail Stores*, 189 F.R.D. 138, 147 (D.N.J. 1999)). Second, Lead Plaintiff is not aware of any other securities fraud actions arising out of Akorn's restatement. Third, in securities actions such as this, "'[j]udicial economy and efficiency' will be promoted by certifying th[e] class, and resolving these matters in one suit." *Id.*; *see also Ingram v. Corporate Receivables, Inc.*, No. 02 C 6608, 2003 WL 21982152, at *5 (N.D. Ill. Aug. 19, 2003) (stating that "interests of judicial economy and avoiding duplicative litigation and potentially inconsistent results underscores the desirability of concentrating the claims in one forum"). This Court is the best forum for adjudicating the Class's securities claims because Akorn maintains its headquarters in this District, and this Court has already decided Defendants' motion to dismiss. Fourth, securities fraud claims are regularly certified and present no unusual manageability issues.

## IV.     Proposed Class Counsel Satisfies Rule 23(g)

Pursuant to Rule 23(g), "[c]lass counsel must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). In appointing class counsel, the Court must consider:

(1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). All of these factors favor appointing Glancy and Pomerantz as Class Counsel.

As set forth in the Dahlstrom Declaration, Glancy and Pomerantz meet each of these prerequisites and will fairly, vigorously, and adequately represent the interests of the Class. The firms have extensive experience prosecuting complex securities class actions on behalf of injured investors, and all of their attorneys involved in this action devote their practices to securities fraud litigation. *See* Dahlstrom Decl., Exs. 2 & 3. In addition, the firms have successfully worked together as co-counsel in several previous cases. Indeed, the firms have already vigorously and zealously been engaged in this action, having conducted an extensive investigation of the claims, developed a detailed plan for the prosecution of the case, defeated Defendants' motion to dismiss, pursuing class certification, and serving discovery requests upon Defendants. Going forward, the firms will devote the resources necessary to promote the interests of the Class, as they have in other securities fraud class actions. Therefore, Glancy and Pomerantz should be appointed as Class Counsel.

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court enter an Order: (1) certifying this action as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the Class defined herein; (2) certifying the Lead Plaintiff members (except for Mr. Kinsey) as Class Representatives; and (3) appointing Glancy and Pomerantz as Class Counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

24

Dated: May 5, 2017                                  Respectfully submitted,

**POMERANTZ LLP**

/s/ *Patrick V. Dahlstrom*

Patrick V. Dahlstrom
Louis C. Ludwig
POMERANTZ LLP
10 South LaSalle Street
Chicago, Illinois 60603
(312) 377-1181
pdahlstrom@pomlaw.com
lcludwig@pomlaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Joshua L. Crowell
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150

*Co-Lead and Proposed Class Counsel*

**LAWRENCE, KAMIN, SAUNDERS &
UHLENHOP, L.L.C.**
John S. Monical
Peter E. Cooper
Mitchell B. Goldberg
300 S. Wacker Drive, Suite 500
Chicago, Illinois 60606
(312) 372-1947

*Liaison Counsel for Plaintiff*

25